## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CRYSTAL DAWN WEIMER,

      Plaintiff,

      v.

COUNTY OF FAYETTE, PENNSYLVANIA,
and OFFICE OF THE FAYETTE COUNTY
DISTRICT ATTORNEY, and
CONNELLSVILLE TOWNSHIP, and
NANCY VERNON, in her official and
individual capacities, and RONALD
HAGGERTY, JR., and THOMAS CESARIO,
and THOMAS PATTON, and BEVERLY
ASHTON, in their individual capacities,

      Defendants.

Case Number:

**COMPLAINT &
JURY DEMAND**

Plaintiff Crystal Dawn Weimer ("Ms. Weimer"), by and through her undersigned

counsel, Blank Rome LLP, hereby alleges as follows:

### INTRODUCTION

1.    Due to the Defendants' deliberate, unlawful and unconstitutional conduct, Ms. Weimer

was wrongfully imprisoned for more than 11 years for the 2001 murder of Curtis Haith

("Mr. Haith").  Throughout her ordeal, Ms. Weimer consistently and steadfastly maintained her

innocence.  On October 1, 2015, Ms. Weimer's wrongful convictions were vacated and she was

granted a new trial.  On June 27, 2016, in recognition of the fact that there was absolutely no

credible evidence tying Ms. Weimer to this murder, all charges against her were dismissed with

prejudice.  Finally, Ms. Weimer was fully exonerated.

1

2.      On April 7, 2006, Ms. Weimer was wrongfully convicted of third-degree murder and conspiracy to commit third-degree murder.  She was sentenced to 15 to 30 years in prison for crimes that she did not commit.

3.      This miscarriage of justice was the direct result of egregious misconduct by the Defendants.  Despite the lack of any credible evidence tying Ms. Weimer to Mr. Haith's murder, the Defendants acted with tunnel vision, focusing their investigation almost solely on Ms. Weimer, to the exclusion of other potential suspects.  Their investigation ignored exculpatory DNA evidence, which corroborated Ms. Weimer's statements and directly contradicted Defendants' alleged version of events.  Lacking any DNA evidence, Defendants coerced multiple false witness statements to implicate Ms. Weimer in the murder.  Even though their investigation revealed evidence that directly contradicted their coerced false witness statements, Defendants nevertheless presented these knowingly false statements as evidence at pre-trial hearings and during trial.  And at trial, the prosecution blatantly lied to the jury on issues that directly impacted the jury's ability to evaluate the credibility of certain key witnesses.

4.      Moreover, Defendants intentionally concealed their misconduct throughout the majority of Ms. Weimer's wrongful incarceration.  Defendants deliberately and knowingly withheld exculpatory portions of their investigative file, only producing certain exculpatory information for the first time in 2014 and 2015, in conjunction with Ms. Weimer's state and federal post-conviction proceedings, and subsequent 2016 pre-trial proceedings.

5.      Indeed, as set forth in detail below, Ms. Weimer's wrongful convictions were the direct result of the unconstitutional and otherwise improper policies, practices, and customs of Fayette County, Pennsylvania, the Fayette County District Attorney's Office and Connellsville

Township, whose policies, practices and customs evidence deliberate indifference and abuse of authority.

6.      Sadly, Ms. Weimer's mistreatment is not an isolated incident.  In 1986, David Munchinski was wrongfully convicted of two counts of first-degree murder and sentenced to two consecutive life sentences without the possibility of parole.  Mr. Munchinski was wrongfully imprisoned for 27 years, until he was fully exonerated by DNA evidence.  By way of further example, the convictions of Mark Breakiron were overturned based in part upon the Fayette County District Attorney's Office's failure to turn over exculpatory evidence.  This unconstitutional conduct demonstrates a pattern and practice of improper behavior that is considered acceptable by the named Defendant entities and their employees.

## JURISDICTION AND VENUE

7.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.  This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

8.      This Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367(a).

9.      Venue is proper in the Western District of Pennsylvania under 28 U.S.C. § 1391(b) in that this is the District in which the claims arose.

## JURY DEMAND

10.     Plaintiff demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the U.S. Constitution and Federal Rule of Civil Procedure 38(b).

**PARTIES**

11.     Plaintiff **CRYSTAL DAWN WEIMER**, at all times relevant to this Complaint, was and is a resident of the Commonwealth of Pennsylvania.  On April 7, 2006, Ms. Weimer was wrongfully convicted of third-degree murder and conspiracy to commit third-degree murder in connection with the murder of Mr. Haith and, as a result, was incarcerated for more than 11 years before she was fully exonerated of all charges.

12.     Defendant **COUNTY OF FAYETTE, PENNSYLVANIA**, at all times relevant to this Complaint, is a county located in the Commonwealth of Pennsylvania.  Upon information and belief, the County of Fayette, Pennsylvania, at all times relevant to this Complaint, was officially responsible for the policies, practices, and customs of the Fayette County District Attorney's Office and the Connellsville Police Department.

13.     Defendant **OFFICE OF THE FAYETTE COUNTY DISTRICT ATTORNEY**, at all times relevant to this Complaint, is located in the Commonwealth of Pennsylvania.  The Office of the Fayette County District Attorney, at all times relevant to this Complaint, was held by Defendant Nancy Vernon, and upon information and belief, was officially responsible for the policies, practices, and customs of the Fayette County District Attorney's Office.

14.     Defendant **CONNELLSVILLE TOWNSHIP**, at all times relevant to this Complaint, is a township located within Fayette County, Pennsylvania.  Upon information and belief, Connellsville Township was officially responsible for the policies, practices, and customs of the Connellsville Police Department, and was the employer of Defendants Thomas Cesario and Ronald Haggerty, Jr. and Thomas Patton.

