## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CRYSTAL DAWN WEIMER,      )
                             )
    Plaintiff              )
           vs.         )    **Civil No. 17-1265**
                             )    **Chief Magistrate Judge Maureen P. Kelly**
COUNTY OF FAYETTE,       )
PENNSYLVANIA, OFFICE OF THE )
FAYETTE COUNTY DISTRICT   )
ATTORNEY, CITY OF         )
CONNELLSVILLE, NANCY VERNON, )    **Re: ECF No. 52**
in her Official and Individual capacities, )
and RONALD HAGGERTY, JR.,   )
THOMAS CESARIO, THOMAS   )
PATTON, and BEVERLY ASHTON, in )
their individual capacities,       )
                             )
    Defendants.          )
                             )

## OPINION

**KELLY, Chief Magistrate Judge**

Pending before the Court is the Rule 12(b)(6) Motion to Dismiss filed by Defendant

Beverly Ashton ("Ashton"). ECF No. 52. Ashton moves to dismiss with prejudice all claims

filed against her by the plaintiff, Crystal Dawn Weimer ("Plaintiff" or "Weimer").

On April 7, 2006, Weimer was wrongfully convicted of third-degree murder and

conspiracy to commit third-degree murder in connection with the murder of Curtis Haith

("Haith"). ECF No. 47 at ¶ 11. Haith had been murdered outside of his apartment, brutally

beaten and shot in the face. Id. ¶ 21. As a result of this wrongful conviction, Weimer was

incarcerated for more than eleven years before she was fully exonerated of all charges. Id. ¶ 11.

The individually named defendants in this matter are: (1) Nancy Vernon ("Vernon"), during the

relevant time period the District Attorney for Fayette County; (2) Thomas Cesario ("Cesario"),

the lead investigator of the Haith murder for the Connellsville Police Department until his retirement in 2002; (3) Ronald Haggerty ("Haggerty"), a sergeant in the Connellsville Police Department who took over as lead investigator of Haith's murder once Cesario retired; (4) Thomas Patton ("Patton"), a corporal in the Connellsville Police Department who led the investigation of Haith's murder after Weimer's convictions were vacated in 2015; and (5) Ashton, a corporal in the Pennsylvania State Police ("PSP") Cold Case Unit who was the lead officer for the state police's investigation of Haith murder that led to Weimer's conviction. Id. ¶¶ 15-19.

## I. PROCEDURAL BACKGROUND

Weimer filed her original Complaint against the defendants, County of Fayette, Pennsylvania ("Fayette County"), Office of the Fayette County District Attorney, Connellsville Township,[1] City of Connellsville ("Connellsville"), Vernon, in her official and individual capacities, and Haggerty, Cesario, Patton, and Ashton in their individual capacities, on September 28, 2017. ECF No. 1. The defendants filed motions to dismiss the original complaint. ECF Nos. 23, 29, 32, and 35. Weimer filed a Motion for Leave to File an Amended Complaint. ECF No. 45. The Court granted the Motion for Leave to File an Amended Complaint. ECF No. 46. On January 30, 2018, Weimer filed her Amended Complaint. ECF No. 47. Ashton filed a Motion to Dismiss the Amended Complaint and supporting brief. ECF Nos. 52-53. Plaintiff filed a brief in opposition to Ashton's Motion to Dismiss. ECF No. 63. Ashton's Motion to Dismiss Plaintiff's amended complaint is ripe for review.[2]

---

[1] Connellsville Township was terminated as a party in this action on January 30, 2018.

[2] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties voluntarily consented to having a United States Magistrate Judge conduct proceedings in this case, including the entry of a final judgment. ECF Nos. 21, 22, 27, 28, and 38.

## II.  STANDARD OF REVIEW

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) must be viewed in the light most favorable to the plaintiff and all the well-pleaded allegations of the complaint must be accepted as true.  Erickson v. Pardus, 551 U.S. 89, 93-94 (2007). A complaint must be dismissed pursuant to Rule 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (rejecting the traditional 12(b)(6) standard set forth in Conley v. Gibson, 355 U.S. 41 (1957)). See also Ashcroft v. Iqbal, 556 U.S. 662 (2009) (specifically applying Twombly analysis beyond the context of the Sherman Act).

A Court need not accept inferences drawn by a plaintiff if they are unsupported by the facts as set forth in the complaint. See California Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004) (citing Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)). Nor must the Court accept legal conclusions set forth as factual allegations. Twombly, 550 U.S. at 555 (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). See also McTernan v. City of York, Penn., 577 F.3d 521, 531 (3d Cir. 2009) ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). A plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 556 (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004)). Although the United States Supreme Court does "not require heightened fact pleading of specifics, [the Court does require] enough facts to state a claim to relief that is plausible on its face." Id. at 570.

In other words, at the motion to dismiss stage, a plaintiff is "required to make a 'showing' rather than a blanket assertion of an entitlement to relief." Smith v. Sullivan, 2008 WL 482469,

at *1 (D. Del. Feb. 19, 2008) (quoting Phillips v. Cty. of Allegheny, 515 F.3d 224, 231 (3d Cir.

2008)). "This 'does not impose a probability requirement at the pleading stage,' but instead

'simply calls for enough facts to raise a reasonable expectation that discovery will reveal

evidence of the necessary element." Phillips, 515 F.3d at 234 (quoting Twombly, 550 U.S. at 556

n. 3).

