# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CRYSTAL DAWN WEIMER, ) | |
| ) | |
| **Plaintiff** ) | |
| vs. ) | Civil No. 17-1265 |
| ) | Chief Magistrate Judge Maureen P. Kelly |
| COUNTY OF FAYETTE, ) | |
| PENNSYLVANIA, OFFICE OF THE ) | |
| FAYETTE COUNTY DISTRICT ) | |
| ATTORNEY, CITY OF ) | |
| CONNELLSVILLE, NANCY VERNON, ) | Re: ECF No. 54 |
| in her Official and Individual capacities, ) | |
| and RONALD HAGGERTY, JR., ) | |
| THOMAS CESARIO, THOMAS ) | |
| PATTON, and BEVERLY ASHTON, in ) | |
| their individual capacities, ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## <u>OPINION</u>

**KELLY, Chief Magistrate Judge**

Pending before the Court is the Rule 12(b)(6) Motion to Dismiss filed by Defendants County of Fayette, Pennsylvania, Office of the Fayette County District Attorney, and Nancy Vernon, in her official and individual capacities ("Vernon") (collectively the "County Defendants"). ECF No. 54. The County Defendants seek the dismissal with prejudice of all claims filed against them in the Amended Complaint by the plaintiff, Crystal Dawn Weimer ("Plaintiff" or "Weimer").

On April 7, 2006, Weimer was wrongfully convicted of third-degree murder and conspiracy to commit third-degree murder in connection with the murder of Curtis Haith ("Haith"). ECF No. 47 ¶ 11. Haith had been murdered outside of his apartment, brutally beaten

and shot in the face. Id. ¶ 21. As a result of this wrongful conviction, Weimer was incarcerated for more than eleven years before she was fully exonerated of all charges. Id. ¶ 11. The individually named defendants in this matter are: (1) Vernon, during the relevant time period the District Attorney for Fayette County; (2) Thomas Cesario ("Cesario"), the lead investigator of Haith murder for the Connellsville Police Department until his retirement; (3) Ronald Haggerty ("Haggerty"), a sergeant in the Connellsville Police Department who took over as lead investigator of Haith's murder once Cesario retired; (4) Thomas Patton ("Patton"), a corporal in the Connellsville Police Department who led the investigation of Haith's murder after Weimer's convictions were vacated in 2015; and (5) Beverly Ashton ("Ashton"), a corporal in the Pennsylvania State Police Cold Case Unit, who was the lead officer for the state police's investigation of Haith's murder that led to Weimer's conviction. Id. ¶¶ 15-19.

## I. PROCEDURAL BACKGROUND

Weimer filed her original Complaint against the defendants, County of Fayette, Pennsylvania ("Fayette County"), Office of the Fayette County District Attorney, Connellsville Township,[1] City of Connellsville ("Connellsville"), Vernon, in her official and individual capacities, and Haggerty, Cesario, Patton, and Ashton in their individual capacities on September 28, 2017. ECF No. 1. The defendants filed motions to dismiss the original complaint. ECF Nos. 23, 29, 32, and 35, and Weimer filed a Motion for Leave to File an Amended Complaint. ECF No. 45. The Court granted the Motion for Leave to File an Amended Complaint. ECF No. 46. On January 30, 2018, Weimer filed her Amended Complaint. ECF No. 47. The County Defendants filed a Motion to Dismiss Amended Complaint and supporting brief. ECF Nos. 55-56. Plaintiff filed a brief in opposition to the County Defendants' motion to dismiss. ECF No. 66.

---

[1] Connellsville Township was terminated as a party in this action on January 30, 2018.

The County Defendants filed a reply brief in response to Weimer's opposition brief. ECF No. 67. The County Defendants' Motion to Dismiss is ripe for review.[2]

## II.      STANDARD OF REVIEW

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) must be viewed in the light most favorable to the plaintiff and all the well-pleaded allegations of the complaint must be accepted as true.  Erickson v. Pardus, 551 U.S. 89, 93-94 (2007). A complaint must be dismissed pursuant to Rule 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (rejecting the traditional 12(b)(6) standard set forth in Conley v. Gibson, 355 U.S. 41 (1957)). See also Ashcroft v. Iqbal, 556 U.S. 662 (2009) (specifically applying Twombly analysis beyond the context of the Sherman Act).

A court need not accept inferences drawn by a plaintiff if they are unsupported by the facts as set forth in the complaint. See California Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004) (citing Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)). Nor must the Court accept legal conclusions set forth as factual allegations. Twombly, 550 U.S. at 555 (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). See also McTernan v. City of York, Penn., 577 F.3d 521, 531 (3d Cir. 2009) ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). A plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 556 (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004)). Although the United States Supreme

[2] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties voluntarily consented to having a United States Magistrate Judge conduct proceedings in this case, including the entry of a final judgment. ECF Nos. 21, 22, 27, 28, and 38.

Court does "not require heightened fact pleading of specifics, [the Court does require] enough facts to state a claim to relief that is plausible on its face." Id. at 570.

In other words, at the motion to dismiss stage, a plaintiff is "required to make a 'showing' rather than a blanket assertion of an entitlement to relief." Smith v. Sullivan, Civ. No. 07-528, 2008 WL 482469, at *1 (D. Del. Feb. 19, 2008) (quoting Phillips v. Cty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008)). "This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." Phillips, 515 F.3d at 234 (quoting Twombly, 550 U.S. at 556 n. 3).

The United States Court of Appeals for the Third Circuit expounded on the Twombly/Iqbal line of cases:

> To determine the sufficiency of a complaint under Twombly and Iqbal, we must take the following three steps:
>
> First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.'

Burtch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) (quoting Santiago v. Warminster Tp., 629 F.3d 121, 130 (3d Cir. 2010)).

"The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case." Tracinda Corp. v. DaimlerChrysler AG, 197 F. Supp. 2d 42, 53 (D. Del. 2002) (citing Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993)). Indeed, the United States Supreme Court has held that a complaint is properly dismissed under Rule 12(b) where it does not allege "enough facts to state a claim to relief that is plausible

on its face," Twombly, 550 U.S. at 570, or where the factual content does not allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. The question is not whether the plaintiff will prevail in the end but, rather, whether the plaintiff is entitled to offer evidence in support of his or her claims. Swope v. City of Pittsburgh, 90 F. Supp.3d 400, 405 (W.D. Pa. 2015) (citing Oatway v. American Intern. Group, Inc., 325 F.3d 184, 187 (3d Cir. 2003)).

## III. FACTUAL ALLEGATIONS

In her Amended Complaint, Weimer alleges the following conduct relevant to the County Defendants' Motion to Dismiss.

Curtis Haith was murdered in the early morning hours on January 27, 2001, outside of his apartment. ECF No. 47 ¶ 21. He was beaten and shot in the face. Id. Connellsville police learned that Haith had been at two parties the evening of January 26, 2001, and morning of January 27, 2001, one in Uniontown and one in Connellsville. Id. ¶ 24. Weimer had attended the first party, in Uniontown, and had been in the car that drove Haith to the second party, in Connellsville. Id. ¶ 26. Along with interviewing other party goers, Connellsville police officers and co-defendants Cesario and Haggerty interviewed Weimer at her house the same day Haith was murdered. Id. ¶ 25.

When Cesario and Haggerty arrived at Weimer's house, she had been sleeping and was dressed in the same clothes she had worn the night before. Id. They observed what appeared to be mud and blood on Weimer's clothes. Id. Weimer also had injuries to her face and foot. Id.