15.     Defendant **NANCY VERNON**, at all times relevant to this Complaint, was the District Attorney for Fayette County, Pennsylvania, acting under color of law and within the scope of her employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the

4

Fayette County District Attorney's Office. She is sued in her official and individual capacities.

Defendant Vernon participated in investigating Mr. Haith's murder, and was the lead prosecuting

attorney in Ms. Weimer's criminal trial and subsequent wrongful conviction.

16.      Defendant **THOMAS CESARIO**, at all times relevant to this Complaint, was an active

or retired Detective Lieutenant in the Connellsville Police Department acting under color of law

and within the scope of his employment pursuant to the statutes, ordinances, regulations,

policies, customs, and usage of the Connellsville Police Department. He is sued in his individual

capacity. Defendant Cesario was the lead police officer originally assigned to oversee the

investigation of Mr. Haith's murder.

17.      Defendant **RONALD HAGGERTY, JR.**, at all times relevant to this Complaint, was a

Sergeant in the Connellsville Police Department acting under color of law and within the scope

of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage

of the Connellsville Police Department. He is sued in his individual capacity. Defendant

Haggerty was the lead police officer assigned to oversee the investigation of Mr. Haith's murder

following Defendant Cesario's retirement. At all relevant times, Defendant Haggerty was also a

member of the Fayette County Drug Task Force.

18.      Defendant **THOMAS PATTON**, at all times relevant to this Complaint, was a Corporal

in the Connellsville Police Department acting under color of law and within the scope of his

employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the

Connellsville Police Department. He is sued in his individual capacity. Defendant Patton

assisted in the ongoing investigation of Mr. Haith's murder following Ms. Weimer's wrongful

convictions.

19.     Defendant **BEVERLY ASHTON**, at all times relevant to this Complaint, was a Corporal in the Pennsylvania State Police Department, assigned to the Cold Case Unit, acting under color of law and pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the Pennsylvania State Police Department.  She is sued in her individual capacity.  Defendant Ashton assisted in the investigation of Mr. Haith's murder.

20.     At all times relevant to this Complaint, the Defendants named above acted in concert and in conspiracy with one another in order to deprive Ms. Weimer of her constitutionally protected rights.

## FACTUAL ALLEGATIONS

**Mr. Haith Is Brutally Murdered.**

21.     Curtis Haith was murdered in the early morning hours of January 27, 2001.  At approximately 4:50 am, police arrived at the crime scene and found Mr. Haith dead on the sidewalk outside his apartment, brutally beaten and with a gunshot wound to the face.

22.     Police analyzed the crime scene and collected evidence.  A sweatshirt and bandana were found near the body and taken into evidence.  Police were also able to recover approximately two dozen hair samples, which were able to be DNA tested.  The police also gathered blood samples from Mr. Haith and the crime scene, which were able to be DNA tested. Soil samples were also collected from the area surrounding the house.

23.     Police also searched Mr. Haith's apartment.  Inside the apartment, they located a large amount of apparent drug-related evidence, including drug paraphernalia, I.O.U. slips, guns and a pager.  These items were also taken into evidence.

24.     Police also began interviewing Mr. Haith's neighbors and friends, and soon learned that Mr. Haith had attended parties on the evening of January 26th and the early morning hours of

January 27th – just prior to his death.  Police began interviewing people that attended those

parties, including but not limited to Ms. Weimer.

**Ms. Weimer Is Interviewed and DNA Testing Fully Corroborates Ms. Weimer's Alibi.**

25.     The police, including Defendants Haggerty and Cesario, went to Ms. Weimer's house to

interview her on the same day that Mr. Haith was murdered.  Ms. Weimer was sleeping when the

police officers arrived, and was dressed in the same clothes that she had on the night before.  The

officers observed mud and what appeared to be blood on Ms. Weimer's clothes, as well as some

injuries to her face and foot.  In the interest of cooperation, Ms. Weimer voluntarily accompanied

the officers to the police station and readily provided her clothing for forensic testing.

26.     Ms. Weimer told the officers that she was at a party with Mr. Haith and others the prior

night in Uniontown, PA, and that Mr. Haith stayed at the party for about an hour.  When he was

ready to leave, Ms. Weimer, her cousin Doug Giles and her oldest daughter Rose, drove

Mr. Haith to Connellsville, PA, and dropped him off at the Arch Café, which turned out to be the

location of Mr. Haith's second party.  After dropping Mr. Haith off, the group returned to

Uniontown, where Ms. Weimer remained until the police arrived the following morning.

27.     Ms. Weimer's whereabouts were confirmed by multiple persons.  Indeed, Giles,

Ms. Weimer's then-boyfriend Michael Gibson, and Ms. Weimer's sisters, Cynthia and Carla, all

accounted for Ms. Weimer's whereabouts during the time of Mr. Haith's murder.  Ms. Weimer

spent the majority of that evening at a birthday party at her sister Cynthia's house and, after

dropping off Mr. Haith in Connellsville hours prior to his murder, spent the rest of her night at

the housing community where her mother and her sisters all lived.

28.     When questioned about her apparent injuries, Ms. Weimer and Mr. Gibson both

explained that she hurt her toe a few days early while "horseplaying" with each other.  She also

explained that she hurt her eye on the night of Mr. Haith's murder during a fight with

Mr. Gibson.  In that fight, Ms. Weimer bit Mr. Gibson's thumb, which caused the thumb to bleed

on Ms. Weimer's clothing.  In response to the bite, Mr. Gibson hit Ms. Weimer in the eye.