The United States Court of Appeals for the Third Circuit expounded on the

Twombly/Iqbal line of cases:

> To determine the sufficiency of a complaint under Twombly and Iqbal, we must
> take the following three steps:
>
> First, the court must 'tak[e] note of the elements a plaintiff must plead to
> state a claim.' Second, the court should identify allegations that, 'because
> they are no more than conclusions, are not entitled to the assumption of
> truth.' Finally, 'where there are well-pleaded factual allegations, a court
> should assume their veracity and then determine whether they plausibly
> give rise to an entitlement for relief.'

Burch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) (quoting Santiago v.

Warminster Tp., 629 F.3d 121, 130 (3d Cir. 2010)).

"The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to

resolve disputed facts or decide the merits of the case." Tracinda Corp. v. DaimlerChrysler AG,

197 F.Supp.2d 42, 53 (D. Del. 2002) (citing Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir.

1993)). Indeed, the Supreme Court has held that a complaint is properly dismissed under Rule

12(b) where it does not allege "enough facts to state a claim to relief that is plausible on its face,"

Twombly, 550 U.S. at 570, or where the factual content does not allow the court "to draw the

reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at

678. The question is not whether the plaintiff will prevail in the end but, rather, whether the

plaintiff is entitled to offer evidence in support of his or her claims. Swope v. City of Pittsburgh,

90 F.Supp.3d 400, 405 (W.D. Pa. 2015) (citing <u>Oatway v. American Intern. Group, Inc.</u>, 325 F.3d 184, 187 (3d Cir. 2003)).

## III.  FACTUAL ALLEGATIONS

In her Amended Complaint, Weimer alleges the following conduct relevant to Ashton's Rule 12(b)(6) Motion to Dismiss.

Curtis Haith was murdered in the early morning hours on January 27, 2001, outside of his apartment. ECF No. 47 ¶ 21).  He was beaten and shot in the face. <u>Id.</u> Connellsville police learned that Haith had been at two parties the evening of January 26, 2001, and morning of January 27, 2001, one in Uniontown and one in Connellsville. <u>Id.</u> ¶ 24. Weimer had attended the first party, in Uniontown, and had been in the car that drove Haith to the second party, in Connellsville. <u>Id.</u> ¶ 26. Along with interviewing other party goers, Connellsville police officers and co-defendants Cesario and Haggerty interviewed Weimer at her house the same day Haith was murdered. <u>Id.</u> ¶ 25.

When Cesario and Haggerty arrived at Weimer's house, she had been sleeping and was dressed in the same clothes she had worn the night before. <u>Id.</u> They observed what appeared to be mud and blood on Weimer's clothes. <u>Id.</u> Weimer also had injuries to her face and foot. <u>Id.</u>

In light of the mud and blood on her clothes and her injuries, the police, including Cesario and Haggerty, asked Weimer to come with them down to the Connellsville Police Department. <u>Id.</u> Weimer voluntarily accompanied the officers to the police station and readily provided her clothing for forensic testing. <u>Id.</u>  At the police station, Weimer told the police she had been at a party with Haith and others in Uniontown, that she, her cousin, Doug Giles ("Giles"), and her minor daughter, Rose, had driven Haith from Uniontown to the Arch Cafe, a bar in Connellsville, left him there, and then returned to Uniontown where she spent the rest of

the night at the housing community where her mother and sisters resided. Id. ¶¶ 26-27. Weimer's location in Uniontown for the rest of the evening after dropping off Haith was corroborated by multiple witnesses. Id. ¶ 27.

In response to questioning about her injuries, Weimer explained to the police, including Cesario and Haggerty, that her foot injury had been caused by horseplay with Michael Gibson ("Gibson"), Weimer's then boyfriend, a few days before, and that the blood on her clothes and injury to her eye had been caused by a fight with Gibson the prior evening (i.e., on January 26, 2001), during which she had bit his thumb, causing Gibson to bleed on her clothing and strike her in the eye. Id. ¶ 28.

DNA testing of items collected from the crime scene as well as from Weimer's clothing subsequently showed that the blood on Weimer's clothing was Gibson's blood, Haith's blood was not on Weimer's clothing, and the hair and blood samples found at the scene of Haith's murder did not belong to Weimer, but rather, to an unidentified male. Id. ¶ 29. Thus, all DNA testing done relative to Haith's murder supported the conclusion that Weimer was not present at the crime scene, corroborated her statements to the police, and supported the accounts of the other individuals who stated to the Connellsville police that Weimer had been in Uniontown, and not in Connellsville, the night of the murder. Id. ¶ 30.

Even though the DNA evidence fully corroborated Weimer's account of the night of Haith's death and tied an unidentified male's DNA to the crime scene, investigators continued to focus their investigation with tunnel vision on Weimer, to the exclusion of other leads. Id. ¶ 31.

In October 2002, Thomas Beal ("Beal") came forward and told the Connellsville police that Weimer, who was Beal's former girlfriend, and Gibson, killed Haith, and that Haith's blood was on Weimer's clothing. Id. ¶ 35. The statement about Haith's blood being on Weimer's

clothes was not, and could not be true; the police already definitively knew, through DNA testing, that Haith's blood was not on Weimer's clothing and that Weimer's blood was not at the crime scene. Id. Knowingly and willfully ignoring those facts, the defendants deliberately elected to rely upon Beal's uncorroborated statement. Id.

In November 2002, nearly two years after the murder, the Pennsylvania State Police ("PSP") Cold Case Squad was engaged to assist with the investigation. Id. ¶ 19. Beverly Ashton was the lead officer for the PSP's investigation of Haith's murder. Id. Despite the assistance of additional outside resources, the defendants' overall investigation maintained a tunnel-vision focus on Weimer. Id. ¶ 36.