In light of the mud and blood on her clothes and her injuries, the police, including Cesario and Haggerty, asked Weimer to come with them down to the Connellsville Police Department. Id. Weimer voluntarily accompanied the officers to the police station and readily

provided her clothing for forensic testing. Id. At the police station, Weimer told the police she had been at a party with Haith and others in Uniontown, that she, her cousin, Doug Giles ("Giles"), and her minor daughter, Rose, had driven Haith from Uniontown to the Arch Cafe, a bar in Connellsville, left him there, and then returned to Uniontown where she spent the rest of the night at the housing community where her mother and sisters resided. Id. ¶¶ 26-27. Weimer's location in Uniontown for the rest of the evening after dropping off Haith was corroborated by multiple witnesses. Id. ¶ 27.

In response to questioning about her injuries, Weimer explained to the police, including Cesario and Haggerty, that her foot injury had been caused by horseplay with Michael Gibson ("Gibson"), Weimer's then boyfriend, a few days before, and that the blood on her clothes and injury to her eye had been caused by a fight with Gibson the prior evening (i.e., on January 26, 2001), during which she had bit his thumb, causing Gibson to bleed on her clothing and strike her in the eye. Id. ¶ 28.

DNA testing of items collected from the crime scene as well as from Weimer's clothing subsequently showed that the blood on Weimer's clothing was Gibson's blood, Haith's blood was not on Weimer's clothing, and the hair and blood samples found at the scene of Haith's murder did not belong to Weimer, but rather, to an unidentified male. Id. ¶ 29. Thus, all DNA testing done relative to Haith's murder supported the conclusion that Weimer was not present at the crime scene, corroborated her statements to the police, and supported the accounts of the other individuals who stated to the Connellsville police that Weimer had been in Uniontown, and not in Connellsville, the night of the murder. Id. ¶ 30.

Even though the DNA evidence fully corroborated Weimer's account of the night of Haith's death and tied an unidentified male's DNA to the crime scene, investigators continued to

focus their investigation with tunnel vision on Weimer, to the exclusion of other leads. Id. ¶ 31. By way of example, witnesses told the Connellsville police that Haith had been involved with drugs, there was drug-related evidence found in Haith's residence upon his death, but no drugs, and yet, there was no indication in the Connellsville police investigative file that the police investigated whether Haith's death was drug-related. Id. ¶ 32). Similarly, at least eight people came to the police and provided evidence as to who killed Haith. Id. From this evidence ten males were implicated in Haith's death, including a male Haith had recently kicked out of his apartment and another male whom Haith had had an altercation with where a gun had been fired into the air. Id. Yet, the Connellsville police investigative file indicates little to no follow-up was conducted by the police with respect to these leads. Id. The focus of the Connellsville police investigation remained on Weimer, the police stubbornly convinced that they would be able to concoct and create some version of events that could tie Weimer to Haith's murder. Id. ¶ 34.

In October 2002, Thomas Beal ("Beal") came forward and told the Connellsville police that Weimer, who was Beal's former girlfriend, and Gibson, killed Haith, and that Haith's blood was on Weimer's clothing. Id. ¶ 35. The statement about Haith's blood being on Weimer's clothes was not, and could not be true; the police already definitively knew, through DNA testing, that Haith's blood was not on Weimer's clothing and that Weimer's blood was not at the crime scene. Id. Knowingly and willfully ignoring those facts, the defendants deliberately elected to rely upon Beal's uncorroborated statement. Id.

In November 2002, nearly two years after the murder, the Pennsylvania State Police ("PSP") Cold Case Squad was engaged to assist with the investigation. Id. ¶ 19. Beverly Ashton was the lead officer for the PSP's investigation of Haith's murder. Id. Despite the assistance of

additional outside resources, the defendants' overall investigation maintained a tunnel-vision focus on Weimer. Id. ¶ 36.

While reviewing autopsy photographs of Haith, even though she did not have any specialized training or knowledge regarding bite marks or bite injuries, Ashton noticed an injury on his hand that appeared to her to be a bite mark. Id. ¶ 37. Significantly, the injury had not been identified as a bite mark by the experienced trained medical personnel that performed Haith's autopsy. Id.

The defendants first reached out to Dr. Kimberly Zeremba-Rabatin ("Dr. Zeremba-Rabatin"), a Fayette County dentist, to analyze the bite mark injury. Id. ¶ 38. Dr. Zeremba-Rabatin initially concluded that the purported bite mark was consistent with Gibson, Weimer's boyfriend. Id. After being provided teeth impressions for Weimer, Dr. Zeremba-Rabatin concluded that she could not make any positive identification as to which teeth caused the bite mark. Id.

Unsatisfied with Dr. Zeremba-Rabatin's conclusions, the defendants continued to pursue the bite mark, shopping for an alleged expert witness who would be willing to link the bite mark to Weimer. Id. Ultimately, the defendants were able to locate such a person, Dr. Gus Karazulas ("Dr. Karazulas"), the Chief Forensic Odontologist for the Connecticut State Police. Id. ¶ 39. Dr. Karazulas reviewed Beal's false (and contradicted by the DNA evidence) statement that Weimer and Gibson committed the murder, photographs of the bite mark, and Gibson's and Weimer's teeth impressions. Based solely upon that information, Dr. Karazulas opined that the bite mark matched Weimer. Id. Later in the investigation, the timing of the bite mark was questioned. Id. ¶ 40. Vernon, who participated in investigating Haith's murder and was the lead prosecuting attorney in Weimer's criminal trial, directed that the bite mark be further investigated, and Dr.

Karazulas was asked to update his opinion to address and eliminate any timing concerns. Id. ¶¶ 15, 40. He did; without reviewing any additional evidence, Dr. Karazulas opined that the bite mark occurred 7-10 minutes before the murder occurred. Id. ¶ 41. Ultimately, in post-conviction proceedings, Dr. Karazulas completely disavowed his trial testimony about the bite mark, testified bite mark evidence was "junk science," and stated he could not and would not even conduct a bite mark analysis in Weimer's case today. Id. ¶ 42.

With their bite mark evidence secured, the defendants again spoke to Beal, only to learn that his "story" had substantially changed. Id. ¶ 43. Beal's newest version of Haith's murder was that a black man named Lonnie was also involved in the murder, and Weimer suffered her toe injury while kicking Haith. Id.

The defendants were forced to further investigate and incorporate Beal's new version of events into their narrative. Id. ¶ 44. Upon further investigation, conducted at the direction and understanding of the individual defendants, the defendants discovered that the man that Beal identified as Lonnie was in jail at the time of Haith's murder. Id. Despite this discovery, the defendants nevertheless continued to utilize Beal as a key part of their investigation into Haith's murder. Id.

In late August 2003, Conrad Clinton Blair ("Blair") contacted police and told them that Joseph Stenger ("Stenger"), a fellow inmate, confessed his involvement in Haith's murder. Id. ¶ 45. Blair told police that Stenger supposedly participated in the murder with Beal and Weimer. Id. Blair also provided police with a statement purportedly written by Stenger, which told a very different story of how Haith was murdered than Blair's version of the murder. Id. ¶ 46. In the written statement, Stenger did not state that he was involved in the murder, but instead said that

he only heard of Haith's death after it occurred, and had assisted in disposing of the weapon and other evidence in a pond. Id.