29.     Very significantly, all DNA testing performed at the crime scene and on Ms. Weimer's

clothing fully corroborated Ms. Weimer's statements.  More specifically, DNA testing confirmed

that Mr. Gibson's blood was the only blood on Ms. Weimer's clothing, corroborating their

statements.  DNA testing also determined that: (a) Mr. Haith's blood was not on Ms. Weimer's

clothing; and (b) the hair and blood samples found at the crime scene did not match Ms. Weimer.

Indeed, to the contrary, an unidentified male DNA profile was discovered through DNA testing

of the hair and blood samples from the crime scene.

30.     All DNA testing performed on Ms. Weimer and the crime scene evidence fully supported

that Ms. Weimer was not present at the crime scene, and corroborated Ms. Weimer's statements

to the police.  The DNA evidence also fully supported the accounts of the various individuals

that gave statements as to Ms. Weimer's whereabouts on the night of Mr. Haith's murder.

**Despite Exculpatory DNA Evidence, Police Continue to Focus on Ms. Weimer, Forgoing Other Leads and Suspects.**

31.     Notwithstanding DNA evidence that: (a) corroborated Ms. Weimer's account the night of

Mr. Haith's death; and (b) tied an unidentified person's DNA to the crime scene, investigators

continued to focus their investigation with tunnel vision on Ms. Weimer, to the exclusion of

other leads.

32.     For example, a number of witnesses told police that Mr. Haith had been involved with

drugs, which was certainly backed up by the significant amounts of drug-related evidence found

at his apartment.  Despite the presence of drug-related evidence, no illegal drugs were found at

Mr. Haith's apartment, which could indicate that he may have been killed in connection with a

drug robbery. Defendant Haggerty, a member of the Fayette County Drug Task Force, was

uniquely qualified to analyze and investigate potential drug-related evidence and leads, but there

is no indication in the investigative file that the police investigated whether Mr. Haith's

involvement with drugs might have provided somebody with a motive to kill him.

33.    In addition, while the murder was being investigated, no less than eight (8) persons came

forward to the police and provided evidence as to the actual perpetrators. From those statements,

no less than ten (10) different people were implicated in Mr. Haith's death, all of which were

males. The police were told that Mr. Haith kicked one of the potential perpetrators out of his

home recently. The police were also told that Mr. Haith had prior altercations with one of the

potential perpetrators, which included a gun being fired into the air. Despite this plethora of

potential suspects and motives, the investigation file reveals that little to no follow up was

conducted by law enforcement on these leads.

34.    Instead, police focused their investigatory efforts against Ms. Weimer, stubbornly

convinced that they would be able to concoct and create some version of events that could tie

Ms. Weimer to the crime.

**Defendants Coerce Their First False Story To Implicate Ms. Weimer.**

35.    Nearly two years after Mr. Haith's murder, Thomas Beal emerged as the first "witness"

that the Defendants would attempt to use against Ms. Weimer. In October 2002, Mr. Beal told

police that Ms. Weimer (his former girlfriend) and Mr. Gibson (her boyfriend at the time of the

murder) were the persons that killed Mr. Haith. Mr. Beal said that Ms. Weimer told him that she

and Mr. Gibson beat Mr. Haith and then shot him. Mr. Beal also said that Ms. Weimer told him

that Mr. Haith's blood was on her clothing. Of course, the police already definitively knew –

through DNA testing – that Mr. Haith's blood was not on Ms. Weimer's clothing and that

Ms. Weimer's blood was not at the crime scene.  Ignoring those facts, Defendants deliberately elected to rely upon Mr. Beal's uncorroborated statement.

36.     In November 2002, nearly two years after the murder, the Pennsylvania State Police Cold Case Squad was engaged to assist with the investigation.  Despite the assistance of additional outside resources, the investigation's tunnel-vision focus remained solely on Ms. Weimer.

37.     Upon reviewing autopsy photographs, Defendant Ashton, a Pennsylvania State Police Corporal, noticed an injury on Mr. Haith's hand that purportedly appeared to her to be a bite mark.  Defendant Ashton purported to identify the bite mark only through photographs.  The injury had not been identified as a bite mark by the medical personnel that performed Mr. Haith's autopsy.

38.     Dr. Kimberly Zeremba-Rabatin, a Fayette County dentist, was initially asked to analyze the purported bite mark injury.  After being provided teeth impressions for Ms. Weimer, she concluded that she could not make any positive identification as to which teeth caused the purported bite mark.

39.     Unsatisfied with Dr. Zeremba-Rabatin's conclusions, Defendants continued to pursue the purported bite mark, shopping for an alleged expert witness that would be willing to link the purported bite mark to Ms. Weimer.  Ultimately, Defendants were able to locate such a person – Dr. Gus Karazulas, the Chief Forensic Odontologist for the Connecticut State Police.  Dr. Karazulas reviewed Mr. Beal's false and contradicted statement that Ms. Weimer and Ms. Gibson committed the murder, photographs of the purported bite mark, and Mr. Gibson's and Ms. Weimer's teeth impressions.  Based solely upon that information, Dr. Karazulas opined that the alleged bite mark matched Ms. Weimer.

40.     Later in the investigation, the timing of the purported bite mark was later called into question, as the purported bite mark could have occurred hours or days before Mr. Haith's murder.   In response, Defendants simply asked their hand-picked expert, Dr. Karazulas, to update his opinions to eliminate any timing concerns.   Thereafter, Dr. Karazulas opined that the purported bite mark occurred within 7-10 minutes before Mr. Haith's death.   Upon information and belief, Dr. Karazulas did not review any additional evidence or materials before rendering this additional opinion.

41.     In post-conviction proceedings, however, Dr. Karazulas completely disavowed his trial testimony about the alleged bite mark.   He testified that bite mark evidence was "junk science" and further testified that he could not and would not even conduct a bite mark analysis in Ms. Weimer's case today.