While reviewing autopsy photographs of Haith, even though she did not have any specialized training or knowledge regarding bite marks or bite injuries, Ashton noticed an injury on his hand that appeared to her to be a bite mark. Id. ¶ 37. Significantly, the injury had not been identified as a bite mark by the experienced trained medical personnel that performed Haith's autopsy. Id.

The defendants first reached out to Dr. Kimberly Zeremba-Rabatin ("Dr. Zeremba-Rabatin"), a Fayette County dentist, to analyze the bite mark injury. Id. ¶ 38. Dr. Zeremba-Rabatin initially concluded that the purported bite mark was consistent with Gibson, Weimer's boyfriend. Id. After being provided teeth impressions for Weimer, Dr. Zeremba-Rabatin concluded that she could not make any positive identification as to which teeth caused the bite mark. Id.

Unsatisfied with Dr. Zeremba-Rabatin's conclusions, the defendants continued to pursue the bite mark, shopping for an alleged expert witness who would be willing to link the bite mark to Weimer. Id. Ultimately, the defendants were able to locate such a person, Dr. Gus Karazulas

("Dr. Karazulas"), the Chief Forensic Odontologist for the Connecticut State Police. Id. ¶ 39. Dr. Karazulas reviewed Beal's false and contradicted by the DNA evidence statement that Weimer and Gibson committed the murder, photographs of the bite mark, and Gibson's and Weimer's teeth impressions. Based solely upon that information, Dr. Karazulas opined that the bite mark matched Weimer. Id. Later in the investigation, the timing of the bite mark was questioned. Id. ¶ 40. Vernon, who participated in investigating Haith's murder and was the lead prosecuting attorney in Weimer's criminal trial, directed that the bite mark be further investigated, and Dr. Karazulas was asked to update his opinion to address and eliminate any timing concerns. Id. ¶¶ 15, 40. He did; without reviewing any additional evidence, Dr. Karazulas opined that the bite mark occurred 7-10 minutes before the murder occurred. Id. ¶ 41. Ultimately, in post-conviction proceedings, Dr. Karazulas completely disavowed his trial testimony about the bite mark, testified bite mark evidence was "junk science," and he could not and would not even conduct a bite mark analysis in Weimer's case today. Id. ¶ 42.

With their bite mark evidence secured, the defendants again spoke to Beal, only to learn that his "story" had substantially changed. Id. ¶ 43. Beal's newest version of Haith's murder was that a black man named Lonnie was also involved in the murder, and Weimer suffered her toe injury while kicking Haith. Id.

The defendants were forced to further investigate and incorporate Beal's new version of events into their narrative. Id. ¶ 44. Upon further investigation, conducted at the direction and understanding of the individual defendants, the defendants discovered that the man that Beal identified as Lonnie was in jail at the time of Haith's murder. Id. Despite this discovery, the defendants nevertheless continued to utilize Beal as a key part of their investigation into Haith's murder. Id.

In late August 2003, Conrad Clinton Blair ("Blair") contacted police and told them that Joseph Stenger ("Stenger"), a fellow inmate, confessed his involvement in Haith's murder. Id. ¶ 45. Blair told police that Stenger supposedly participated in the murder with Beal and Weimer. Id. Blair also provided police with a statement purportedly written by Stenger, which told a very different story of how Haith was murdered than Blair's version of the murder. Id. ¶ 46. In the written statement, Stenger did not state that he was involved in the murder, but instead said that he only heard of Haith's death after it occurred, and had assisted in disposing of the weapon and other evidence in a pond. Id.

Even though the statements of Beal, Blair, and Stenger were inaccurate, uncorroborated and contradicted by DNA evidence known to the defendants, as well as inconsistent with each other, nevertheless, the defendants agreed to proceed with filing charges against Weimer. Id. ¶ 47. In January, 2004, Weimer was arrested and charged with Haith's murder. Id. ¶ 48. At Weimer's March 2004 preliminary hearing, the Commonwealth called Beal, as its only fact witness against Weimer, even though the defendants knew that Beal's statements were contradicted by known evidence, other statements, and even by Beal himself. Id. ¶ 49. On the stand, Beal invoked his Fifth Amendment rights and refused to testify. Id. Weimer was still held over for trial. Id.

At Weimer's subsequent April 2004 hearing, the Commonwealth again called Beal to testify. Id. ¶ 50. On the stand, Beal fully recanted the statement he previously made to police in which he had implicated Weimer in Haith's death. Id. Beal testified that "the officer there, [Defendant] Haggerty, kind of like coaxed me along on how to do it." Id. Thereafter, the judge dismissed the charges against Weimer and released her from prison. Id.

Even after Beal revealed to the Court that the defendants had coerced and fabricated false testimony in their zeal to prosecute Weimer, the defendants still refused to drop their vendetta against Weimer. Id. ¶ 52. Instead, they re-focused their efforts, and worked to concoct and fabricate new evidence against Weimer. Id. This time, the defendants fabricated false statements from Stenger, who made many inconsistent statements throughout the course of the defendants' investigation. Id. Specifically, in July 2004, Stenger told law enforcement officials that he would be willing to implicate Weimer in Haith's murder in exchange for leniency on his sentencing for unrelated robbery convictions. Id. ¶ 53. The defendants intentionally elected to ignore that Stenger's new version of events was already contradicted by his own prior written statement, by DNA evidence, and by other known facts. Id. ¶ 54. Instead, using Stenger's statement, Weimer was again arrested and charged with Haith's murder. Id.