Even though the statements of Beal, Blair and Stenger were inaccurate, uncorroborated and contradicted by DNA evidence known to the defendants, as well as inconsistent with each other, nevertheless, the defendants agreed to proceed with filing charges against Weimer. Id. ¶ 47. In January, 2004, Weimer was arrested for Haith's murder. Id. ¶ 48. At Weimer's March 2004 preliminary hearing, the Commonwealth called Beal, as its only fact witness against Weimer, even though the defendants knew that Beal's statements were contradicted by known evidence, other statements, and even by Beal himself. Id. ¶ 49. On the stand, Beal invoked his Fifth Amendment rights and refused to testify. Id. Weimer was still held over for trial. Id.

At Weimer's subsequent April 2004 hearing, the Commonwealth again called Beal to testify. Id. ¶ 50. On the stand, Beal fully recanted the statement he previously made to police in which he had implicated Weimer in Haith's death. Id. Beal testified that "the officer there, [Defendant] Haggerty, kind of like coaxed me along on how to do it." Id. Thereafter, the judge dismissed the charges against Weimer and released her from prison. Id.

Even after Beal revealed to the Court that the defendants had coerced and fabricated false testimony in their zeal to prosecute Weimer, the defendants still refused to drop their vendetta against Weimer. Id. ¶ 52. Instead, they re-focused their efforts, and worked to concoct and fabricate new evidence against Weimer. Id. This time, the defendants fabricated false statements from Stenger, who made many inconsistent statements throughout the course of the defendants' investigation. Id. Specifically, in July 2004, Stenger told law enforcement officials that he would be willing to implicate Weimer in Haith's murder in exchange for leniency on his sentencing for unrelated robbery convictions. Id. ¶ 53. The defendants intentionally elected to ignore that

Stenger's new version of events was already contradicted by his own prior written statement, by DNA evidence, and by other known facts. Id. ¶ 54. Instead, using Stenger's statement, Weimer was again arrested and charged with Haith's murder. Id.

At Weimer's October 2004 preliminary hearing, the defendants elicited testimony from Stenger that was profoundly different from his prior statements. Id. By the time Stenger testified at Weimer's preliminary hearing, he claimed to have been present during Haith's murder, and claimed that Haith was beaten by two unidentified black men while Weimer was "screamin' and yelling." Id. ¶ 55. The defendants elicited this testimony despite the fact that Stenger's first written statement claimed only that he learned about Haith's murder after the fact and implicated Beal in the murder. Id.

During the course of the defendants' ongoing investigation of Haith's murder and Weimer's prosecution, Stenger made 15 statements, either directly or through others. Id. ¶ 56. He also testified 3 times (at his plea hearing, Weimer's second preliminary hearing, and Weimer's trial), and received a favorable plea deal in exchange for his cooperation. Id. Stenger's story changed each time he provided a statement until, during Weimer's post-conviction proceedings in 2015, he finally fully recanted, disavowed all of his prior stories, and unequivocally stated that he has no knowledge of the circumstances surrounding Haith's death. Id.

Prior to Weimer's trial, Anthony Williams ("Williams"), an inmate, came forward, providing evidence that undermined Stenger's false testimony. Id. ¶ 57.  Williams alerted Weimer's criminal trial counsel that Stenger admitted that he was going to provide false testimony at trial implicating Weimer in Haith's murder. Id.

Upon learning that Williams was going to be called as a defense witness at trial, in March 2006, Vernon directed Haggerty and Ashton to further investigate Williams's evidence. Id. ¶ 58.

Haggerty and Ashton visited Williams in prison and used their positions of authority to threaten Williams and attempt to force him to provide false testimony that would place Weimer at the crime scene. Id. ¶ 59. Williams refused to provide any false testimony. Id.

The defendants also used their positions of authority to encourage individuals to provide false jailhouse confessions by Weimer. Id. ¶ 60. In late 2004 into 2005, at least two jailhouse informants, Robert Mackey ("Mackey") and Linda Reynolds ("Reynolds"), directly contacted Vernon with information that Weimer allegedly "confessed" some involvement in Haith's death to them. Id. ¶ 61. Both Mackey and Reynolds sought consideration, for themselves or a significant other, in exchange for their testimony. Id. ¶¶ 61-66.

Vernon received and reviewed Mackey's and Reynolds' letters and, in furtherance of the defendants' investigation, oversaw and directed additional investigatory acts, including interviews with these potential witnesses and others. Id. ¶ 67.

The letters written by Mackey and Reynolds were not provided to Weimer's trial counsel prior to, or after, trial. Id. ¶ 68. Reynolds' November 29, 2004 letter was first produced by the Fayette County District Attorney's Office during post-conviction discovery in 2015. Id. Reynolds' June 7, 2005 letter was provided directly by the Connellsville Police Department from their files, and it was mailed on June 22, 2016, mere days before Weimer's pre-trial hearing after being released from prison. Id.

The individual defendants acted together to collect evidence that could be used to prosecute Weimer, to turn a blind eye toward contradictory evidence and other potential leads, and to not disclose exculpatory evidence prior to trial. Id. ¶ 69.

Vernon also knowingly elicited perjury by letting Mackey and Reynolds testify falsely that they were not receiving anything in exchange for their testimony when they were receiving

consideration. Id. ¶ 70. Vernon also lied to the jury by telling them that the fact that Mackey and Reynolds had asked for nothing in exchange for their testimony should underscore the credibility of their testimony. Id. ¶ 69.

Weimer was wrongfully convicted on April 7, 2006. Id. ¶ 2.

On October 1, 2015, after serving eleven years in prison, Weimer's convictions and sentence were vacated, and she was granted a new trial. Id. at 1. After Weimer's convictions were vacated, the individual defendants continued to act in concert to attempt to create additional evidence, with the intent of re-prosecuting Weimer for Haith's murder. Id. ¶ 79. The defendants' ongoing investigation of Haith's murder and malicious pursuit of Weimer included interviews of Stenger, as well as the continued and deliberate withholding of exculpatory evidence, including the Mackey and Reynolds letters. Id.

At this point, Stenger completely recanted his trial testimony. Id. In an interview with Weimer's federal habeas investigator, Stenger admitted that he never saw Weimer on the night of Haith's murder, and he had no knowledge that she was involved in the crime. Id. ¶ 80. Stenger further admitted that law enforcement, including Haggerty, walked him through his eventual "story," directly provided evidence and details as to how and where things happened to Stenger, to ensure that Stenger's details matched the actual crime scene. Id.

In all, Stenger told 15 stories regarding Haith's murder, either directly to law enforcement or to others, from 2003 through 2014. Id. ¶ 83. In each version Stenger's story shifted, starting with his claim to Blair that he gave Beal a gun and Beal and Weimer killed Haith, to his claim that he was at the scene but did not participate, to his claim that he shot Haith, to his final total recantation. Id. Despite the scores of inaccuracies in Stenger's statements, which were revealed during the defendants' investigation, they nevertheless called Stenger at court

hearings and elicited false testimony from him three different times, in their unfettered zeal to convict Weimer regardless of the actual evidence that showed she could not have committed the murder. Id. ¶ 84.

Additionally, Weimer's post-conviction relief legal counsel, after requesting the defendants' entire investigatory file, were able to discover, in Vernon's file, some of the letters by Mackey and Reynolds specifically asking for deals in exchange for their cooperation. Id. ¶ 85. A remaining letter from Reynolds was only discovered when, after multiple discovery requests and court conferences, documents were produced from the Connellsville Police Department's file during Weimer's 2016 pre-trial proceedings. Id. These letters revealed the intentionally misleading testimony elicited at trial, as well as Vernon's lie to the jury in her closing arguments during Weimer's criminal trial. Id.