42.     With their alleged bite mark evidence secured, Defendants again spoke to Mr. Beal, only to learn that his fabricated story had substantially changed.   Now, Mr. Beal told police that a black man named Lonnie was also involved in the murder and that Ms. Weimer suffered her toe injury while kicking Mr. Haith.

43.     Defendants were forced to investigate and incorporate Mr. Beal's newly fabricated version of events into their narrative.   Upon further investigation, Defendants discovered that the man that Mr. Beal identified as Lonnie was in jail at the time of Mr. Haith's murder.   Despite this discovery, Defendants nevertheless continued to utilize Mr. Beal as a key part of their investigation into Mr. Haith's murder.

44.     In late August 2003, Conrad Clinton Blair contacted police and told them that Joseph Stenger, a fellow inmate, confessed his involvement in Mr. Haith's murder.   Mr. Blair told police that Mr. Stenger supposedly participated in the murder with Mr. Beal and Ms. Weimer.

45.    Mr. Blair also provided police with a statement purportedly written by Mr. Stenger, which recounted a substantially different version of events from the one that Mr. Blair told to the Defendants.  In the written statement, Mr. Stenger did not state that he was involved in the murder, but instead said that he only heard of Mr. Haith's death after it occurred and that he assisted in disposing of the weapon and other evidence in a pond.

46.    These statements made by three different persons – Beal, Blair and Stenger – are patently inconsistent, and are contradicted by known DNA evidence.  Nevertheless, despite these wildly inaccurate and uncorroborated stories, Defendants deliberately elected to proceed with filing criminal charges against Ms. Weimer.

47.    In January 2004, Ms. Weimer was arrested for Mr. Haith's murder.

48.    At Ms. Weimer's March 2004 preliminary hearing, the Commonwealth called Mr. Beal as its only fact witness against Ms. Weimer, even though Defendants knew that Mr. Beal's statements were contradicted by known evidence, other statements, and even by Mr. Beal himself.  On the stand, Mr. Beal invoked his Fifth Amendment rights and refused to testify, yet Ms. Weimer was still held over for trial.

49.    At Ms. Weimer's subsequent April 2004 hearing, Defendants again called Mr. Beal to testify, presumably in support of their prosecution.  On the stand, Mr. Beal fully recanted the statement he previously made to police in which he had implicated Ms. Weimer in Mr. Haith's death.  Among other things, Beal testified that "the officer there, [Defendant] Haggerty, kind of like coaxed me along on how to do it."  Thereafter, the judge dismissed the charges against Ms. Weimer and released her from prison.

50.    Mr. Beal was the first person to admit – under oath – that the Defendants directly conspired to fabricate false and misleading evidence to implicate Ms. Weimer in Mr. Haith's

murder.  Defendants did not merely rely upon inconsistent and uncorroborated statements throughout their investigation, but they also knowingly conspired to fabricate false statements to bolster their investigation.

**Defendants Coerce Their Second False Story, Again Ignoring Evidence To The Contrary.**

51.     Shockingly, even after Mr. Beal revealed that the Defendants coerced and fabricated false testimony in their zeal to prosecute Ms. Weimer, the Defendants still refused to drop their vendetta against Ms. Weimer.  Instead, they re-focused their efforts, and worked to concoct and fabricate new evidence against Ms. Weimer.  This time, Defendants fabricated false statements from Mr. Stenger, who made several inconsistent statements throughout the course of Defendants' investigation.

52.     In July 2004, Mr. Stenger told law enforcement officials that he would be willing to implicate Ms. Weimer in Mr. Haith's murder in exchange for leniency on his sentencing for unrelated robbery convictions.

53.     Defendants intentionally elected to ignore that Mr. Stenger's new version of events was already contradicted by his own prior written statement, by DNA evidence and by other known facts.  Instead, using Mr. Stenger's statement, Ms. Weimer was again arrested and charged with Mr. Haith's murder.

54.     At Ms. Weimer's October 2004 preliminary hearing, Defendants elicited testimony from Mr. Stenger that was profoundly different from his prior statements to Defendants.  By the time Mr. Stenger testified at Ms. Weimer's preliminary hearing, he claimed to have been present during Mr. Haith's murder, and claimed that Mr. Haith was beaten by two unidentified black men while Ms. Weimer was "screamin'and yelling."  Defendants elicited this testimony despite the fact that Mr. Stenger's first written statement claimed only that he learned about Mr. Haith's murder after the fact, and that his written statement implicated Beal.

55.     Indeed, during the course of Ms. Weimer's ordeal, Mr. Stenger made 15 statements,

either directly or through others.  He also testified 3 times (at his plea hearing, Ms. Weimer's

second preliminary hearing, and Ms. Weimer's trial), receiving a favorable plea deal in exchange

for his cooperation.  Mr. Stenger's story changed each time that he provided a statement until,

during Ms. Weimer's post-conviction proceedings, he finally fully recanted and disavowed all of

his prior stories and unequivocally stated that he has no knowledge of the circumstances

surrounding Mr. Haith's death.

56.     Leading up to Ms. Weimer's trial, Anthony Williams also came forward, providing

evidence that further undermined Mr. Stenger's false testimony.  Mr. Williams alerted

Ms. Weimer's criminal trial counsel that Mr. Stenger admitted that he was going to provide false

trial testimony implicating Ms. Weimer in Mr. Haith's murder.

57.     Learning that Mr. Williams was going to be called as a defense witness at trial, in March

2006, Defendants Haggerty and Ashton visited Mr. Williams in prison.