At Weimer's October 2004 preliminary hearing, the defendants elicited testimony from Stenger that was profoundly different from his prior statements. Id. By the time Stenger testified at Weimer's preliminary hearing, he claimed to have been present during Haith's murder, and claimed that Haith was beaten by two unidentified black men while Weimer was "screamin' and yelling." Id. ¶ 55. The defendants elicited this testimony despite the fact that Stenger's first written statement claimed only that he learned about Haith's murder after the fact and implicated Beal in the murder. Id.

During the course of the defendants' ongoing investigation of Haith's murder and Weimer's prosecution, Stenger made 15 statements, either directly or through others. Id. ¶ 56. He also testified 3 times (at his plea hearing, Weimer's second preliminary hearing, and Weimer's trial), and received a favorable plea deal in exchange for his cooperation. Id. Stenger's story changed each time he provided a statement until, during Weimer's post-conviction proceedings

in 2015, he finally fully recanted, disavowed all of his prior stories, and unequivocally stated that he has no knowledge of the circumstances surrounding Haith's death. Id.

Prior to Weimer's trial, Anthony Williams ("Williams"), an inmate, came forward, providing evidence that undermined Stenger's false testimony. Id. at ¶ 57. Williams alerted Weimer's criminal trial counsel that Stenger admitted that he was going to provide false testimony at trial implicating Weimer in Haith's murder. Id.

Upon learning that Williams was going to be called as a defense witness at trial, in March 2006, Vernon directed Haggerty and Ashton to further investigate Williams's evidence. Id. ¶ 58. Haggerty and Ashton visited Williams in prison and used their positions of authority to threaten Williams and attempt to force him to provide false testimony that would place Weimer at the crime scene. Id. ¶ 59. Williams refused to provide any false testimony. Id.

The defendants also used their positions of authority to encourage individuals to provide false jailhouse confessions by Weimer. Id. ¶ 60. In late 2004 into 2005, at least two jailhouse informants, Robert Mackey ("Mackey") and Linda Reynolds ("Reynolds"), directly contacted Vernon with information that Weimer allegedly "confessed" some involvement in Haith's death to them. Id. ¶ 61. Both Mackey and Reynolds sought consideration, for themselves or a significant other, in exchange for their testimony. Id. ¶¶ 61-66.

The individual defendants acted together to collect evidence that could be used to prosecute Weimer, to turn a blind eye toward contradictory evidence and other potential leads, and to not disclose exculpatory evidence prior to trial. Id. ¶ 69.

Weimer was wrongfully convicted on April 7, 2006. Id. at ¶ 2.

On October 1, 2015, after serving eleven years in prison, Weimer's convictions and sentence were vacated, and she was granted a new trial. Id. at 1. After Weimer's convictions

were vacated, the individual defendants continued to act in concert to attempt to create additional evidence, with the intent of re-prosecuting Weimer for Haith's murder. Id. ¶ 79. The defendants' ongoing investigation of Haith's murder and continued malicious pursuit of Weimer included interviews of Stenger, as well as the continued and deliberate withholding of exculpatory evidence, including the Mackey and Reynolds letters. Id.

At this point, Stenger completely recanted his trial testimony. Id. In an interview with Weimer's federal habeas investigator, Stenger admitted that he never saw Weimer on the night of Haith's murder, and he had no knowledge that she was involved in the crime. Id. ¶ 80. Stenger further admitted that law enforcement, including Haggerty, walked him through his eventual "story," directly provided evidence and details as to how and where things happened to Stenger, to ensure that Stenger's details matched the actual crime scene. Id.

In all, Stenger told 15 stories regarding Haith's murder, either directly to law enforcement or to others, from 2003 through 2014. Id. ¶ 83. In each version Stenger's story shifted, starting with his claim to Blair that he gave Beal a gun and Beal and Weimer killed Haith, to his claim that he was at the scene but did not participate, to his claim that he shot Haith, to his final total recantation. Id. Despite the scores of inaccuracies in Stenger's statements, which were revealed during the defendants' investigation, they nevertheless called Stenger at court hearings and elicited false testimony from him three different times, in their unfettered zeal to convict Weimer regardless of the actual evidence that showed she could not have committed the murder. Id. ¶ 84. There is a videotaped "confession" showing Stenger receiving details about evidence from Haggerty and Ashton, who are in the room, but not visible on the video. Id. ¶ 83.

On June 27, 2016, the trial court dismissed all charges against Weimer with prejudice. Id.
¶ 89.

## IV.    DISCUSSION

### A.  Plaintiff's § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments Claim – Count I

Ashton contends that her Motion to Dismiss should be granted as to Weimer's § 1983 malicious prosecution claim against her to the extent that it is based upon the Fourteenth Amendment because "[a]lthough plaintiff refers to the Fourth and Fourteenth Amendments in Count I, analysis of Weimer's malicious prosecution claim should proceed under the Fourth Amendment, as the explicit source rule prohibits a claim under the more generalized notion of substantive due process contained in the Fourteenth Amendment." ECF No. 53 at 9 (citing Albright v. Oliver, 510 U.S. 266, 273 (1994); Graham v. Conner, 490 U.S. 386, 395 (1989); quoting Torres v. McLaughlin, 163 F.3d 169, 172 (3d Cir. 1998) ("we note that Albright commands that claims governed by explicit constitutional text may not be grounded in substantive due process")). Ashton further contends that her Motion to Dismiss should be granted as to Weimer's § 1983 malicious prosecution claim to the extent that it is based upon the Fourth Amendment because the Amended Complaint does not allege that Ashton initiated any criminal proceeding against Weimer and the only mention of Ashton prior to the criminal charges being filed against Weimer involve Ashton noticing a bite mark on Haith's hand in an autopsy photograph. ECF No. 53 at 9-10.