On June 27, 2016, the trial court dismissed all charges against Weimer with prejudice. Id. ¶ 89. By June 27, 2016, Vernon was a sitting Court of Common Pleas Judge in Fayette County. Id.

The defendants' deliberate and willful actions taken against Weimer are not isolated events, but rather demonstrate ongoing policies, practices or customs of unconstitutional misconduct in homicide investigations, and in particular, the use of coercive techniques in interviews and interrogations to induce false confessions; the withholding of exculpatory evidence; and the fabricating of incriminating statements from witnesses, suspects, and arrestees by feeding details about the crime that the police knew (or believed to be true) to those witnesses, suspects, and arrestees. Id. ¶ 90.

Various cases demonstrate that this misconduct was pervasive within Fayette County law enforcement agencies at the time of Ms. Weimer's investigation. Id. ¶ 91. The misconduct was

committed with the knowledge of the defendants' supervisors, or was allowed to occur because of their deliberate indifference to this misconduct. Id.

These unconstitutional acts and practices were used time and again during the investigation of Haith's murder, which resulted in Weimer's wrongful conviction and imprisonment. Id. ¶ 92.

The same acts and practices were also perpetrated by the same Fayette County District Attorney's Office against David Munchinski, who was wrongfully convicted and served 27 years in prison before being fully exonerated. Id. ¶ 93. See Munchinski v. Solomon, in his Official Capacity as District Attorney of Fayette County, Pennsylvania and in his Individual Capacity, et al., Civ. No. 2:13-cv-1280 (W.D. Pa). Id. The same acts and practices were also perpetrated by the same Fayette County District Attorney's Office against Mark Breakiron, whose convictions were overturned because exculpatory evidence was withheld. Id. See Breakiron v. Horn, et al., 642 F.3d 126 (3d Cir. 2011). Id. There are notable similarities between these cases. Id. The Munchinski case, like this case, involved witness coaching, the use of witnesses who were not credible, recanted testimony, and the withholding of exculpatory evidence relating to witness credibility. Id. The Breakiron case, like this case, also involved prosecutorial use of non-credible witnesses and failure to disclose that a material witness had sought a deal in exchange for their testimony. Id.

Policymakers at the City of Connellsville, Fayette County, and Fayette County District Attorney's Office were aware or should have been aware of the individual defendants' unconstitutional practices, as well as alternatives to such practices, including training and discipline to prevent fabrication of evidence, the withholding of exculpatory evidence, ignoring exculpatory evidence, the procurement of false witness statements, failing to pursue leads, and

arrest and prosecution without probable cause. Id. ¶ 144. As reflected by the wrongful

convictions against Weimer, Breakiron, and Munchinski, the policy makers at the City of

Connellsville, Fayette County, and Fayette County District Attorney's Office acquiesced in a

long standing policy or custom of inaction in regard to wrongful and malicious investigations

and prosecutions. Id. ¶ 145. The policymakers at City of Connellsville, Fayette County, and

Fayette County District Attorney's Office were aware or should have been aware of these

practices, as well as alternatives to such practices, and failed to discipline the individual

defendants, either before or after the incidents in question. Id. ¶ 146.

## IV. DISCUSSION

### A. Plaintiff's § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments Claim against Vernon – Count I

The County Defendants contend that their Motion to Dismiss must be granted as to

Weimer's § 1983 malicious prosecution claim against Vernon because there are no allegations in

the Amended Complaint that she was involved in the investigation of Haith's murder, Vernon's

involvement in Weimer's case stems solely from her acts in prosecuting the matter, and

therefore, Vernon is entitled to absolute prosecutorial immunity as to the § 1983 malicious

prosecution claim. ECF No. 55 at 9-13. Alternatively, the County Defendants argue that

Weimer's allegations concerning Vernon seeking clarification concerning the bite mark evidence

would be entitled to qualified immunity. Id. at 15.

Weimer responds that the County Defendants' Motion to Dismiss should be denied as to

her § 1983 malicious prosecution claim against Vernon because Vernon participated in the police

investigation of Haith's murder, which pre-dated Weimer's arrest and charge, and as to her

purely investigatory activities, Vernon is not entitled to absolute immunity. ECF No. 66 at 10.

Weimer also asserts that Vernon's continued post-conviction withholding of exculpatory

evidence should not enjoy the protection of absolute immunity since she was no longer acting as a prosecutor in the case and was instead serving as a state court judge. Id. at 11. Finally, as to Vernon's contention that she should be given qualified immunity as to her investigation of the bite mark evidence, Weimer argues:

> [The] Amended Complaint alleges that Vernon actively participated in and directed certain aspects of the Connellsville police's reckless and deliberately indifferent investigation, which violated Ms. Weimer's clearly established constitutional rights. Vernon's involvement in the investigation was not limited to the bogus bite mark evidence. Indeed, Vernon participated in investigating in Blair's and Stenger's statements, which were inconsistent, contradicted by DNA evidence, and in certain instances, fabricated and coerced. Moreover, the alleged bite mark evidence was contradicted by medical personnel, other witness testimony and exculpatory DNA evidence.

Id. at 12.

 "[I]n initiating a prosecution and in presenting the State's case," a prosecutor has absolute immunity under § 1983 from actions for malicious prosecution. Imbler v. Pachtman, 424 U.S. 409 (1976). "This is true even where a prosecutor has acted maliciously or dishonestly." Mujaddid v. Wehling, 663 F. App'x 115, 119 (3d Cir. 2016). "The filing of formal charges is a threshold event that separates the investigatory phase [of a criminal proceeding] from the prosecutorial phase of a criminal proceeding." Richter v. Pa. State Police, Civ. No. 15-775, 2018 WL 2984966, at *6 n. 11 (W.D. Pa. June 14, 2018) (citing Spiker v. Allegheny Cnty. Bd. of Probation & Parole, 920 F. Supp. 2d 580, 600-601 (W.D. Pa. 2013)). To the contrary, "[m]erely investigative evidence-gathering is not absolutely protected." See Kulwicki v. Dawson, 969 F.2d 1454, 1465 (3d Cir. 1992).  Importantly:

> Absolute immunity for prosecutorial activity is not limited to the initiation of a lawsuit. The Supreme Court has recognized that "the duties of the prosecutor in [her] role as advocate for the State involve actions preliminary to the initiation of prosecution and actions apart from the courtroom." Imbler, 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33. Immunity extends to "the preparation necessary to present a case," and this includes the "obtaining, reviewing, and evaluation of evidence."

> *Schrob [v. Catterson]*, 948 F.2d [1402,] 1414 [(3d Cir. 1991)], citing *Imbler*, 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33. *See Forsyth v. Kleindienst*, 599 F.2d 1203, 1215 (3d Cir.1979) ("[T]o the extent that the securing of information is necessary to a prosecutor's decision to initiate a criminal prosecution, it is encompassed within the protected, quasi-judicial immunity afforded to the decision itself."), *cert. denied, sub nom. Mitchell v. Forsyth*, 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981).

Kulwicki, 969 F.2d at 1464–65.