58.     At that meeting, Defendants Haggerty and Ashton used their positions of authority to

threaten Mr. Williams and force him to provide false testimony that would place Ms. Weimer at

the crime scene.  Mr. Williams refused to provide any false testimony.

**Defendants Cultivate False Jailhouse Informant Testimony Induced By Potential Leniency,
And Fail To Disclose The Requests for Leniency To Ms. Weimer's Defense Counsel.**

59.     Leading up to Ms. Weimer's trial, and in their further efforts to investigate the alleged

facts and circumstances of Mr. Haith's murder, Defendants used their positions of authority to

encourage witnesses to provide false jailhouse confessions.

60.     In late 2004 into 2005, at least two (2) jailhouse informants—Linda Reynolds and Robert

Mackey—came forward for the first time saying that Ms. Weimer allegedly "confessed" some

involvement in Mr. Haith's death to them.  Both Ms. Reynolds and Mr. Mackey sought

consideration in exchange for their testimony.

61.     In his written statement, dated April 15, 2005, Mr. Mackey directly conditions his

testimony against Ms. Weimer on the willingness of the Defendants to make a deal.  Specifically,

Mackey writes "If your willing to make a deal … I would like to see about getting out on early

parole.  Also I would like someone to talk to Tropper Curry on my wife, Joyce Mackey, whos

case is comeing up May 26th at Kulas.  If I was able to get out early it would also benefit Trooper

Gar[] who I made a deal with to help him on some stuff."

62.     By his own admission, Mr. Mackey's testimony is being offered in exchange for a deal to

help himself and his wife with pending charges and the length of potential jail sentences.

Mr. Mackey's true motives clearly detract from his credibility and trustworthiness, and seriously

undermine the eventual testimony that he provided against Ms. Weimer.

63.     Ms. Reynolds also conditioned her testimony against Ms. Weimer on the willingness of

the Defendants to make a deal.  Indeed, Reynolds wrote two letters directly to Defendant Vernon

during the course of Defendants' investigation, seeking to help herself in exchange for testimony

against Ms. Weimer.  Specifically, on November 29, 2004, Reynolds wrote:  "Nancy, Can you

help me?  Are you able to talk to Judge Solomen and explain to him I'd been to see you.  I was

there 5 months before the charges – surely you can see that I was trying to get the mess

straightened up the right way and I wasn't trying to fraud anyone … I do have something that I

can help you with, if you want.  I'm hoping you can use another witness on Crystal Weimer…"

64.     Further, in a second letter dated June 7, 2005, Ms. Reynolds again directly wrote to

Defendant Vernon, offering testimony against Ms. Weimer for leniency.  Specifically, Reynolds

wrote "My reason for writing is to ask if there is anyway your office can help me.  On April 18,

2005, 2 Fay. Co. SP Homicide Detectives interviewed me here. They indicated my information involving Debra Payne and Crystal Weimer were very helpful to the cases. I asked if they'd help me with House Arrest for the duration of my minimum sentence … I realize this may be viewed as an unusual request, but I also feel a homicide trial the magnitude of, especially, Crystal's should normally take a higher stand then theft by deception [Reynold's convicted crime] … I'm praying for the opportunity to prove myself and help the Commonwealth in these 2 cases. I feel you'll help if you legally can."

65.     By her own admission, Ms. Reynolds' testimony is being offered in exchange for a deal to help herself with the length of her jail sentence. Ms. Reynolds' true motives clearly detract from her credibility and trustworthiness, and seriously undermine the eventual testimony that she provided against Ms. Weimer.

66.     Prior to Ms. Weimer's trial, the letters written by Mr. Mackey and Ms. Reynolds were not provided in discovery to Ms. Weimer's defense counsel. Indeed, the November 29, 2004 letter was first produced by the District Attorney's Office during post-conviction discovery in 2015. The June 7, 2005 letter was provided directly by the Connellsville Police Department from their files, and it was mailed on June 22, 2016, mere days before Ms. Weimer's pre-trial hearing after being released from prison.

**Defendant Vernon Suborns Perjury and Blatantly Lies to the Jury Regarding Jailhouse Informants' Testimony.**

67.     Not only did the Commonwealth fail to disclose the letters written by Mr. Mackey and Ms. Reynolds, offering testimony in exchange for leniency, Defendant Vernon knowingly elicited perjury, and then failed to correct false testimony, by having Mackey and Reynolds testify that they sought nothing in exchange for their testimony. Just as egregiously, Defendant Vernon then blatantly lied to the jury when she told them that the fact that Mr. Mackey and

Ms. Reynolds asked for nothing in exchange for their testimony should underscore the credibility of their testimony.

68.     Defendant Vernon deliberately elicited testimony intended to mislead the jury regarding Mr. Mackey's motivation for providing testimony. Specifically, the following testimony was elicited: "Q. Why is it that you contacted the police? A. Because I didn't think it was right, what happened. Q. Were you provided any deals by the Commonwealth, any promises, any plea bargains, any consideration whatsoever for your testimony? A. Not for me, no."

69.     Mr. Mackey then went on to provide completely unsubstantiated evidence, including false testimony that Ms. Weimer was allegedly dating Mr. Haith in 2003, which was of course impossible because Mr. Haith was murdered in 2001.

70.     Defendant Vernon also deliberately elicited testimony intended to mislead the jury regarding Ms. Reynolds' motivation for providing testimony. Specifically, the following testimony was elicited: "Q. Did you contact the authorities to tell them about this conversation? A. Yes. Q. Why did you do that? A. Because someone died and it wasn't – someone died. Q. Were any promises, offers, leniency, deals, anything offered to you in exchange for your testimony? A. No. Q. You don't expect anything from your testimony; is that correct? A. That's correct."