Weimer responds,

Despite Ashton's attempts to downplay her individual actions, Ms. Weimer's Amended Complaint contains detailed allegations concerning Ashton's improper and wrongful investigation tactics, which played a crucial role in Ms. Weimer's eventual malicious prosecution. Specifically, Ashton recklessly directed the investigation to pursue purported bite mark evidence, despite her lack of specialized

training or medical knowledge, and despite the fact that the medical personnel who performed Haith's autopsy noted no bite marks. Am. Comp. ¶ 37. Further, Anthony Williams, who testified at Ms. Weimer's trial, testified under oath that Ashton and Haggerty used their positions of authority to threaten Williams, and attempted to coerce him to provide false testimony against Ms. Weimer. Id. ¶ 59. Finally, a videotaped "confession" shows that Stenger was being coached off camera about the details of his alleged "confession" from Ashton and/or Haggerty, the only other persons present during the interview. *Id.* ¶ 83. Since Ashton and Haggerty were both intentionally out of camera range, Ashton either provided the fabricated evidence or permitted Haggerty to provide fabricated evidence. *Id.* Based in no small part upon Ashton's reckless and deliberately indifferent investigation tactics, Ms. Weimer was wrongfully arrested and maliciously prosecuted.

ECF No. 63 at 11-12.

### 1. Fourteenth Amendment malicious prosecution claim

Although Weimer asserts that her malicious prosecution claim is brought pursuant to both the Fourth and Fourteenth Amendments, she only subjects her § 1983 malicious prosecution claim against Ashton to a Fourth Amendment analysis. See ECF No. 62 at 7-10. The Court finds that Weimer has implicitly conceded that her § 1983 malicious prosecution claim is properly brought pursuant to the Fourth Amendment, and not pursuant to the Fourteenth Amendment. Further, as a matter of law, Weimer's § 1983 malicious prosecution claim against Ashton, premised upon Ashton influencing and participating in the decision to prosecute Weimer for Haith's murder despite evidence that showed Weimer could not have committed the crime, which resulted in her being arrested and wrongfully convicted, is properly brought as a § 1983 Fourth Amendment malicious prosecution claim. See Albright, 510 U.S. at 270 (1994) (explaining section 1983 claims should be brought to vindicate the specific constitutional right allegedly infringed). Accordingly, the Court will grant Ashton's Motion to Dismiss the § 1983 malicious prosecution claim with prejudice to the extent that it is brought pursuant to the Fourteenth Amendment.

## 2. Fourth Amendment malicious prosecution claim

To prevail on a § 1983 Fourth Amendment malicious prosecution claim, a

plaintiff must establish that:

> (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding
> ended in [the plaintiff's] favor; (3) the defendant initiated the proceeding without
> probable cause[3]; (4) the defendant acted maliciously or for a purpose other than
> bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty
> consistent with the concept of seizure as a consequence of a legal proceeding.

Halsey v. Pfeiffer, 750 F.3d 273, 296–97 (3d Cir. 2014) (citing Johnson v. Knorr, 477

F.3d 75, 82 (3d Cir. 2007) (footnote added); see also Rose v. Bartle, 871 F.2d 331, 349

(3d Cir. 1989). "It is settled law that 'officers who conceal and misrepresent material

facts to the district attorney are not insulated from a § 1983 claim for malicious

prosecution simply because the prosecutor, grand jury, trial court, and appellate court all

act independently to facilitate erroneous convictions'.  If the officers influenced or

participated in the decision to institute criminal proceedings, they can be liable for

malicious prosecution." Halsey, 750 F.3d at 297 (citations and footnote omitted). Actions

that are "too minor" or "too removed" from the prosecution or the decision to institute

proceeding are insufficient. See Wiltz v. Middlesex Cty. Office of Prosecutor, 249 F.

App'x. 944, 950 (3d Cir. 2007). The officer's conduct must be a "significant cause of the

prosecution." Aleynikov v. McSwain, Civ. No. 15-1170, 2016 WL 3398581, at *11

(D.N.J. June 15, 2016), opinion clarified, Civ. No. 15-1170, 2016 WL 5340513 (D.N.J.

Sept. 22, 2016) (quoting Halsey, 750 F.3d at 297 n. 22).

---

[3] In Orsatti v. N.J. State Police, 71 F.3d 460 (3d Cir. 1995), the appellate court concluded, "[p]robable cause to arrest requires more than mere suspicion; however, it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt. Rather, probable cause to arrest exists when the facts and circumstances within the arresting officers' knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." Orsatti, 71 F.3d at 483 (internal citations omitted).