While Weimer, by her argument appears to concede this point, to be clear, upon review of the Amended Complaint, the Court finds that all of the alleged misconduct undertaken by Vernon with respect to Weimer falls under the umbrella of prosecutorial activities protected by absolute immunity, with one exception.[3] Weimer alleges that at some point, as part of the investigation, the timing of the purported bite mark on Haith's hand was called into question and Vernon directed that the bite-mark evidence be further investigated. With respect to the investigation of the bite mark, the Court finds that Plaintiff has sufficiently alleged conduct by Vernon that plausibly could be mere investigatory activity not protected by absolute prosecutorial immunity. Further, while Vernon argues that she is entitled to qualified immunity with respect her directing further investigation of the bite mark evidence because "at the relevant time bite mark analysis evidence was not clearly established," this Court finds that the record will need to be further developed as it relates to the bite mark and Vernon's conduct concerning the investigation of the bite mark, including the timing of the further inquiry, and Vernon's

---

[3]Alleged misconduct of Vernon which falls under the umbrella of prosecutorial activities protected by absolute immunity includes: (1) prosecuting Weimer using false or inconsistent statements/testimony from Beal, Blair, Stenger, Mackey and Reynolds; (2) prosecuting Weimer using bite mark evidence; (3) failing to disclose to defense counsel prior to or during trial deals made to Mackey and Reynold in exchange for testimony; (4) allowing Mackey and Reynolds to testify at trial that they were not receiving any consideration for themselves or others in return for testifying; (5) stating to the jury in closing arguments that Mackey and Reynolds had not received any consideration for themselves in return for testifying against Weimer at her trial; and (6) any attempt to have Williams testify falsely at Weimer's trial.

participation in the investigation in the Haith murder in general before it can be determined whether she is entitled to qualified immunity on this issue.[4]

Weimer also contends that Vernon should not enjoy the protection of absolute immunity relative to exculpatory evidence located during Weimer's post-conviction proceedings since she was no longer acting as a prosecutor in the case and was instead serving as a state court judge. The Court, however, does not read the Amended Complaint to allege that Vernon withheld the exculpatory evidence during Weimer's post-conviction proceedings. The paragraph in the Amended Complaint to which Weimer cites in support of this argument alleges that Weimer's post-conviction relief counsel requested the defendants' entire investigatory file, and letters from Mackey and Reynolds were located in one of Vernon's files, which the Court reasonably infers was located in the Fayette County District Attorney's Office, Vernon's former employer. See ECF No. 47 at ¶ 85. Given that said allegation does not equate to Vernon withholding exculpatory evidence during Weimer's post-conviction proceedings, the Court will not deny the County Defendants' Motion to Dismiss Weimer's § 1983 malicious prosecution claim against Vernon based upon this argument.

Finally, in addition to her substantive response to the County Defendants' Motion to Dismiss Vernon's § 1983 malicious prosecution claim, Weimer also sought permission to amend her complaint if any of her claims against Vernon are dismissed, "particularly on the basis of absolute immunity," to add facts about Vernon's actions from a Connellsville Police Report. ECF No. 66 at 4 n. 2.  The County Defendants oppose this request on the basis that the allegations of fact that Weimer seeks to add to her Amended Complaint are derived from a Connellsville Police Report that was attached to co-defendant Cesario's original Motion to

---

[4] Indeed, it is possible that through discovery it will be determined that Vernon is entitled to absolute prosecutorial immunity will respect to this action and qualified immunity need not even be addressed.

Dismiss. Therefore, Weimer could have included the allegations in the current Amended Complaint. While an accurate statement, nevertheless, the Court will allow Plaintiff an additional opportunity to state a plausible § 1983 Fourth Amendment malicious prosecution claim against Vernon.

For all these reasons, the Court shall grant the County Defendants' Motion to Dismiss Weimer's § 1983 malicious prosecution claim against Vernon on the basis of prosecutorial immunity and dismiss the claim with prejudice to the extent the claim is based upon allegations of misconduct by Vernon involving prosecutorial activities. See footnote 2 supra. As to Weimer's allegations of misconduct by Vernon concerning investigating the bite mark evidence only, the Motion to Dismiss as to Count I shall be denied. Further, Plaintiff is granted leave to file a second amended complaint to identify specific wrongful investigatory acts by Vernon and otherwise add facts from the Connellsville Police Report referenced above.

**B. Plaintiff's § 1983 Deprivation of Liberty Without Due Process and Denial of Fair Trial and Deliberately Failing to Conduct a Constitutionally Adequate Investigation Claim Against Vernon - Count II**

In Count II of her Amended Complaint, Weimer alleges that Vernon violated her Fourteenth Amendment due process rights to not be subjected to a reckless investigation and to receive a fair trial. ECF No. 47 ¶¶ 105-111. The County Defendants move to dismiss this claim against Vernon on the bases that: (1) the Amended Complaint does not allege that Vernon was involved in the investigation of the Haith murder; (2) the evidence Weimer claims was fabricated by Vernon and exculpatory was neither fabricated by Vernon nor exculpatory; (3) Vernon is entitled absolute prosecutorial immunity as to the claim; and (4) qualified immunity applies to the claim concerning the bite mark evidence. ECF No. 55 at 13-16.

Weimer raises the same arguments in response to the County Defendants' Motion to Dismiss Weimer's § 1983 Fourteenth Amendment due process rights claim against Vernon as she did in response to the County Defendants' Motion to Dismiss Weimer's § 1983 malicious prosecution claim. ECF No. 66 at 10-12.

The Court finds as follows. First, to the extent that Weimer's claim against Vernon in Count II is based upon Vernon's reckless investigation of the purported bite mark in violation of Weimer's due process rights under the Fourteenth Amendment, such a claim fails. In <u>Geness v. Cox</u>, ___ F.3d __, 2018 WL 4087887, at *6 n. 5 (3d Cir. Aug. 28, 2018), the United States Court of Appeals for the Third Circuit recently stated with respect to a claim for reckless investigation brought pursuant to the Fourteenth Amendment:

> Although Geness purports to state a claim for reckless investigation under the Due Process Clause of the Fourteenth Amendment, such a claim, if cognizable, could only arise under the Fourth Amendment. See *Manuel v. City of Joliet, Ill*, ––– U.S. ––––, 137 S.Ct. 911, 919, 197 L.Ed.2d 312 (2017) ("If the complaint is that a form of legal process resulted in pretrial detention unsupported by probable cause, then the right allegedly infringed lies in the Fourth Amendment."); accord *Albright v. Oliver*, 510 U.S. 266, 274, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality opinion). *Geness v. Cox*, No. 17-2073, 2018 WL 4087887, at *6 (3d Cir. Aug. 28, 2018) "Whatever doubts we may harbor as to the viability of such a claim, however, *see Brooks v. City of Chi*., 564 F.3d 830, 833 (7th Cir. 2009) (observing that "[a] plaintiff cannot state a due process claim by combining what are essentially claims for false arrest under the Fourth Amendment and state law malicious prosecution into a sort of hybrid substantive due process claim under the Fourteenth Amendment" (citations omitted)); *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (stating that an officer need not "explore and eliminate every theoretically plausible claim of innocence" even if "an investigation might have cast doubt upon the basis for the arrest" (citations omitted)), we have no occasion to resolve them today [because] no such constitutional right was "clearly established" at the relevant time, as required to overcome qualified immunity. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011).