71.     By the time that Ms. Reynolds provided this testimony, she had already been released from prison and was serving the remainder of her time for theft by deception at a halfway house.

72.     In closing arguments, Defendant Vernon relied upon this deliberately misleading testimony and argued that the jurors should be more willing to believe Mackey and Reynolds than those witnesses called by the defense. Specifically, Defendant Vernon told the jury that: "Then we come down to the testimony of Reynolds, Harris and Mackey … And, you know, there

are some good people left in this world.  And there are some people that once somebody tells

them something, particularly about somebody that died, that they can live with that for awhile,

and then say, 'I need to tell someone.'  These aren't the Anthony Williams' that want to deal and

that I'm going to be happy if I get them out of prison for something or try to get him time served

toward the sentence.  These are people that have asked nothing of the Commonwealth.  What

possible motive would they have to come forward?"

73.     Defendant Vernon's statements that Mr. Mackey and Ms. Reynolds did not "want to

deal" and that they "asked nothing of the Commonwealth" are deliberate and blatant lies to the

jury.  Those statements are plainly contradicted by Mackey's and Reynolds' letters, some of

which were addressed directly to Defendant Vernon.  These blatant falsehoods could not be

rebutted or challenged because Defendant Vernon deliberately withheld the exculpatory letters

from Ms. Weimer's criminal trial lawyers.

**After Ms. Weimer's Wrongful Conviction, Ms. Weimer's Appeal and Post-Conviction
Hearings Reveal Additional Misconduct.**

74.     In late 2014 and early 2015, the Commonwealth's already weak case against Ms. Weimer

crumbled.

75.     Mr. Stenger completely recanted his trial testimony.  In an interview with Ms. Weimer's

federal habeas investigator, Mr. Stenger admitted that he never saw Ms. Weimer on the night of

Mr. Haith's murder and he has no knowledge that she was involved in the crime.  Mr. Stenger

further admitted that law enforcement, including Defendant Haggerty, walked him through his

eventual "story" – directly provided evidence and details as to how and where things happened –

to ensure that Mr. Stenger's details matched the actual crime scene.

76.     At one point, Defendant Haggerty asked Mr. Stenger to take him to Mr. Haith's

residence, but he could not do so because he did not know where Mr. Haith lived.  Consequently,

Defendant Haggerty just drove Mr. Stenger to Mr. Haith's residence, prompting purported driving directions from Mr. Stenger as Defendant Haggerty himself was making the turns.

77.     Mr. Stenger reiterated his recantation to Defendant Patton, a Connellsville Police Officer, on December 12, 2015.  By 2015, Defendant Haggerty was no longer with the Connellsville Police Department.  Officer Patton interviewed Mr. Stenger, without his legal counsel present, while Mr. Stenger was still incarcerated.  In that interview, Mr. Stenger again admitted that "he was coerced by police into confessing and implicated Crystal Weimer."

78.     In all, Stenger told 15 stories regarding Mr. Haith's murder, either directly to law enforcement or to others, from 2003 through 2014.  In each version his story shifted, starting from his claim to Mr. Blair that he gave Mr. Beal a gun and Mr. Beal and Ms. Weimer killed Haith, to his claim that he was at scene but did not participate, to his claim that he shot Mr. Haith, to his now total recantation.  One such videotaped "confession", shows that Mr. Stenger is receiving details about the evidence from Defendants Haggerty and Ashton, who are in the room, but not visible on the video.

79.     Despite the scores of inaccuracies in his statements, which were revealed during the Defendants' investigation, the Defendants called him and elicited false testimony 3 different times, in their unfettered zeal to convict Ms. Weimer regardless of the actual evidence.

80.     Further, Ms. Weimer's Post-Conviction Relief legal counsel, after requesting the Defendants' entire investigatory file, were able to discover, in Defendant Vernon's file, some of the letters by Mackey and Reynolds specifically asking for deals in exchange for their cooperation.  A remaining letter from Reynolds was only discovered when, after multiple discovery requests and court conferences, Defendants produced documents from the Connellsville Police Department's file during Ms. Weimer's 2016 pre-trial proceedings.  These

letters directly revealed the intentionally misleading testimony elicited at trial, as well as Defendant Vernon's blatant lie to the jury in her closing arguments.

81.     The prosecution's hand-picked alleged bite mark evidence expert, Dr. Karazulas, completely disavowed his trial testimony about the purported bite mark.  Indeed, Dr. Karazulas testified that bite mark evidence is "junk science."

82.     Dr. Charles Wetli, a forensic pathologist who reviewed the autopsy report, autopsy photographs, and photographs of the injuries to Ms. Weimer's toe taken by police on January 27, 2001, also concluded that Ms. Weimer's toe injury was consistent with Ms. Weimer's and Mr. Gibson's account that Ms. Weimer's toe was injured when Gibson pulled it while they were "horseplaying" a few days before Mr. Haith's death.

83.     The crumbling of the case against Ms. Weimer culminated on Monday, June 27, 2016. By that date, Judge Daniel Howsare (Senior Judge, Bedford County) had been assigned to Ms. Weimer's case because the Court of Common Pleas Judges from Fayette County were conflicted out of the case as a result of the fact that Defendant Vernon was by then a sitting Court of Common Pleas Judge in Fayette County.  On that date, after a non-Fayette County Judge heard the facts and circumstances surrounding Ms. Weimer's wrongful conviction, the charges against her were dropped with prejudice, and Ms. Weimer was fully exonerated.