The Amended Complaint alleges that Ashton recklessly pursued bite mark evidence in order to manufacture evidence of Weimer's involvement in Haith's murder even though she did not have any formal training on the subject matter and the autopsy of Haith, performed by trained medical experts had not concluded Haith had a bite mark on his hand. The Amended Complaint also alleges that at some point during the case Ashton and Haggerty "coached" Stenger by providing evidence to him about the case. ECF No. 47 ¶ 83. Based upon this evidence, Weimer has sufficiently alleged that Ashton influenced the "initiated a criminal proceeding" against Weimer. See Trzaska v. L'Oreal USA, Inc., 865 F.3d 155, 162 (3d Cir. 2017), as amended (Aug. 22, 2017) (at the motion to dismiss stage, the court "must consider no more than whether the complaint establishes 'enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements' of the cause of action") (quotation omitted); Thomas v. City of Phila., 290 F. Supp. 3d 371, 379-380 (E.D. Pa. 2018) (court denied police officer's motion to dismiss § 1983 malicious prosecution claim because he had "contributed to the faulty and fallacious investigation" and thus, "influenced or participated in the decision to institute criminal proceedings"). Therefore, Ashton's Motion to Dismiss Weimer's § 1983 Fourth Amendment malicious prosecution claim is denied.

**B. Plaintiff's § 1983 Deprivation of Liberty Without Due Process and Denial of Fair Trial and Deliberately Failing to Conduct a Constitutionally Adequate Investigation Claim - Count II**

In Count II of the Amended Complaint, Weimer alleges that Ashton violated her right under the Fourteenth Amendment to due process of law by conducting a reckless and deliberately inadequate criminal murder investigation. Ashton moves to dismiss the claim, arguing that "allegations of 'inadequate' investigation do not state a constitutional claim and to the extent Weimer is alleging a "reckless" investigation, the Unites States

Court of Appeals for the Third Circuit has expressed significant doubt as to the viability

of said claim. ECF No. 53 at 13 (citing Johnson v. Logan, 721 F. App'x. 205, 208 n. 9

(3d Cir. 2018). Weimer contends that she had sufficiently pleaded that "Ashton

meaningfully and personally participated in a reckless and deliberately inadequate

criminal murder investigation, depriving Ms. Weimer of due process." ECF No. 63 at 13.

In Geness v. Cox, __ F.3d __, 2018 WL 4087887, at *6 n. 5 (3d Cir. Aug. 28, 2018), the

Unites States Court of Appeals for the Third Circuit recently stated with respect to a claim for

reckless investigation brought pursuant to the Fourteenth Amendment:

> Although Geness purports to state a claim for reckless investigation under the Due
> Process Clause of the Fourteenth Amendment, such a claim, if cognizable, could
> only arise under the Fourth Amendment. See *Manuel v. City of Joliet, Ill*, —— U.S.
> ——, 137 S.Ct. 911, 919, 197 L.Ed.2d 312 (2017) ("If the complaint is that a form
> of legal process resulted in pretrial detention unsupported by probable cause, then
> the right allegedly infringed lies in the Fourth Amendment."); accord *Albright v.
> Oliver*, 510 U.S. 266, 274, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality
> opinion). *Geness v. Cox*, No. 17-2073, 2018 WL 4087887, at *6 (3d Cir. Aug. 28,
> 2018) "Whatever doubts we may harbor as to the viability of such a claim, however,
> *see Brooks v. City of Chi.*, 564 F.3d 830, 833 (7th Cir. 2009) (observing that "[a]
> plaintiff cannot state a due process claim by combining what are essentially claims
> for false arrest under the Fourth Amendment and state law malicious prosecution
> into a sort of hybrid substantive due process claim under the Fourteenth
> Amendment" (citations omitted)); *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d
> Cir. 2001) (stating that an officer need not "explore and eliminate every
> theoretically plausible claim of innocence" even if "an investigation might have
> cast doubt upon the basis for the arrest" (citations omitted)), we have no occasion
> to resolve them today [because] no such constitutional right was "clearly
> established" at the relevant time, as required to overcome qualified immunity.
> *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011).

Geness, 2018 WL 4087887, at *6 n. 5 (3d Cir. Aug. 28, 2018). See also Johnson, 721 F. App'x.

at 208 n. 9 ("We note, without deciding, that we have significant doubts about whether there is

an independent substantive due process right to be free from a reckless investigation") (citing

Brooks v. City of Chicago, 564 F.3d 830, 833 (7th Cir. 2009) ("[a] plaintiff cannot state a due

process claim 'by combining what are essentially claims for false arrest under the Fourth

Amendment and state law malicious prosecution into a sort of hybrid substantive due process claim under the Fourteenth Amendment.'") (quoting <u>McCann v. Mangialardi</u>, 337 F.3d 782, 786 (7th Cir. 2003))); <u>Newton v. City of New York</u>, 566 F. Supp. 2d 256, 278 (S.D.N.Y. 2008) ("[T]here is no constitutional right to an adequate investigation."); <u>Thomas v. City of Philadelphia</u>, 290 F. Supp. 3d 371, 386 (E.D. Pa. 2018) (court declined to hold that there was an independent cause of action under the Fourteenth Amendment for failing to conduct a constitutionally adequate investigation, emphasizing "here, even without a stand-alone claim for 'failure to investigate,' the detectives' wrongful conduct is still captured in other claims. For instance, the leads that the detectives failed to investigate pertain to the malicious prosecution claim—the detectives arguably knew enough to realize they did not have probable cause, but they prosecuted Mr. Thomas anyway. The investigation-related issues are indeed addressed in other causes of action in this case"). Pursuant to <u>Geness, supra,</u> Ashton's Motion to Dismiss Weimer's § 1983 Fourteenth Amendment due process claim against Ashton for reckless investigation must be granted and this claim dismissed with prejudice.

### C. Plaintiff's § 1983 Civil Rights Conspiracy Claim - Count III

In Count III of the Amended Complaint, Weimer alleges a § 1983 civil rights conspiracy claim against the individual defendants, including Ashton.  Ashton moves to dismiss Weimer's § 1983 conspiracy claim on the basis that the plaintiff has only alleged unsupported conclusory statements in support of the claim and her opinion that the parties "acted in concert" to deprive her of her constitutional rights. ECF No. 53 at 14.