<u>Geness</u>, 2018 WL 4087887, at *6 n. 5 (3d Cir. Aug. 28, 2018). <u>See also</u> <u>Johnson v. Logan</u>, No. 17-1090, 721 F. App'x. 205, 208 n. 9 (3d Cir. 2018) ("We note, without deciding, that we have significant doubts about whether there is an independent substantive due process right to be free

from a reckless investigation") (citing <u>Brooks v. City of Chicago</u>, 564 F.3d 830, 833 (7th Cir. 2009) ("[a] plaintiff cannot state a due process claim 'by combining what are essentially claims for false arrest under the Fourth Amendment and state law malicious prosecution into a sort of hybrid substantive due process claim under the Fourteenth Amendment.'") (quoting <u>McCann v. Mangialardi</u>, 337 F.3d 782, 786 (7th Cir. 2003))); <u>Newton v. City of New York</u>, 566 F. Supp. 2d 256, 278 (S.D.N.Y. 2008) ("[T]here is no constitutional right to an adequate investigation."); <u>Thomas v. City of Philadelphia</u>, 290 F. Supp. 3d 371, 386 (E.D. Pa. 2018) (court declined to hold that there was an independent cause of action under the Fourteenth Amendment for failing to conduct a constitutionally adequate investigation, emphasizing "here, even without a stand-alone claim for 'failure to investigate,' the detectives' wrongful conduct is still captured in other claims. For instance, the leads that the detectives failed to investigate pertain to the malicious prosecution claim—the detectives arguably knew enough to realize they did not have probable cause, but they prosecuted Mr. Thomas anyway. The investigation-related issues are indeed addressed in other causes of action in this case"). Pursuant to <u>Geness</u>, <u>supra</u>. the County Defendants' Motion to Dismiss Count II of Weimer's Amended Complaint against Vernon to the extent it contains a § 1983 Fourteenth Amendment reckless investigation claim is granted and Weimer's § 1983 Fourteenth Amendment reckless investigation claim against Vernon is dismissed with prejudice.

Turning to Weimer's § 1983 Fourteenth Amendment violation of right to a fair trial claim against Vernon, "[i]t is well settled that prosecutors are entitled to absolute immunity from claims based on their failure to disclose exculpatory evidence, so long as they did so while functioning in their prosecutorial capacity." <u>Yarris v. Cty. of Delaware</u>, 465 F.3d 129, 137 (3d Cir. 2006). Therefore, to the extent Weimer's due process claim is premised upon Vernon's

failure to provide Reynold's and Mackey's letters to defense counsel during Weimer's trial, or otherwise reveal to defense counsel that two of the prosecution's trial witnesses were testifying at trial that Weimer had confessed to them while in jail to be involved in the Haith murder in exchange for "consideration" in their own case or the case of a significant other, she is entitled to absolute immunity on the claim. See also Lokuta v. Sallemi, Civ. No. 13-0288, 2013 WL 5570227, at *9 (M.D. Pa. Oct. 9, 2013); Gibbs v. Deckers, 234 F. Supp. 2d 458, 462-63 (E.D. Pa. 2002) (holding that concealment of exculpatory evidence is protected by prosecutorial immunity); Douris v. Schweiker, 229 F. Supp. 2d 391, 399 (E.D. Pa. 2002) ("withholding exculpatory evidence is a quasi-judicial act protected by absolute immunity"). Vernon also is entitled to absolute immunity to the extent Weimer's claim is based upon Vernon knowingly offering Mackey and Reynold's perjured testimony when she allowed Mackey and Reynolds to testify at Weimer's trial that they were testifying without any expectation that they would receive anything in exchange for their testimony and to the extent Vernon stated in closing arguments to the jury that Mackey and Reynolds had not received anything in consideration for their testimony at trial. The United States Supreme Court and the Third Circuit have "held that absolute immunity applies to a prosecutor's knowing use of perjured testimony in a judicial proceeding." Schrob v. Catterson, 948 F.2d 1402, 1417 (3d Cir. 1991) (citations omitted); see also id. ("[p]rosecutors and other lawyers were absolutely immune at common law for making false or defamatory statements in judicial proceedings"); Yarris, 465 F.3d at 139 (use of false testimony in connection with a prosecution is absolutely protected); Lokuta, 2013 WL 5570227, at *9.

For these reasons, the County Defendants' Motion to Dismiss Weimer's § 1983 Fourteenth Amendment due process claim against Vernon shall be granted and Weimer's § 1983

Fourteenth Amendment violation of right to a fair trial claim against Vernon shall be dismissed with prejudice.

### C. Plaintiff's § 1983 Civil Rights Conspiracy Claim against Vernon - Count III

In Count III of the Amended Complaint, Weimer alleges a § 1983 civil rights conspiracy claim against the individual defendants in this action, including Vernon. ECF No. 47 ¶¶ 15-19, 112-120. The County Defendants move to dismiss the § 1983 civil rights conspiracy claim against Vernon on the basis that she is shielded by absolute prosecutorial immunity. ECF No. 55 at 16.

In response, Weimer reiterates her arguments as to why Vernon's actions should not be subject to absolute immunity, i.e., Vernon participated in the police investigation of Haith's murder. ECF No. 66 at 12-13.

"To state a viable claim for conspiracy under Section 1983, a plaintiff must allege: (1) the existence of a conspiracy involving state action; and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." Bishop v. Upper Darby Police Dep't, Civ. No. 15-6069, 2018 WL 2359241, at *6 (E.D. Pa. May 24, 2018) (citing Marchese v. Umstead, 110 F. Supp. 2d 361, 371 (E.D. Pa. 2000). "Civil rights conspiracies brought under Section 1983 require a 'meeting of the minds,' and to survive screening of a motion to dismiss, plaintiffs must provide some factual basis to support the existence of the elements of a conspiracy, namely, agreement and concerted action." Id. (citing Startzell v. City of Philadelphia, 533 F.3d 183, 205 (3d Cir. 2008) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158 (1970)). Thus, in Martin v. Secretary of Corrections, Civ. No. 16-2060, 2018 WL 1158250 (M.D. Pa. Mar. 5, 2018), the district court recently explained:

In order to demonstrate a conspiracy, "a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a constitutional right 'under color of law.'" *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 700 (3d Cir. 1993) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)), abrogated on other grounds by *United Artists Theatre Circuit, Inc. v. Twp. of Warrington, Pa.*, 316 F.3d 392, 400 (3d Cir. 2003). "Bare conclusory allegations of 'conspiracy' or 'concerted action' will not suffice to allege a conspiracy. The plaintiff must expressly allege an agreement or make averments of communication, consultation, cooperation, or command from which such an agreement can be inferred." *Flanagan v. Shively*, 783 F. Supp. 922, 928 (M.D. Pa. 1992). The plaintiff's allegations of a conspiracy "must be supported by facts bearing out the existence of the conspiracy and indicating its broad objectives and the role each Defendant allegedly played in carrying out those objectives." *Id.* A plaintiff cannot rely on subjective suspicions and unsupported speculation. *Young v. Kann*, 926 F.2d 1396, 1405 n. 16 (3d Cir. 1991).