**Ms. Weimer's Wrongful Conviction Is Not An Isolated Instance.**

84.     The Defendants' deliberate and willful actions taken against Ms. Weimer are not isolated events, but rather demonstrate ongoing policies, practices, or customs of unconstitutional misconduct in homicide investigations, and in particular, using coercive techniques in interviews and interrogations to induce false confessions; withholding exculpatory evidence; and fabricating

incriminating statements from witnesses, suspects, and arrestees by feeding details about the

crime that the police knew (or believed to be true) to those witnesses, suspects, and arrestees.

85.     Various cases demonstrate that this misconduct was pervasive within Fayette County law

enforcement agencies at the time of Ms. Weimer's investigation.   Upon information and belief,

the misconduct described herein was committed with the knowledge of Defendants' supervisors,

or was allowed to occur because of their deliberate indifference to this misconduct.

86.     These unconstitutional acts and practices were used time and again during the

investigation of Mr. Haith's murder, which resulted in Ms. Weimer's wrongful conviction.

87.     The same acts and practices were also perpetrated by the same Fayette County District

Attorney's Office against Mr. Munchinski, who was wrongfully convicted and served 27 years in

prison before being fully exonerated. *See Munchinski v. Solomon, in his Official Capacity as*

*District Attorney of Fayette County, Pennsylvania and in his Individual Capacity, et al.*, Civil

Action No. 2:13-cv-1280 (DSC), W.D Pa.  The same acts and practices were also perpetrated by

the same Fayette County District Attorney's Office against Mr. Breakiron, whose convictions

were overturned because exculpatory evidence was withheld.  *See Breakiron v. Horn, et al*., 642

F.3d 126 (3d Cir. 2011).

### DAMAGES

88.     The unlawful, intentional, willful, deliberately indifferent, and reckless acts and

omissions of the Defendants caused Ms. Weimer to be improperly arrested and imprisoned,

unfairly tried, wrongfully convicted, and forced to serve over 11 years in prison for a murder that

she did not commit.

89.     As a direct result of Defendants' conduct and omissions, Ms. Weimer sustained injuries

and damages, including loss of her freedom for more than 11 years, pain and suffering, mental

anguish, emotional distress, indignities, degradation, permanent loss of natural psychological

development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

90.      As a direct result of Defendants' conduct and omissions, Ms. Weimer was deprived of her familial relationships, including with her children, Rose, Miranda and Bridgett, who were only 10, 7 and 4 years old respectively, when Ms. Weimer was incarcerated, as well as her parents, four sisters, and two grandsons who were born while she was incarcerated.

91.      As a direct result of Defendants' conduct and omissions, Ms. Weimer sustained economic injuries and damages, including loss of income and loss of career opportunities.

92.      As a direct result of Defendants' conduct and omissions, Ms. Weimer sustained physical injuries and damages, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care.

## CAUSES OF ACTION

### COUNT I:  42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments

93.      Plaintiff incorporates by reference all of the foregoing paragraphs.

94.      The individual Defendants, acting individually and in concert with malice and knowing that their investigation revealed that probable cause did not exist to prosecute Ms. Weimer, intentionally caused Ms. Weimer to be arrested, charged, and prosecuted for those crimes, thereby violating Ms. Weimer's clearly established right, under the Fourth and Fourteenth Amendments of the U.S. Constitution, to be free of prosecution absent probable cause.

22

95.     The individual Defendants, acting individually and in concert, fabricated evidence and intentionally withheld and misrepresented exculpatory evidence, all of which resulted in an arrest and conviction without probable cause.

96.     The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Ms. Weimer's clearly established constitutional rights.

97.     The acts and omissions by the individual Defendants described in the preceding paragraphs were the direct and proximate cause of Ms. Weimer's injuries because these Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of Ms. Weimer.

**COUNT II:  42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation**

98.     Plaintiff incorporates by reference all of the foregoing paragraphs.

99.     The individual Defendants, acting individually and in concert, and within the scope of their investigation of Mr. Haith's murder, deprived Ms. Weimer of her clearly established constitutional right to due process of law and to a fair trial by fabricating evidence and deliberately using coercion and/or suggestion to obtain false witness statements, including the statements of Mr. Beal, Mr. Stenger, Mr. Mackey and Ms. Reynolds.

100.    The individual Defendants deprived Ms. Weimer of her right to a fair trial by withholding material exculpatory and impeachment evidence from prosecutors and defense, including without limitation, information regarding the true circumstances of the testimony provided by Beal, Stenger, Mackey and Reynolds — that these witnesses knew nothing about the murders and had no real information implicating Ms. Weimer.

101.   The individual Defendants deprived Ms. Weimer of her right to a fair trial by deliberately failing to conduct a constitutionally adequate investigation, including without limitation, by failing to pursue information on other leads that may have led to the discovery of the true murderer.

102.   The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Ms. Weimer's clearly established constitutional rights.

103.   Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Ms. Weimer's injuries.  Defendants knew, or should have known, that their conduct would result in Ms. Weimer's wrongful arrest, prosecution, conviction, and incarceration.

### COUNT III:  42 U.S.C. § 1983 Civil Rights Conspiracy

104.   Plaintiff incorporates by reference all of the foregoing paragraphs.

105.   The individual Defendants, acting within the scope of their employment and under color of state law, acted in concert in order to deprive Ms. Weimer of her clearly established Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, self-incrimination, and to a fair trial.

106.   In furtherance of the conspiracy, the Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

   a.   Suggesting, coercing, and/or fabricating evidence in the form of false witness statements;

   b.   Intentionally or with deliberate indifference failing to comply with their duty to disclose *Brady* and impeachment material during the pendency of the case;

    c.  Wrongfully prosecuting Ms. Weimer while knowing that they lacked probable cause; and

    d.  Committing and inducing perjury during hearings and trials.