"To state a viable claim for conspiracy under Section 1983, a plaintiff must allege: (1) the existence of a conspiracy involving state action; and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." <u>Bishop v. Upper Darby Police Dep't</u>,

Civ. No. 15-6069, 2018 WL 2359241, at *6 (E.D. Pa. May 24, 2018) (citing Marchese v.

Umstead, 110 F. Supp.2d 361, 371 (E.D. Pa. 2000). "Civil rights conspiracies brought under

Section 1983 require a 'meeting of the minds,' and to survive screening of a motion to dismiss,

plaintiffs must provide some factual basis to support the existence of the elements of a

conspiracy, namely, agreement and concerted action." Id. (citing Startzell v. City of Philadelphia,

533 F.3d 183, 205 (3d Cir. 2008) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158

(1970)). Thus, in Martin v. Secretary of Corrections, Civ. No. 16-2060, 2018 WL 1158250

(M.D. Pa. Mar. 5, 2018), the district court recently explained:

> In order to demonstrate a conspiracy, "a plaintiff must show that two or more
> conspirators reached an agreement to deprive him or her of a constitutional right
> 'under color of law.'" *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685,
> 700 (3d Cir. 1993) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 150, 90
> S.Ct. 1598, 26 L.Ed.2d 142 (1970)), abrogated on other grounds by *United Artists
> Theatre Circuit, Inc. v. Twp. of Warrington, Pa.*, 316 F.3d 392, 400 (3d Cir. 2003).
> "Bare conclusory allegations of 'conspiracy' or 'concerted action' will not suffice
> to allege a conspiracy. The plaintiff must expressly allege an agreement or make
> averments of communication, consultation, cooperation, or command from which
> such an agreement can be inferred." *Flanagan v. Shively*, 783 F. Supp. 922, 928
> (M.D. Pa. 1992). The plaintiff's allegations of a conspiracy "must be supported by
> facts bearing out the existence of the conspiracy and indicating its broad objectives
> and the role each Defendant allegedly played in carrying out those objectives." *Id.*
> A plaintiff cannot rely on subjective suspicions and unsupported speculation.
> *Young v. Kann*, 926 F.2d 1396, 1405 n. 16 (3d Cir. 1991).

Martin, 2018 WL 1158250, at *5. "It is not enough that the end result of the parties' independent

conduct caused plaintiff harm or even that the alleged perpetrators of the harm acted in conscious

parallelism." Spencer v. Steinman, 968 F. Supp. 1011, 1020 (E.D. Pa.1997).

In the Amended Complaint, Weimer alleges that the defendants agreed to pursue charges

against Weimer for the murder of Haith regardless of the evidence. ECF No. 47 ¶¶ 117-118.

Further, Weimer alleges that in furtherance of this conspiracy, Ashton and Haggerty attempted to

coerce Williams to provide false testimony that would place Weimer at the crime scene and

"coached" Stenger by providing evidence to him about the case. ECF No. 47 ¶¶ 59, 83. The Court finds that Weimer has alleged a plausible § 1983 civil rights conspiracy claim against Ashton. Ashton's motion to dismiss Weimer's § 1983 civil rights conspiracy claim is denied.

### D. Plaintiff's § 1983 Failure to Intervene Claim - Count IV

In Count IV of the Amended Complaint, Weimer alleges a § 1983 failure to intervene claim against the individual defendants, including Ashton. Ashton moves to dismiss the claim on the basis that there is no legal basis for the claim. "Certainly, the theory of 'failure to intervene' has not been recognized in the Circuit outside of failure to intervene in excessive use of force or abuse (even then, the allegations must support a realistic and reasonable opportunity to intervene)." ECF No. 53 at 15.

Contrary to Ashton's legal position, the Court opines that if the Third Circuit was presented with a non-excessive force case where a law enforcement official had a realistic and reasonable opportunity to intervene in the face of a constitutional violation by a fellow law enforcement official investigating a homicide and she simply refused to intervene, the Third Circuit would find that a viable § 1983 failure to intervene claim had been stated. See Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994) (concluding that "[a]n officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring."); Woody v. City of Granite City, Ill., Civ. No. 17-534, 2018 WL 587517, at *2 (S.D. Ill. Jan. 29, 2018) (plaintiff who alleged that police defendants knew of the building and zoning defendants' actions (which included

harassment, assault, invasion of property, and issuance of baseless citations), had the power to present the actions, and did nothing, had stated a § 1983 failure to intervene claim); Herrera v. City of New Brunswick, Civ. No. 04-3002, 2008 WL 305275, at *10 (D.N.J. Feb. 1, 2008) (same) (citing Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994) (explaining "[i]t is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.") (citing cases). Ashton's Motion to Dismiss Weimer's § 1983 failure to intervene claim is denied.

### E. Plaintiff's § 1983 Supervisory Liability Claim – Count V

In Count V of her Amended Complaint, Weimer alleges a § 1983 supervisory liability claim against Ashton. Ashton moves to dismiss this claim on the basis that Weimer has not alleged that Ashton, a PSP trooper, exercised any level of supervisory control over the Connellsville police or Fayette County prosecutors, but rather, alleges only that Ashton was "assisting" with the investigation. ECF No. 53 at 15. In response, Weimer argues "Ashton, as the sole member of the [PSP] Cold Case Unit, directed all aspects of the reckless and deliberately inadequate investigation conducted by that police unit." ECF No. 63 at 18.