Martin, 2018 WL 1158250, at *5. "It is not enough that the end result of the parties' independent conduct caused plaintiff harm or even that the alleged perpetrators of the harm acted in conscious parallelism." Spencer v. Steinman, 968 F. Supp. 1011, 1020 (E.D. Pa. 1997)

Again, as currently alleged, all of Vernon's misconduct undertaken pursuant to the alleged conspiracy is shielded by absolute prosecutorial immunity but for Vernon's involvement in the alleged conspiracy wherein she sought further investigation of the bite mark evidence. See Gregg v. Pettit, Civ. No. 07-1544, 2009 WL 57118, at *4 (W.D. Pa. Jan. 8, 2009) (where plaintiff had alleged that two prosecutors had "maliciously conspired with all other ... defendants to prosecute, convict and execute Plaintiff for a heinous crime he did not commit," court granted prosecutors' motion to dismiss as the allegation of conspiracy came within a prosecutor's absolute immunity). As with the Plaintiff's § 1983 Fourth Amendment malicious prosecution claim against Vernon found in Count I of the Amended Complaint, Weimer requests, and the Court shall permit, her the opportunity to file a second amended complaint that states a plausible § 1983 civil rights conspiracy claim against Vernon based upon her involvement in the police investigation of Haith's murder. Accordingly, the County Defendants' Motion to Dismiss

Weimer's § 1983 conspiracy claim against Vernon is granted. However, the Motion to Dismiss Count III as to Vernon is granted and the claim is dismissed with prejudice as to all allegations of misconduct/conspiracy based upon Vernon's prosecutorial activities. The Motion to Dismiss Count III is granted without prejudice as to investigatory misconduct/conspiracy by Vernon concerning the bite mark evidence and other investigatory conduct, such that Plaintiff may file a second amended complaint.[5]

### D. Plaintiff's § 1983 Failure to Intervene Claim against Vernon - Count IV

In Count IV of the Amended Complaint, Weimer alleges a § 1983 failure to intervene claim against the individual defendants, including Vernon. ECF No. 47 ¶¶ 121-125. The County Defendants move to dismiss the claim against Vernon on the basis that there is no authority in this Circuit that recognizes a claim against a prosecutor for failure to intervene in the actions of a police officer and even if there was, the amended complaint does not allege that Vernon had a realistic and reasonable opportunity to correct any alleged violation. ECF No. 55 at 18-19.

In response, Weimer argues that the Amended Complaint sufficiently alleges that Vernon actively participated in the defendants' reckless and deliberately indifferent investigation and that her participation dates back to the initial stages of the investigation such that Vernon had numerous reasonable and realistic opportunities to intervene to prevent unconstitutional investigatory activities prior to Weimer's arrest. ECF No. 66 at 14. Weimer further asserts that although Vernon may not have had official authority over the police officers, she was an active

---

[5] In anticipation of Plaintiff filing a second Amended Complaint with respect to Vernon participating in a conspiracy to violate her constitutional rights in violation of § 1983, the parties are directed to the recent decision of the United States Court of Appeals for the Third Circuit in Jutrowski v. Tp. of Riverdale, __ F.3d __, 2018 WL 4344677, at *8-9 (3d Cir. Sept. 12, 2018), wherein the appellate court extensively addressed the requisite elements of a conspiracy claim brought pursuant to § 1983.

participant and the amended complaint sufficiently alleges that the officers routinely follow her requests and sought her guidance throughput the investigation. Id.

Upon review, as currently pleaded Weimer's Amended Complaint does not sufficiently allege that Vernon actively participated in the defendants' reckless and deliberately indifferent investigation and that her involvement in the investigation dates back to the initial states of the investigation such that Vernon had numerous reasonable and realistic opportunities to intervene to prevent unconstitutional investigatory activities prior to Weimer's arrest. Accordingly, the County Defendants' Motion to Dismiss Weimer's § 1983 failure to intervene claim in Count IV against Vernon shall be granted and the claim dismissed. Said dismissal shall be without prejudice, however, to file a second amended complaint that alleges a plausible § 1983 failure to intervene claim against Vernon since "[d]ismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility" and in this case, there is no suggestion of bad faith, undue delay, prejudice, or futility. Alston v. Parker, 363 F.3d 229, 236 (3d Cir. 2004) (citation omitted).

In particular, the Court finds that allowing Weimer leave to amend this claim would not be futile because while the County Defendants are correct that there is no case law in the Third Circuit holding a prosecutor liable for a failure to intervene in the conduct of police officers, there is case law supporting this premise in at least one other jurisdiction. See Serrano v. Guevara, 315 F. Supp. 3d 1026, 1038 (N.D. Ill. 2018) (quoting Harris v. City of Chicago, Civ. No. 15-3859, 2015 WL 5445012, at *4 (N.D. Ill. Sept. 15, 2015)) ("a prosecutor acting as an investigator can be held liable for failing to intervene"). Further, with respect to the defendants' contention that Vernon had no authority over the police defendants, as explained in Harris, where the prosecutor similarly had argued that "he, a non-officer, was powerless to prevent the officer

defendants from violating plaintiff's constitutional rights[,] [d]irect physical intervention was not required, however. Instead, [the prosecutor] could have satisfied his duty to intervene by cautioning [the officers] to stop, or by bringing the situation to their supervisor's attention." Harris, 2015 WL 5445012, at *4 (citing Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994)).

### E. Plaintiff's § 1983 Supervisory Liability Claim – Count V

In Count V of her Amended Complaint, Weimer alleges a § 1983 supervisory liability claim against all the defendants. The County Defendants move to dismiss the claim as against each of the County Defendants, including Vernon.

It is well established that "'[t]here are two theories of supervisory liability,' one under which supervisors can be liable if they 'established and maintained a policy, practice or custom which directly caused [the] constitutional harm,' and another under which they can be liable if they 'participated in violating plaintiff's rights, directed others to violate them, or, as the person[s] in charge, had knowledge of and acquiesced in [their] subordinates' violations'." Santiago v. Warminster Twp., 629 F.3d 121, 129 n. 5 (3d Cir. 2010) (quoting A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004)).

#### 1. The Office of the Fayette County District Attorney

The County Defendants move to dismiss the Office of the Fayette County District Attorney as not being a proper party to this claim. ECF No. 55 at 20.

Weimer asserts that the Office of the Fayette County District Attorney and Fayette County are separate entities and therefore, can both be sued. ECF No. 66 at 15.

The Court agrees that the Office of the Fayette County District Attorney is not an entity for purposes of § 1983 liability. In Reitz v. County of Bucks, 125 F.3d 139, 148 (3d Cir. 1997), the Third Circuit held: "To recapitulate, the district court's grant of summary judgment in favor

28

of Bucks County will be affirmed, the Bucks County District Attorney's Office is not an entity for purposes of § 1983 liability." Reitz, 125 F.3d at 14. Accordingly, the County Defendants' motion to dismiss Weimer's § 1983 supervisory liability claim against Office of the Fayette County District Attorney is granted and Weimer's § 1983 supervisory liability claim against the Office of the Fayette County District Attorney is dismissed with prejudice.

### 2. Fayette County

The County Defendants move to dismiss the supervisory liability claim against the County on the basis that Weimer has failed to allege a *Monell* liability claim. ECF 55 at 21-23. They assert Weimer fails to sufficiently allege that Vernon's actions constituted official policy or that she had policy-making authority. Id. at 21. They contend that the Amended Complaint fails to sufficiently allege a custom or practice through the use of previous civil rights cases against the County stemming from wrongful convictions because these cases were prosecuted by different County District Attorneys. Id. at 21-22.

A county cannot be held liable for its employees' bad acts on the basis of respondeat superior. Monell v. Dept. of Social Services, 436 U.S. 658, 694-95 (1978); Panas v. City of Philadelphia, 871 F. Supp. 2d 370, 377-78 (E.D. Pa. May 14, 2012). Rather, the "government itself, through its policies or practices, must be sufficiently culpable before" a court imposes § 1983 liability. Id. However, merely alleging the existence of a policy, practice, or custom is not enough. The plaintiff in a Section 1983 action must show an "affirmative link" between the occurrence of police misconduct and the municipality's policy, custom, or practice. Rizzo v. Goode, 423 U.S. 362, 371 (1976). Thus, consistent with Monell, in order to impose liability on a local governmental entity for failing to act to preserve constitutional rights, a Section 1983 plaintiff must establish not only that he was deprived of a constitutional right, but that: (1) the

municipality had a policy; (2) the policy "amounts to deliberate indifference" to the plaintiff's constitutional right; and (3) the policy is the "moving force behind the constitutional violation." City of Canton, Ohio v. Harris, 489 U.S. 378, 389–91, 109 S.Ct. 1197, (1989).