107.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Ms. Weimer's injuries.  Defendants knew, or should have known, that their conduct would result in Ms. Weimer's wrongful arrest, prosecution, conviction, and incarceration.

**COUNT IV:  42 U.S.C. § 1983 Failure to Intervene**

108.    Plaintiff incorporates by reference all of the foregoing paragraphs.

109.    By their conduct and under color of state law, the individual Defendants, acting within the scope of their employment, had opportunities to intervene on behalf of Ms. Weimer to prevent her false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so.

110.    These Defendants' failures to intervene violated Ms. Weimer's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments.  No reasonable law enforcement officer or prosecuting attorney would have believed that failing to intervene to prevent these Defendants from coercing and fabricating evidence, withholding material exculpatory and/or impeachment evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Ms. Weimer to be arrested and prosecuted without probable cause, were lawful.

111.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Ms. Weimer's injuries.  Defendants knew, or should have known, that

25

their conduct would result in Ms. Weimer's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT V:  42 U.S.C. § 1983 Supervisory Liability Claim

112.    Plaintiff incorporates by reference all of the foregoing paragraphs.

113.    The individual Defendants acted with impunity in an environment in which they were not adequately trained, supervised, or disciplined by the Fayette County, the Fayette County District Attorney's Office and Connellsville Township, both in this case and as a matter of practice and custom.

114.    Defendant Vernon acted recklessly and with deliberate indifference to Ms. Weimer's constitutional rights during her investigation and prosecution of Mr. Haith's murder, eliciting false witness testimony, failing to disclose critical evidence regarding witness credibility, and deliberately lying to the jury regarding the alleged motivation of certain witnesses, all of which deprived Ms. Weimer of her clearly established constitutional rights, including her rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, self-incrimination, and to a fair trial.

115.    Defendant Vernon was the Fayette County District Attorney and the lead prosecuting attorney in Ms. Weimer's trial, and directly supervised the investigative and prosecutorial acts taken by the Fayette County District Attorney's Office.

116.    Defendant Vernon's acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Ms. Weimer's injuries.

117.    Defendant Haggerty acted recklessly and with deliberate indifference to Ms. Weimer's constitutional rights by coercing false witness testimony, and ignoring other contradictory evidence, to deprive Ms. Weimer of her clearly established constitutional rights, including her

rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, self-incrimination, and to a fair trial.

118.    Defendant Haggerty was a lead investigator in Mr. Haith's murder, and directly supervised the investigative acts taken by the Connellsville Police Department.

119.    Defendant Haggerty's acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Ms. Weimer's injuries. Defendant Haggerty knew, or should have known, that his conduct would result in Ms. Weimer's wrongful arrest, prosecution, conviction, and incarceration.

120.    Defendant Cesario acted recklessly and with deliberate indifference to Ms. Weimer's constitutional rights by coercing false witness testimony, and ignoring other contradictory evidence, to deprive Ms. Weimer of her clearly established constitutional rights, including her rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, self-incrimination, and to a fair trial.

121.    Defendant Cesarior was a lead investigator in Mr. Haith's murder, and directly supervised the investigative acts taken by the Connellsville Police Department.

122.    Defendant Cesario's acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Ms. Weimer's injuries. Defendant Cesario knew, or should have known, that his conduct would result in Ms. Weimer's wrongful arrest, prosecution, conviction, and incarceration.

123.    Defendant Patton acted recklessly and with deliberate indifference to Ms. Weimer's constitutional rights by coercing false witness testimony, and ignoring other contradictory

evidence, to deprive Ms. Weimer of her clearly established constitutional rights, including her rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, self-incrimination, and to a fair trial.

124.   Defendant Patton's acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Ms. Weimer's injuries.  Defendant Patton knew, or should have known, that his conduct would result in Ms. Weimer's wrongful arrest, prosecution, conviction, and incarceration.

125.   Defendant Ashton acted recklessly and with deliberate indifference to Ms. Weimer's constitutional rights by coercing false witness testimony, and ignoring other contradictory evidence, to deprive Ms. Weimer of her clearly established constitutional rights, including her rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, self-incrimination, and to a fair trial.

126.   Defendant Ashton's acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Ms. Weimer's injuries.  Defendant Ashton knew, or should have known, that her conduct would result in Ms. Weimer's wrongful arrest, prosecution, conviction, and incarceration.

### COUNT VIII:  Malicious Prosecution under Pennsylvania state law

127.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

128.   The Defendants investigated, initiated and participated in proceedings against Ms. Weimer, without probable cause, with malice or specific intent to injure, and the proceedings ultimately terminated in Ms. Weimer's favor, when she was fully exonerated.

129.    As a result of this malicious prosecution, Ms. Weimer sustained the injuries and damages set forth above.

**WHEREFORE**, Plaintiff Crystal Dawn Weimer prays as follows:

A.  That the Court award compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

B.  That the Court award punitive damages to Plaintiff, and against all individual Defendants in their individual capacity, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

C.  For a trial by jury;

D.  For pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E.  For any and all other relief to which Plaintiff may be entitled.


**JURY TRIAL DEMANDED.**


/s/ Joseph E. Culleiton
Joseph E. Culleiton
Pa. ID No. 82823
Blank Rome, LLP
501 Grant Street
Suite 850
Pittsburgh, PA  15219

Counsel for Plaintiff Crystal Dawn Weimer

## VERIFICATION

I, Crystal Dawn Weimer, hereby verify that the statements and allegations made in the foregoing Complaint are true and correct to the best of my knowledge, information and belief.  I make this Verification subject to the penalties of 18 P.S.A. § 4914, related to unsworn falsifications to authorities.


September 28, 2017

Crystal Dawn Weimer