It is well established that "'[t]here are two theories of supervisory liability,' one under which supervisors can be liable if they 'established and maintained a policy, practice or custom which directly caused [the] constitutional harm,' and another under which they can be liable if they 'participated in violating plaintiff's rights, directed others to violate them, or, as the person[s] in charge, had knowledge of and acquiesced in [their] subordinates' violations'." Santiago v. Warminster Twp., 629 F.3d 121, 129 n. 5 (3d Cir. 2010) (quoting A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004)).

Contrary to Weimer's argument, to allege a § 1983 supervisory liability claim against Ashton, it is not enough that Weimer allege facts that show that Ashton participated in the allegedly unconstitutional conduct.  Ashton must allege facts that support that Ashton participated in her subordinates' violation of Weimer's constitutional rights. Santiago, 629 F.3d at 129 n. 5. The Amended Complaint does not allege that Ashton supervised any subordinates. Ashton's Motion to Dismiss Weimer's § 1983 supervisory liability claim must, therefore, be granted and Weimer's § 1983 supervisory liability claim against Ashton dismissed. Said dismissal, however, shall be without prejudice to Weimer to file second Amended Complaint that alleges a plausible § 1983 supervisory liability claim against Ashton since "[d]ismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility" and in this case, there is no suggestion of bad faith, undue delay, or prejudice, the Court cannot state that allowing such an amendment would be futile.  Alston v. Parker, 363 F.3d 229, 236 (3d Cir. 2004) (citation omitted).

### F.  Plaintiff's State Law Malicious Prosecution Claim – Count VI

In Count VI of her Amended Complaint, Weimer alleges a Pennsylvania state law malicious prosecution claim against Ashton. Ashton contends Weimer's state law malicious prosecution claim against her is barred by sovereign immunity. ECF No. 53 at 15.

Weimer responds that sovereign immunity is inapplicable because Ashton's conduct which caused Weimer's injury fell outside the scope of Ashton's employment as a PSP trooper. ECF No. 62 at 17 (citing Perkins v. Staskiewicz, Civ. No. 08-1651, 2009 WL 693176, at *4 (M.D. Pa. 2009)) (denying immunity to state trooper pursuant to 1 Pa.Con.Stat.Ann. § 2310 because "[w]hile properly investigating complaints made to the police department would fall

within the scope of his employment, the same cannot be said for conducting a purposefully flawed investigation").

Ashton is entitled to sovereign immunity to the extent that she was acting within the scope of her job as a PSP trooper. See PA CONST art. 1, § 11; 1 Pa. Cons. Stat. § 2310.[4] There are nine specifically delineated exceptions to sovereign immunity, 42 Pa. Cons. Stat. § 8522, but none of these apply to this case.[5]

Weimer has alleged, *inter alia*, that Ashton attempted to coerce an individual, Williams, to provide false testimony that would place Weimer at the scene of a murder when she was not there and that Ashton "coached" a key witness, Stenger, by providing evidence to him about the case. These actions, if true, would fall outside the scope of her employment as a Pennsylvania state trooper. Accordingly, at this juncture in the proceedings, where the Court must assume the allegations contained in the Amended Complaint are true, Weimer's state law malicious prosecution claim against Ashton is not barred by sovereign immunity. Ashton's Motion to Dismiss Weimer's state law malicious prosecution claim is denied.

## V. CONCLUSION

For the reasons set forth above, Defendant Beverly Ashton's motion to dismiss is granted in part and denied in part. An appropriate Order follows.

---

[4] "Pursuant to section 11 of Article 1 of the Constitution of Pennsylvania, it is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity." 1 Pa. Const. Stat. § 2310.
[5] Sovereign immunity is not a valid defense in cases for damages caused by: 1) vehicle liability; 2) medical-professional liability; 3) care, custody, or control of personal property; 4) Commonwealth real estate, highways and sidewalks; 5) potholes and other dangerous conditions; 6) care, custody or control of animals; 7) liquor store sales; 8) National Guard activities; and 9) toxoids and vaccines. 42 Pa. Const. Stat. § 8522.

# **ORDER**

AND NOW this 14th day of September, 2018, it is hereby ORDERED, ADJUDGED, AND DECREED that the Motion to Dismiss filed by defendant Beverly Ashton, ECF No. 52, is granted in part and denied in part as follows:

(1)    As to Count I, the motion is granted with prejudice as to Plaintiff's § 1983 Fourteenth Amendment malicious prosecution claim;

(2)    As to Count I, the motion is denied as to Plaintiff's § 1983 Fourth Amendment malicious prosecution claim;

(3)    As to Count II, the motion is granted with prejudice as to Plaintiff's § 1983 Fourteenth Amendment reckless investigation claim;

(4)    As to Count III, the motion is denied as to Plaintiff's § 1983 civil conspiracy claim;

(5)    As to Count IV, the motion is denied as to Plaintiff's § 1983 failure to intervene claim;

(6)    As to Count V, The motion is granted without prejudice as to Plaintiff's § 1983 supervisory liability claim and Plaintiff shall have until October 15, 2018 to file a second Amended Complaint that states a plausible § 1983 supervisory liability claim; and

(7)    As to Count VI, the motion to dismiss Plaintiff's state law malicious prosecution claim is denied.

/s/ Maureen P. Kelly
MAUREEN P. KELLY
CHIEF UNITED STATES MAGISTRATE JUDGE