Courts have held municipalities liable for their policies, practices, or customs in a variety of scenarios that appear relevant to the instant case. First, liability may attach where a municipality's course of conduct is considered to be a "custom" when, though not authorized by law, "practices of state officials [are] so permanent and well-settled as to virtually constitute law." Id. This may occur when "policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to [plaintiff's] injury." Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (citing Bielevicz v. Dubinon, 915 F.2d 845, 851 (3d Cir. 1990)).

Second, a municipality may be held liable for the constitutional violations of employee police officers when the municipality fails to adequately supervise or train its officers. City of Canton, Ohio, 489 U.S. at 388. In this case, where the basis for § 1983 liability rests upon a municipality's alleged failure to adequately train or supervise its officers, the claim will only succeed if the failure to train or supervise amounts to "deliberate indifference" to the rights of persons with whom the police come into contact. Id. at 388. "Deliberate indifference" exists where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Id. at 390. Only then can "such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." Id. at 389.

In addition to establishing a policy or custom of constitutional violations, or a lack of supervision or training amounting to deliberate indifference, a plaintiff also bears the "burden of proving that the municipal practice was the proximate cause of the injuries suffered." Bielevicz, 915 F.2d at 850. "To establish the necessary causation, a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue." Id. at 850. Causation is normally a jury question. Panas, 871 F. Supp. 2d at 378. "As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." Bielevicz, 915 F.2d at 851.

In the Amended Complaint, Weimer has clearly alleged a long-standing pattern and practice in the Office of the Fayette County District Attorney of abuses and misconduct, including the withholding of exculpatory evidence, the using or directing of coercive interview techniques, and the fabricating of incriminating statements from witnesses, suspects, and arrestees. She further alleges that said misconduct occurred in her criminal case, as well as in two earlier criminal cases that were prosecuted in the Office of the Fayette County District Attorney, Breakiron v. Horn et al., 642 F.3d 126 (3d Cir. 2011) and Munchinski v. Solomon in his Official Capacity as District Attorney of Fayette County and in his Individual Capacity, et al., Civ. Act. No. 13-1280 (W.D. Pa.), and that this pattern of similar unconstitutional behavior caused the plaintiff and those individuals all to be wrongfully convicted of serious criminal offenses. Based upon these allegations, the Court finds that as to the County, while the record will need to be more fully developed, in particular as it relates to the specifics of the two identified cases, at this early stage of this case, Weimer has sufficiently alleged a Monell

supervisory liability claim. The County Defendants' Motion to Dismiss Weimer's § 1983 supervisory liability claim against the County is denied.

### 3. Vernon

Weimer argues that the County Defendants' Motion to Dismiss her § 1983 supervisory liability claim against Vernon should be denied because "Vernon should be held liable for supervisory liability relating to her subordinate's investigative acts and any actions that are not covered by absolute immunity." ECF No. 66 at 15.

As currently pleaded, the Amended Complaint does not allege that Vernon supervised any subordinates in the District Attorney's office with respect to the investigation of the Haith murder. The County Defendants' Motion to Dismiss Weimer's § 1983 supervisory liability claim against Vernon must, therefore, be granted and Weimer's § 1983 supervisory liability claim against Vernon dismissed. Said dismissal, however, shall be without prejudice to file a second amended complaint that alleges a plausible § 1983 supervisory liability claim against Vernon since "[d]ismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility" and in this case, there is no suggestion of bad faith, undue delay, prejudice, or futility. Alston, 363 F.3d at 236.

### F. Plaintiff's State Law Malicious Prosecution Claim– Count VI

In Count VI of her Amended Complaint, Weimer alleges a Pennsylvania state law malicious prosecution claim against Vernon. The County Defendants move to dismiss Weimer's state law malicious prosecution claim against Vernon on the basis that Vernon has high public official immunity with respect to the claim. ECF No. 55 at 24.

Weimer does not provide a substantive response to the County Defendants' Motion to Dismiss the state law claim, which the Court considers an implicit concession that this claim is

properly dismissed on the basis of high public official immunity. The County Defendants'
Motion to Dismiss Weimer's state law malicious prosecution claim against Vernon is granted.

## V.     CONCLUSION

For the reasons set forth above, the Motion to Dismiss filed on behalf of the County of
Fayette, Pennsylvania, Office of the Fayette County District Attorney, and Nancy Vernon, in her
official and individual capacities, ECF No. 54, is granted in part and denied in part. An
appropriate Order follows.

## <u>ORDER</u>

AND NOW this 14th day of September, 2018, it is hereby ORDERED, ADJUDGED,
AND DECREED that the motion to dismiss filed by defendants County of Fayette,
Pennsylvania, Office of the Fayette County District Attorney, and Nancy Vernon, in her official
and individual capacities is granted in part and denied in part as follows:

(1) The motion is granted as to Plaintiff's § 1983 malicious prosecution claim against
Defendant Vernon at Count I to the extent the claim is premised upon allegations of
misconduct by Vernon involving prosecutorial activities and is denied to the extent the
claim is premised upon Vernon investigating the bite mark evidence and other
investigatory conduct;

(2) The motion is granted as to Plaintiff's § 1983 Fourteenth Amendment claims against
Defendant Vernon contained in Count II of Plaintiff's Amended Complaint and the
claims in Count II are dismissed with prejudice;

(3) The motion is granted as to Plaintiff's §1983 civil rights conspiracy claim against
Defendant Vernon at Count III; however, the claim is dismissed with prejudice to the
extent the claim is premised upon allegations of misconduct/conspiracy by Vernon

involving prosecutorial activities and is dismissed without prejudice to the extent the claim is premised upon Vernon investigating the bite mark evidence and other investigatory conduct;

(4) The motion is granted without prejudice as to Plaintiff's § 1983 failure to intervene claim against Defendant Vernon;

(5) The motion is granted with prejudice as to Plaintiff's § 1983 supervisory liability claim against the Defendant Office of the Fayette County District Attorney;

(6) The motion is denied as to Plaintiff's § 1983 supervisory liability claim against the County;

(7) The motion is granted without prejudice as to Plaintiff's § 1983 supervisory liability claim against Defendant Vernon; and

(8) The motion is granted as to Plaintiff's Pennsylvania state law malicious prosecution claim.

IT IS FURTHER HEREBY ORDERED, ADJUDGED, AND DECREED that Plaintiff is granted leave to file a second Amended Complaint no later than October 15, 2018:

(1) as to Count I, that identifies specific wrongful investigatory acts, including as to bite mark evidence, by Vernon and otherwise add facts from the Connellsville Police Report referenced in the Opinion accompanying this Order;

(2) as to Count III, that states a plausible § 1983 civil rights conspiracy claim against Vernon and identifies specific wrongful investigatory acts, including as to bite mark evidence;

(3) as to Count IV, that states a plausible § 1983 failure to intervene claim against Vernon; and,

(4) as to Count V, that states a plausible § 1983 supervisory liability claim against Vernon.


/s/  Maureen P. Kelly
MAUREEN P. KELLY
CHIEF UNITED STATES MAGISTRATE JUDGE