**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CRYSTAL DAWN WEIMER,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| vs. | ) | **Civil Action No. 17-1265** |
| | ) | **Chief Magistrate Judge Maureen P. Kelly** |
| **COUNTY OF FAYETTE,** | ) | |
| **PENNSYLVANIA, OFFICE OF THE** | ) | |
| **FAYETTE COUNTY DISTRICT** | ) | |
| **ATTORNEY, CITY OF** | ) | |
| **CONNELLSVILLE, NANCY VERNON,** | ) | **Re: ECF No. 56** |
| **in her Official and Individual capacities,** | ) | |
| **and RONALD HAGGERTY, JR.,** | ) | |
| **THOMAS CESARIO, THOMAS** | ) | |
| **PATTON, and BEVERLY ASHTON, in** | ) | |
| **their individual capacities,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

<u>**OPINION**</u>

**KELLY, Chief Magistrate Judge**

Pending before the Court is the Rule 12(b)(6) Motion to Dismiss filed by Defendants

City of Connellsville ("Connellsville"), Ronald Haggerty, Jr. ("Haggerty"), and Thomas Patton

("Patton") (the "Connellsville Defendants"). ECF No. 56. The Connellsville Defendants seek the

dismissal with prejudice of all claims filed against them in the Amended Complaint by the

plaintiff, Crystal Dawn Weimer ("Plaintiff" or "Weimer").

On April 7, 2006, Weimer was wrongfully convicted of third-degree murder and

conspiracy to commit third-degree murder in connection with the murder of Curtis Haith

("Haith"). ECF No. 47 ¶ 11. Haith had been murdered outside of his apartment, brutally beaten

and shot in the face. <u>Id.</u> ¶ 21. As a result of this wrongful conviction, Weimer was incarcerated

for more than eleven years before she was fully exonerated of all charges. <u>Id.</u> ¶ 11. The

individually named defendants in this matter are: (1) Nancy Vernon ("Vernon"), during the relevant time period the district attorney for Fayette County; (2) Thomas Cesario ("Cesario"), the lead investigator of the Haith murder for the Connellsville Police Department until his retirement in September 2002; (3) Haggerty, a sergeant in the Connellsville Police Department who took over as lead investigator of Haith's murder once Cesario retired; (4) Patton, a corporal in the Connellsville Police Department who led the investigation of Haith's murder after Weimer's convictions were vacated in 2015; and (5) Beverly Ashton ("Ashton"), a corporal in the Pennsylvania State Police Cold Case Unit, who was the lead officer for the state police's investigation of Haith's murder that led to Weimer's conviction. Id. ¶¶ 15-19.

## I. PROCEDURAL BACKGROUND

Weimer filed her original Complaint against the defendants, County of Fayette, Pennsylvania ("Fayette County"), Office of the Fayette County District Attorney, Connellsville Township,[1] Connellsville, Vernon, in her official and individual capacities, and Haggerty, Cesario, Patton, and Ashton in their individual capacities on September 28, 2017. ECF No. 1. The defendants filed motions to dismiss the original Complaint, ECF Nos. 23, 29, 32, and 35, and Weimer file a Motion for Leave to file an Amended Complaint, ECF No. 45. The Court granted the Motion for Leave to File an Amended Complaint, ECF No. 46, and on January 30, 2018, Weimer filed her Amended Complaint. ECF No. 47. The Connellsville Defendants filed a Motion to Dismiss the Amended Complaint and supporting brief. ECF Nos. 57-58. Plaintiff filed a brief in opposition to the Connellsville Defendants' Motion to Dismiss. ECF No. 65. The Connellsville Defendants filed a reply in response to Weimer's opposition brief. ECF No. 68.

---

[1] Connellsville Township was terminated as a party in this action on January 30, 2018.

The Connellsville Defendants' Motion to Dismiss Plaintiff's Amended Complaint is ripe for review. [2]

## II. STANDARD OF REVIEW

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) must be viewed in the light most favorable to the plaintiff and all the well-pleaded allegations of the complaint must be accepted as true. Erickson v. Pardus, 551 U.S. 89, 93-94 (2007). A complaint must be dismissed pursuant to Rule 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (rejecting the traditional 12(b)(6) standard set forth in Conley v. Gibson, 355 U.S. 41 (1957)). See also Ashcroft v. Iqbal, 556 U.S. 662 (2009) (specifically applying Twombly analysis beyond the context of the Sherman Act).

A Court need not accept inferences drawn by a plaintiff if they are unsupported by the facts as set forth in the complaint. See California Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004) (citing Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)). Nor must the Court accept legal conclusions set forth as factual allegations. Twombly, 550 U.S. at 555 (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). See also McTernan v. City of York, Penn., 577 F.3d 521, 531 (3d Cir. 2009) ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). A plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 556 (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004)). Although the United States Supreme

---

[2] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties voluntarily consented to having a United States Magistrate Judge conduct proceedings in this case, including the entry of a final judgment. ECF Nos. 21, 22, 27, 28, and 38.

Court does "not require heightened fact pleading of specifics, [the Court does require] enough facts to state a claim to relief that is plausible on its face." Id. at 570.

In other words, at the motion to dismiss stage, a plaintiff is "required to make a 'showing' rather than a blanket assertion of an entitlement to relief." Smith v. Sullivan, 2008 WL 482469, at *1 (D. Del. Feb. 19, 2008) (quoting Phillips v. Cty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008)). "This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." Phillips, 515 F.3d at 234 (quoting Twombly, 550 U.S. at 556 n. 3).

The United States Court of Appeals for the Third Circuit expounded on the Twombly/Iqbal line of cases:

> To determine the sufficiency of a complaint under Twombly and Iqbal, we must take the following three steps:
>
> First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.'

Burch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) (quoting Santiago v. Warminster Tp., 629 F.3d 121, 130 (3d Cir. 2010)).

"The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case." Tracinda Corp. v. DaimlerChrysler AG, 197 F.Supp.2d 42, 53 (D. Del. 2002) (citing Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993)). Indeed, the United States Supreme Court has held that a complaint is properly dismissed under Rule 12(b) where it does not allege "enough facts to state a claim to relief that is plausible on its face," Twombly, 550 U.S. at 570, or where the factual content does not allow the court "to

draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678. The question is not whether the plaintiff will prevail in the end but, rather, whether the plaintiff is entitled to offer evidence in support of his or her claims. <u>Swope v. City of Pittsburgh</u>, 90 F.Supp.3d 400, 405 (W.D. Pa. 2015) (citing <u>Oatway v. American Intern. Group, Inc.</u>, 325 F.3d 184, 187 (3d Cir. 2003)).

## III. FACTUAL ALLEGATIONS

In her Amended Complaint, Weimer alleges the following conduct relevant to the Connellsville Defendants' Motion to Dismiss.

Curtis Haith was murdered in the early morning hours on January 27, 2001, outside of his apartment. ECF No. 47 ¶ 21. He was beaten and shot in the face. <u>Id.</u> Connellsville police learned that Haith had been at two parties the evening of January 26, 2001, and morning of January 27, 2001, one in Uniontown and one in Connellsville. <u>Id.</u> ¶ 24. Weimer had attended the first party, in Uniontown, and had been in the car that drove Haith to the second party, in Connellsville. <u>Id.</u> ¶ 26. Along with interviewing other party goers, Connellsville police officers and co-defendants Cesario and Haggerty interviewed Weimer at her house the same day Haith was murdered. <u>Id.</u> ¶ 25.

When Cesario and Haggerty arrived at Weimer's house, she had been sleeping and was dressed in the same clothes she had worn the night before. <u>Id.</u> They observed what appeared to be mud and blood on Weimer's clothes. <u>Id.</u> Weimer also had injuries to her face and foot. <u>Id.</u>

In light of the mud and blood on her clothes and her injuries, the police, including Cesario and Haggerty, asked Weimer to come with them down to the Connellsville Police Department. <u>Id.</u> Weimer voluntarily accompanied the officers to the police station and readily provided her clothing for forensic testing. <u>Id.</u> At the police station, Weimer told the police she

had been at a party with Haith and others in Uniontown, that she, her cousin, Doug Giles ("Giles"), and her minor daughter, Rose, had driven Haith from Uniontown to the Arch Cafe, a bar in Connellsville, left him there, and then returned to Uniontown where she spent the rest of the night at the housing community where her mother and sisters resided. Id. ¶¶ 26-27. Weimer's location in Uniontown for the rest of the evening after dropping off Haith was corroborated by multiple witnesses. Id. ¶ 27.

In response to questioning about her injuries, Weimer explained to the police, including Cesario and Haggerty, that her foot injury had been caused by horseplay with Michael Gibson ("Gibson"), Weimer's then boyfriend, a few days before, and that the blood on her clothes and injury to her eye had been caused by a fight with Gibson the prior evening (i.e., on January 26, 2001), during which she had bit his thumb, causing Gibson to bleed on her clothing and strike her in the eye. Id. ¶ 28.

DNA testing of items collected from the crime scene as well as from Weimer's clothing subsequently showed that the blood on Weimer's clothing was Gibson's blood, Haith's blood was not on Weimer's clothing, and the hair and blood samples found at the scene of Haith's murder did not belong to Weimer, but rather, to an unidentified male. Id. ¶ 29. Thus, all DNA testing done relative to Haith's murder supported the conclusion that Weimer was not present at the crime scene, corroborated her statements to the police, and supported the accounts of the other individuals who stated to the Connellsville police that Weimer had been in Uniontown, and not in Connellsville, the night of the murder. Id. ¶ 30.

Even though the DNA evidence fully corroborated Weimer's account of the night of Haith's death and tied an unidentified male's DNA to the crime scene, investigators continued to focus their investigation with tunnel vision on Weimer, to the exclusion of other leads. Id. ¶ 31.

By way of example, witnesses told the Connellsville police that Haith had been involved with drugs, there was drug-related evidence found in Haith's residence upon his death, but no drugs, and yet, there was no indication in the Connellsville police investigative file that the police investigated whether Haith's death was drug-related. Id. ¶ 32. Similarly, at least eight people came to the police and provided evidence as to who killed Haith. Id. From this evidence ten males were implicated in Haith's death, including a male Haith had recently kicked out of his apartment and another male whom Haith had had an altercation with where a gun had been fired into the air. Id. Yet, the Connellsville police investigative file indicates little to no follow-up was conducted by the police with respect to these leads. Id. The focus of the Connellsville police investigation remained on Weimer, the police stubbornly convinced that they would be able to concoct and create some version of events that could tie Weimer to Haith's murder. Id. ¶ 34.

In October 2002, Thomas Beal ("Beal") came forward and told the Connellsville police that Weimer, who was Beal's former girlfriend, and Gibson, killed Haith, and that Haith's blood was on Weimer's clothing. Id. ¶ 35. The statement about Haith's blood being on Weimer's clothes was not, and could not be true; the police already definitively knew, through DNA testing, that Haith's blood was not on Weimer's clothing and that Weimer's blood was not at the crime scene. Id. Knowingly and willfully ignoring those facts, the defendants deliberately elected to rely upon Beal's uncorroborated statement. Id.

In November 2002, nearly two years after the murder, the Pennsylvania State Police ("PSP") Cold Case Squad was engaged to assist with the investigation. Id. ¶ 19. Ashton became the lead officer for the PSP's investigation of Haith's murder. Id. Despite the assistance of additional outside resources, the defendants' overall investigation maintained a tunnel-vision focus on Weimer. Id. ¶ 36.

At some point in the investigation, the defendants again spoke to Beal, only to learn that his "story" had substantially changed. Id. ¶ 43. Beal's newest version of Haith's murder was that a black man named Lonnie was also involved in the murder, and Weimer suffered her toe injury while kicking Haith. Id.

The defendants were forced to further investigate and incorporate Beal's new version of events into their narrative. Id. ¶ 44. Upon further investigation, conducted at the direction and understanding of the individual defendants, the defendants discovered that the man that Beal identified as Lonnie was in jail at the time of Haith's murder. Id. Despite this discovery, the defendants nevertheless continued to utilize Beal as a key part of their investigation into Haith's murder. Id.

In late August 2003, Conrad Clinton Blair ("Blair") contacted police and told them that Joseph Stenger ("Stenger"), a fellow inmate, confessed his involvement in Haith's murder. Id. ¶ 45. Blair told police that Stenger supposedly participated in the murder with Beal and Weimer. Id. Blair also provided police with a statement purportedly written by Stenger, which told a very different story of how Haith was murdered than Blair's version of the murder. Id. ¶ 46. In the written statement, Stenger did not state that he was involved in the murder, but instead said that he only heard of Haith's death after it occurred, and had assisted in disposing of the weapon and other evidence in a pond. Id.

Even though the Beal, Blair and Stenger statements were inaccurate, uncorroborated and contradicted by DNA evidence known to the defendants, as well as inconsistent with each other, nevertheless, the defendants agreed to proceed with filing charges against Weimer. Id. ¶ 47. In January, 2004, Weimer was arrested for Haith's murder. Id. ¶ 48. At Weimer's March 2004 preliminary hearing, the Commonwealth called Beal, as its only fact witness against Weimer,

even though the defendants knew that Beal's statements were contradicted by known evidence, other statements, and even by Beal himself. Id. ¶ 49. On the stand, Beal invoked his Fifth Amendment rights and refused to testify. Id. Weimer was still held over for trial. Id.

At Weimer's subsequent April 2004 hearing, the Commonwealth again called Beal to testify. Id. ¶ 50. On the stand, Beal fully recanted the statement he previously made to police in which he had implicated Weimer in Haith's death. Id. Beal testified that "the officer there, [Defendant] Haggerty, kind of like coaxed me along on how to do it." Id. Thereafter, the judge dismissed the charges against Weimer and released her from prison. Id.

Even after Beal revealed to the Court that the defendants had coerced and fabricated false testimony in their zeal to prosecute Weimer, the defendants still refused to drop their vendetta against Weimer. Id. ¶ 52. Instead, they re-focused their efforts, and worked to concoct and fabricate new evidence against Weimer. Id. This time, the defendants fabricated false statements from Stenger, who made many inconsistent statements throughout the course of the defendants' investigation. Id. Specifically, in July 2004, Stenger told law enforcement officials that he would be willing to implicate Weimer in Haith's murder in exchange for leniency on his sentencing for unrelated robbery convictions. Id. ¶ 53. The defendants intentionally elected to ignore that Stenger's new version of events was already contradicted by his own prior written statement, by DNA evidence, and by other known facts. Id. ¶ 54. Instead, using Stenger's statement, Weimer was again arrested and charged with Haith's murder. Id.

At Weimer's October 2004 preliminary hearing, the Commonwealth elicited testimony from Stenger that was profoundly different from his prior statements. Id. By the time Stenger testified at Weimer's preliminary hearing, he claimed to have been present during Haith's murder, and claimed that Haith was beaten by two unidentified black men while Weimer was

"screamin' and yelling." <u>Id.</u> ¶ 55. The defendants elicited this testimony despite the fact that Stenger's first written statement claimed only that he learned about Haith's murder after the fact and implicated Beal in the murder. <u>Id.</u>

During the course of the defendants' ongoing investigation of Haith's murder and Weimer's prosecution, Stenger made 15 statements, either directly or through others. <u>Id.</u> ¶ 56. He also testified 3 times (at his plea hearing, Weimer's second preliminary hearing, and Weimer's trial), and received a favorable plea deal in exchange for his cooperation. <u>Id.</u> Stenger's story changed each time he provided a statement until, during Weimer's post-conviction proceedings in 2015, he finally fully recanted, disavowed all of his prior stories, and unequivocally stated that he has no knowledge of the circumstances surrounding Haith's death. <u>Id.</u>

Prior to Weimer's trial, Anthony Williams ("Williams"), an inmate, came forward, providing evidence that undermined Stenger's false testimony. <u>Id.</u> ¶ 57. Williams alerted Weimer's criminal trial counsel that Stenger admitted that he was going to provide false testimony at trial implicating Weimer in Haith's murder. <u>Id.</u>

Upon learning that Williams was going to be called as a defense witness at trial, in March 2006, Vernon directed Haggerty and Ashton to further investigate Williams' evidence. <u>Id.</u> ¶ 58. Haggerty and Ashton visited Williams in prison and used their positions of authority to threaten Williams and attempt to force him to provide false testimony that would place Weimer at the crime scene. <u>Id.</u> ¶ 59. Williams refused to provide any false testimony. <u>Id.</u>

The defendants also used their positions of authority to encourage individuals to provide false jailhouse confessions by Weimer. <u>Id.</u> ¶ 60. In late 2004 into 2005, at least two jailhouse informants, Robert Mackey ("Mackey") and Linda Reynolds ("Reynolds"), directly contacted Vernon with information that Weimer allegedly "confessed" some involvement in Haith's death

to them. Id. ¶ 61. Both Mackey and Reynolds sought consideration, for themselves or a significant other, in exchange for their testimony. Id. ¶¶ 61-66.

Vernon received and reviewed Mackey's and Reynolds' letters and, in furtherance of the defendants' investigation, oversaw and directed additional investigatory acts, including interviews with these potential witnesses and others. Id. ¶ 67.

The letters written by Mackey and Reynolds were not provided to Weimer's trial counsel prior to, or after, trial. Id. ¶ 68. Reynolds' November 29, 2004 letter was first produced by the Fayette County District Attorney's Office during post-conviction discovery in 2015. Id. Reynolds' June 7, 2005 letter was provided directly by the Connellsville Police Department from their files, and it was mailed on June 22, 2016, mere days before Weimer's pre-trial hearing after being released from prison. Id.

The individual defendants acted together to collect evidence that could be used to prosecute Weimer, to turn a blind eye toward contradictory evidence and other potential leads, and to not disclose exculpatory evidence prior to trial. Id. ¶ 69.

Weimer was wrongfully convicted on April 7, 2006. Id. ¶ 2.

On October 1, 2015, after serving eleven years in prison, Weimer's convictions and sentence were vacated, and she was granted a new trial. Id. at 1. After Weimer's convictions were vacated, the individual defendants continued to act in concert to attempt to create additional evidence, with the intent of re-prosecuting Weimer for Haith's murder. Id. ¶ 79. The defendants' ongoing investigation of Haith's murder and malicious pursuit of Weimer included interviews of Stenger, as well as the continued and deliberate withholding of exculpatory evidence, including the Mackey and Reynolds letters. Id.

At this point, Stenger completely recanted his trial testimony. <u>Id.</u> In an interview with Weimer's federal habeas investigator, Stenger admitted that he never saw Weimer on the night of Haith's murder, and he had no knowledge that she was involved in the crime. <u>Id.</u> ¶ 80. Stenger further admitted that law enforcement, including Haggerty, walked him through his eventual "story," directly provided evidence and details as to how and where things happened to Stenger, to ensure that Stenger's details matched the actual crime scene. <u>Id.</u>

Patton had been assigned to lead the ongoing investigation of Haith's murder in an effort to re-prosecute Weimer for Haith's murder. <u>Id.</u> ¶ 82. Stenger reiterated his recantation to Patton on December 12, 2015 when Patton interviewed him without Stenger's legal counsel present. <u>Id.</u> Stenger told Patton "he was coerced by police into confessing and implicated Crystal Weimer." <u>Id.</u> There is a videotaped "confession" showing Stenger receiving details about evidence from Haggerty and Ashton, who are in the room, but not visible on the video. <u>Id.</u> ¶ 83.

In all, Stenger told 15 stories regarding Haith's murder, either directly to law enforcement or to others, from 2003 through 2014. <u>Id.</u> In each version Stenger's story shifted, starting with his claim to Blair that he gave Beal a gun and Beal and Weimer killed Haith, to his claim that he was at the scene but did not participate, to his claim that he shot Haith, to his final total recantation. <u>Id.</u> Despite the scores of inaccuracies in Stenger's statements, which were revealed during the defendants' investigation, they nevertheless called Stenger at court hearings and elicited false testimony from him three different times, in their unfettered zeal to convict Weimer regardless of the actual evidence that showed she could not have committed the murder. <u>Id.</u> ¶ 84.

Additionally, Weimer's post-conviction relief legal counsel, after requesting the defendants' entire investigatory file, were able to discover, in Vernon's file, some of the letters

by Mackey and Reynolds specifically asking for deals in exchange for their cooperation. Id. ¶ 85. A remaining letter from Reynolds was only discovered when, after multiple discovery requests and court conferences, documents were produced from the Connellsville Police Department's file during Weimer's 2016 pre-trial proceedings. Id.

On June 27, 2016, the trial court dismissed all charges against Weimer with prejudice. Id. ¶ 89. By June 27, 2016, Vernon was a sitting Court of Common Pleas Judge in Fayette County. Id.

The defendants' deliberate and willful actions taken against Weimer are not isolated events, but rather demonstrate ongoing policies, practices or customs of unconstitutional misconduct in homicide investigations, and in particular, the use of coercive techniques in interviews and interrogations to induce false confessions; the withholding of exculpatory evidence; and the fabricating of incriminating statements from witnesses, suspects, and arrestees by feeding details about the crime that the police knew (or believed to be true) to those witnesses, suspects, and arrestees. Id. ¶ 90.

Various cases demonstrate that this misconduct was pervasive within Fayette County law enforcement agencies at the time of Ms. Weimer's investigation. Id. ¶ 91. The misconduct was committed with the knowledge of the defendants' supervisors, or was allowed to occur because of their deliberate indifference to this misconduct. Id.

These unconstitutional acts and practices were used time and again during the investigation of Haith's murder, which resulted in Weimer's wrongful conviction and imprisonment. Id. ¶ 92.

Policymakers at the City of Connellsville, Fayette County, and Fayette County District Attorney's Office were aware or should have been aware of the individual defendants'

unconstitutional practices, as well as alternatives to such practices, including training and discipline to prevent fabrication of evidence, the withholding of exculpatory evidence, ignoring exculpatory evidence, the procurement of false witness statements, failing to pursue leads, and arrest and prosecution without probable cause. Id. ¶ 144. As reflected by the wrongful convictions against Weimer, Breakiron, and Munchinski, the policy makers at the City of Connellsville, Fayette County, and Fayette County District Attorney's Office acquiesced in a long standing policy or custom of inaction in regard to wrongful and malicious investigations and prosecutions. Id. ¶ 145. The policymakers at City of Connellsville, Fayette County, and Fayette County District Attorney's Office were aware or should have been aware of these practices, as well as alternatives to such practices, and failed to discipline the individual defendants, either before or after the incidents in question. Id. ¶ 146.

IV.     DISCUSSION

   A.  Plaintiff's § 1983 Malicious Prosecution Claim against Patton- Count I[3]

       The Connellsville Defendants contend that their Motion to Dismiss Weimer's § 1983 Fourteenth Amendment malicious prosecution claim must be granted as to Patton because the claim is improperly brought pursuant to the Fourteenth Amendment given that it is premised upon her right to be free from deprivation of liberty absent probable cause which is grounded in the Fourth Amendment's prohibition against unreasonable searches and seizures. ECF No. 57 at 7. The Connellsville Defendants also contend that their Motion to Dismiss Weimer's § 1983 Fourth Amendment malicious prosecution claim must be granted as to Patton because he was not involved in the criminal proceeding that led to Weimer's incarceration. Id. at 8. They argue that

---

[3] The Connellsville Defendants do not move to dismiss Count I as to Defendant Haggerty. ECF No. 57 at 18, n. 4.

Patton had no personal involvement in Weimer's arrest or the prosecution that led to her conviction. Id.

Weimer responds that Patton can be held liable for malicious prosecution even though he became involved after her convictions were vacated because he influenced the decision to re-prosecute her. ECF No. 65 at 11. In particular, Weimer asserts that Patton's actions contributed to the decision to re-prosecute her after her convictions had been vacated but her criminal charges were still pending in that Patton re-interviewed Stenger, learned that his testimony was false and had been coerced by Haggerty and others, and "Patton misrepresented those facts, thereby directly influencing the prosecutor's decision to continue to pursue Ms. Weimer's re-prosecution." Id. at 12.

The Connellsville Defendants' reply that there are no factual allegations in the Amended Complaint that support that Patton influenced the prosecution. ECF No. 68 at 2. Additionally, they contend that the re-prosecution did not lead to a deprivation of liberty, an element of a malicious prosecution claim, in that in 2016, Weimer's Petition for Writ of Habeas Corpus was granted and all charges against her dismissed. Id.

### 1. Fourteenth Amendment malicious prosecution claim

Weimer does not provide a substantive response to the Connellsville Defendants' Motion to Dismiss her § 1983 Fourteenth Amendment malicious prosecution claim as to Patton which the Court considers an implicit concession that this claim is properly dismissed as to Patton on the basis that her malicious prosecution claim is one based upon a Fourth Amendment violation and not one based upon a Fourteenth Amendment violation. Further, the Court finds that, as a matter of law, Weimer's § 1983 malicious prosecution claim against Patton, which is premised upon his alleged influence in the decision to re-prosecute Weimer for Haith's murder, is properly

brought as a § 1983 Fourth Amendment malicious prosecution claim and not as a § 1983 Fourteenth Amendment malicious prosecution claim. See Albright v. Oliver, 510 U.S. 266, 811 (1994) (explaining section 1983 claims should be brought to vindicate the specific constitutional right allegedly infringed). The Connellsville Defendants' Motion to Dismiss the § 1983 Fourteenth Amendment malicious prosecution claim against Patton is granted and the claim against Patton will be dismissed with prejudice.

### 2. Fourth Amendment malicious prosecution claim

In order to prevail on a § 1983 Fourth Amendment malicious prosecution claim, a plaintiff must establish that:

> (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in [the plaintiff's] favor; (3) the defendant initiated the proceeding without probable cause[4]; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

Halsey v. Pfeiffer, 750 F.3d 273, 296–97 (3d Cir. 2014) (citing Johnson v. Knorr, 477 F.3d 75, 82 (3d Cir. 2007) (footnote added); see also Rose v. Bartle, 871 F.2d 331, 349 (3d Cir. 1989).

"It is settled law that 'officers who conceal and misrepresent material facts to the district attorney are not insulated from a § 1983 claim for malicious prosecution simply because the prosecutor, grand jury, trial court, and appellate court all act independently to facilitate erroneous convictions'.  If the officers influenced or participated in the decision to institute criminal proceedings, they can be liable for malicious prosecution." Halsey, 750 F.3d at 297 (citations and footnote omitted). The officer's conduct must be a "significant cause of the prosecution."

---

[4] In Orsatti v. N.J. State Police, 71 F.3d 480 (3d Cir. 1995), the appellate court concluded, "[p]robable cause to arrest requires more than mere suspicion; however, it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt. Rather, probable cause to arrest exists when the facts and circumstances within the arresting officers' knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." Orsatti, 71 F.3d at 483 (internal citations omitted).

Aleynikov v. McSwain, Civ. No. 15-1170, 2016 WL 3398581, at *11 (D.N.J. June 15, 2016), opinion clarified, Civ. No. 15-1170, 2016 WL 5340513 (D.N.J. Sept. 22, 2016) (quoting Halsey, 750 F.3d at 297 n. 22).

As alleged in the Amended Complaint, Patton became involved with Weimer's case in 2015 when, as a corporal with the Connellsville Police Department, he became the lead investigator in the Haith murder in an effort to re-prosecute Weimer for the Haith murder ECF No. 47 ¶¶ 18, 82. Patton interviewed Stenger on December 12, 2015, without his legal counsel present. Id. Stenger reiterated to Patton that Weimer was not involved in the Haith murder and that he had been coerced by the police into confessing, and implicated Weimer. Id. That is the sum total of the allegations with respect to Patton, and nothing alleged therein equates to Patton influencing the prosecutor's decision to re-prosecute Weimer, as argued by Weimer. Moreover, the criminal proceeding for which Weimer suffered a "deprivation of liberty" was in 2006, nine years prior to Patton's involvement in the Haith murder investigation. Accordingly, because Weimer has not alleged that Patton influenced or participated in any decision to institute or reinstitute criminal proceedings against Weimer that resulted in the deprivation of Weimer's liberty, the Connellsville Defendants' Motion to Dismiss Weimer's § 1983 Fourth Amendment malicious prosecution claim against Patton must be granted. To the extent that Weimer can allege additional facts sufficient to support a malicious prosecution claim, solely related to the re-prosecution, she may file a second amended complaint as to Count I.

**B. Plaintiff's § 1983 Deprivation of Liberty Without Due Process and Denial of Fair Trial and Deliberately Failing to Conduct a Constitutionally Adequate Investigation Claim against Patton and Haggerty - Count II**

    **1. Involvement of Patton and Haggerty in the various stages of the Haith murder investigation**

The Connellsville Defendants move to dismiss Weimer's § 1983 Fourteenth Amendment deprivation of liberty and due process claim brought against Patton in Count II of the Amended Complaint, and argue in support thereof that the Amended Complaint does not contain any factual allegations that support that Patton's actions deprived Weimer of her liberty or due process in violation of her rights under the Fourteenth Amendment. ECF No. 57 at 9. They also move to dismiss Weimer's § 1983 Fourteenth Amendment deprivation of liberty and due process claim against Haggerty in Count II. They argue that Weimer's allegations fail to show that Haggerty conducted the Haith investigation in a manner that "shocks the conscience." Id. at 19.

Weimer responds that she has sufficiently alleged a § 1983 deprivation of due process claim against Patton and Haggerty in Count II because the United States Constitution guarantees the right to be free from deliberately inadequate or reckless police investigations and she has adequately pleaded that both police officer defendants "meaningfully and personally participated in a recklessly and deliberately inadequate criminal murder investigation," which deprived Weimer of her due process rights under the Fourteenth Amendment. ECF No. 65 at 13-14.

In Geness v. Cox, ___ F.3d ___, 2018 WL 4087887, at *6 n. 5 (3d Cir. Aug. 28, 2018), the United States Court of Appeals for the Third Circuit recently stated with respect to a claim for reckless investigation brought pursuant to the Fourteenth Amendment:

> Although Geness purports to state a claim for reckless investigation under the Due Process Clause of the Fourteenth Amendment, such a claim, if cognizable, could only arise under the Fourth Amendment. See *Manuel v. City of Joliet, Ill*, —— U.S. ——, 137 S.Ct. 911, 919, 197 L.Ed.2d 312 (2017) ("If the complaint is that a form of legal process resulted in pretrial detention unsupported by probable cause, then

18

the right allegedly infringed lies in the Fourth Amendment."); accord *Albright v. Oliver*, 510 U.S. 266, 274, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality opinion). *Geness v. Cox*, No. 17-2073, 2018 WL 4087887, at *6 (3d Cir. Aug. 28, 2018) "Whatever doubts we may harbor as to the viability of such a claim, however, *see Brooks v. City of Chi.*, 564 F.3d 830, 833 (7th Cir. 2009) (observing that "[a] plaintiff cannot state a due process claim by combining what are essentially claims for false arrest under the Fourth Amendment and state law malicious prosecution into a sort of hybrid substantive due process claim under the Fourteenth Amendment" (citations omitted)); *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (stating that an officer need not "explore and eliminate every theoretically plausible claim of innocence" even if "an investigation might have cast doubt upon the basis for the arrest" (citations omitted)), we have no occasion to resolve them today [because] no such constitutional right was "clearly established" at the relevant time, as required to overcome qualified immunity. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011).

Geness, 2018 WL 4087887, at *6 n. 5 (3d Cir. Aug. 28, 2018). See also Johnson v. Logan, No. 17-1090, 721 F. App'x. 205, 208 n. 9 (3d Cir. 2018) ("We note, without deciding, that we have significant doubts about whether there is an independent substantive due process right to be free from a reckless investigation") (citing Brooks v. City of Chicago, 564 F.3d 830, 833 (7th Cir. 2009) ("[a] plaintiff cannot state a due process claim 'by combining what are essentially claims for false arrest under the Fourth Amendment and state law malicious prosecution into a sort of hybrid substantive due process claim under the Fourteenth Amendment.'") (quoting McCann v. Mangialardi, 337 F.3d 782, 786 (7th Cir. 2003))); Newton v. City of New York, 566 F. Supp. 2d 256, 278 (S.D.N.Y. 2008) ("[T]here is no constitutional right to an adequate investigation."); Thomas v. City of Philadelphia, 290 F. Supp. 3d 371, 386 (E.D. Pa. 2018) (court declined to hold that there was an independent cause of action under the Fourteenth Amendment for failing to conduct a constitutionally adequate investigation, emphasizing "here, even without a stand-alone claim for 'failure to investigate,' the detectives' wrongful conduct is still captured in other claims. For instance, the leads that the detectives failed to investigate pertain to the malicious prosecution claim—the detectives arguably knew enough to realize they did not have probable

cause, but they prosecuted Mr. Thomas anyway. The investigation-related issues are indeed addressed in other causes of action in this case"). Pursuant to Geness, supra., to the extent that Weimer's § 1983 Fourteenth Amendment due process claim is premised upon Haggerty and Patton engaging in a reckless investigation, the Connellsville Defendants' Motion to Dismiss Weimer's § 1983 Fourteenth Amendment due process claim against Haggerty and Patton must be granted and the claims against Haggerty and Patton dismissed with prejudice.

## 2. Fabrication of evidence claim - Haggerty

The Connellsville Defendants further contend that Weimer's allegations do not support a stand-alone fabrication-of-evidence claim because the false witness statements Haggerty allegedly coerced from Beal and Stenger were insufficient to support a stand-alone fabrication-of-evidence-claim which requires "a reasonable likelihood that, absent that fabricated evidence, the defendant would not have been criminally charged." ECF No. 57 at 19 (quoting Black v. Montgomery County, 835 F.3d 358, 371 (3d Cir. 2016)).

Weimer asserts that Haggerty knowingly coerced and fabricated, and attempted to coerce and fabricate, false testimony from multiple witnesses on numerous occasions and thereby violated her due process rights under the Fourteenth Amendment. ECF No. 65 at 14.

In Halsey v. Pfeiffer, supra., the Third Circuit court held:

> [I]f a defendant has been convicted at a trial at which the prosecution has used fabricated evidence, the defendant has a stand-alone claim under section 1983 based on the Fourteenth Amendment if there is a reasonable likelihood that, without the use of that evidence, the defendant would not have been convicted. Appellees do not argue that the false confession attributed to Halsey, which the prosecutor acknowledged in the state courts was the only direct evidence linking Halsey to the crimes, could not have affected the jury's verdict. As a result, we have no difficulty in concluding that Halsey has demonstrated that there is a genuine dispute of material fact on the question of whether appellees violated his right to due process of law by fabricating evidence against him.  . . .

In reaching our result, we hasten to add that courts in this Circuit should not permit a criminal defendant who later brings a civil action against state actors who had been involved in his prosecution to use this opinion beyond the scope of our holding. Thus, a civil plaintiff alleging that he had been convicted in a criminal prosecution in which the prosecutor used fabricated evidence should not be permitted to survive a motion for summary judgment or for judgment as a matter of law unless he can demonstrate that the record supports a conclusion that the allegedly fabricated evidence was so significant that it could have affected the outcome of the criminal case. Moreover, testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong. Therefore, for example, a witness's misidentification should not be regarded as a fabrication in the absence of persuasive evidence supporting a conclusion that the proponents of the evidence were aware that the identification was incorrect, and thus, in effect, offered the evidence in bad faith. Accordingly, we expect that it will be an unusual case in which a police officer cannot obtain a summary judgment in a civil action charging him with having fabricated evidence used in an earlier criminal case. But we deal here with such a case.

Halsey, 750 F.3d at 294–95 (footnotes omitted). The appellate court explained:

We use "reasonable likelihood" to emphasize that plaintiffs bringing fabrication claims must draw a meaningful connection between their conviction and the use of fabricated evidence against them. *See* 42 U.S.C. § 1983 (imposing liability on any official who violates or "causes to" violate a person's constitutional right). As the Court of Appeals for the Seventh Circuit recently explained, this causal link is a familiar concept in tort law, requiring both factual and proximate causation. *Whitlock*, 682 F.3d at 582–83; *see also Gregory*, 444 F.3d at 737 ("It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." (Emphasis added.)) The requirement is in line with our own precedent, though until today we have not had occasion to apply it in the fabrication context. *See, e.g., Lamont v. New Jersey*, 637 F.3d 177, 185 (3d Cir. 2011) ("Like a tort plaintiff, a § 1983 plaintiff must establish both causation in fact and proximate causation."). Because the record at summary judgment established that Halsey's fabricated confession was critical to his conviction, we do not decide whether the mere introduction of falsified evidence at trial—without regard to its significance in the context of other evidence considered by the jury—is necessarily sufficient to satisfy the causal link. Nor do we decide whether a defendant acquitted at a trial where fabricated evidence has been used against him has an actionable section 1983 claim. We note, however, that if fabricated evidence is used as a basis for a criminal charge that would not have been filed without its use the defendant certainly has suffered an injury.

Id. at 294, n. 19.

In the Amended Complaint, Weimer alleges:

> Mr. Stenger completely recanted his trial testimony. In an interview with Ms. Weimer's federal habeas investigator, Mr. Stenger admitted that he never saw Ms. Weimer on the night of Mr. Haith's murder and he has no knowledge that she was involved in the crime. Mr. Stenger further admitted that law enforcement, including Defendant Haggerty, walked him through his eventual "story" – directly provided evidence and details as to how and where things happened – to ensure that Mr. Stenger's details matched the actual crime scene.

ECF No. 47 ¶ 80. Contrary to the Connellsville Defendants' argument, the Court opines that assuming that the factual allegation in the Amended Complaint are true, as it must for purpose of deciding this Motion to Dismiss, there is a reasonable likelihood that without the use of Stenger's false testimony at trial, provided by Stenger to Haggerty, Weimer would not have been convicted of Haith's murder. The Connellsville Defendants' Motion to Dismiss Weimer's § 1983 Fourteenth Amendment claim is denied to the extent Weimer's claim is premised upon Haggerty knowingly coercing and fabricating false testimony and thereby violated her due process rights under the Fourteenth Amendment.

### C. Plaintiff's § 1983 Civil Rights Conspiracy Claims against Patton and Haggerty - Count III

In Count III of the Amended Complaint, Weimer alleges § 1983 civil rights conspiracy claims against the individual defendants in this action, Vernon, Haggerty, Cesario, Patton, and Ashton. ECF No. 47 ¶¶ 15-19, 112-120. Weimer claims that at all times relevant to her claims the five individual defendants acted in concert and in conspiracy with one another in order to deprive Weimer of her constitutionally protected rights, from the time period before she was wrongfully convicted of murdering Haith, through her trial, the time period when she was wrongfully incarcerated, and continuing through the defendants' attempt to re-prosecute Weimer after her criminal convictions were vacated. Id. ¶¶ 20, 115. More specifically, Weimer alleges

that the five individual defendants, including Haggerty and Patton were acting within the scope of their employment and under color of state law, when they acted in concert in order to deprive Weimer of her rights under the Fourth, Fifth, and Fourteenth Amendments to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, self-incrimination, and to a fair trial. Id. ¶ 113. The object of the conspiracy, to which all the individual defendants agreed and/or came to an understanding about, was to investigate and pursue charges against Weimer as the sole suspect in the murder of Haith regardless of the evidence. Id. ¶¶ 116-117. Weimer alleges that the defendants' combination, agreement, or understanding began when the defendants, investigating Haith's murder under Cesario's lead, acted in concert to ignore the robust and compelling evidence that Weimer did not kill Haith, said evidence being that Weimer's DNA was not found at the scene of Haith's murder, Haith's DNA was not found on Weimer, Weimer's statement that she was not in Connellsville at the time of the murder, and the corroborating testimony of witnesses that Weimer was not in Connellsville at the time Haith was killed. Id. ¶ 117.  Despite all of these exculpatory facts, Weimer asserts that the defendants agreed and/or came to an understanding that they would continue to investigate Weimer as the sole suspect. Id. The defendants also acted together to ignore statements by other witnesses that implicated other suspects. Id.

"To state a viable claim for conspiracy under Section 1983, a plaintiff must allege: (1) the existence of a conspiracy involving state action; and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." Bishop v. Upper Darby Police Dep't, Civ. No. 15-6069, 2018 WL 2359241, at *6 (E.D. Pa. May 24, 2018) (citing Marchese v. Umstead, 110 F. Supp. 2d 361, 371 (E.D. Pa. 2000)). "Civil rights conspiracies brought under

Section 1983 require a 'meeting of the minds,' and to survive screening of a motion to dismiss, plaintiffs must provide some factual basis to support the existence of the elements of a conspiracy, namely, agreement and concerted action." Id. (citing Startzell v. City of Philadelphia, 533 F.3d 183, 205 (3d Cir. 2008) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158 (1970)). Thus, in Martin v. Secretary of Corrections, Civ. No. 16-2060, 2018 WL 1158250 (M.D. Pa. Mar. 5, 2018), the district court recently explained:

> In order to demonstrate a conspiracy, "a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a constitutional right 'under color of law.'" *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 700 (3d Cir. 1993) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)), abrogated on other grounds by *United Artists Theatre Circuit, Inc. v. Twp. of Warrington, Pa.*, 316 F.3d 392, 400 (3d Cir. 2003). "Bare conclusory allegations of 'conspiracy' or 'concerted action' will not suffice to allege a conspiracy. The plaintiff must expressly allege an agreement or make averments of communication, consultation, cooperation, or command from which such an agreement can be inferred." *Flanagan v. Shively*, 783 F. Supp. 922, 928 (M.D. Pa. 1992). The plaintiff's allegations of a conspiracy "must be supported by facts bearing out the existence of the conspiracy and indicating its broad objectives and the role each Defendant allegedly played in carrying out those objectives." *Id.* A plaintiff cannot rely on subjective suspicions and unsupported speculation. *Young v. Kann*, 926 F.2d 1396, 1405 n. 16 (3d Cir. 1991).

Martin, 2018 WL 1158250, at *5. "It is not enough that the end result of the parties' independent conduct caused plaintiff harm or even that the alleged perpetrators of the harm acted in conscious parallelism." Spencer v. Steinman, 968 F. Supp. 1011, 1020 (E.D. Pa. 1997).

**1. Patton**

The Connellsville Defendants move to dismiss the civil conspiracy claim against Patton on the basis that Weimer has not alleged that Patton formally agreed with the other defendants to deprive Weimer of her constitutional rights. ECF No. 57 at 10. The Court must agree. The sole paragraph in the Amended Complaint that alleges facts with respect to actions undertaken by Patton states:

Mr. Stenger reiterated his recantation to Defendant Patton, a Connellsville Police Officer, on December 12, 2015. By 2015, Defendant Haggerty was no longer with the Connellsville Police Department. Upon information and belief, Defendant Patton was assigned to lead the ongoing investigation of Mr. Haith's murder, in an effort to re-prosecute Ms. Weimer for Mr. Haith's murder. Toward that end, Defendant Patton interviewed Mr. Stenger, without his legal counsel present, while Mr. Stenger was still incarcerated. In that interview, Mr. Stenger again admitted that "he was coerced by police into confessing and implicated Crystal Weimer."

ECF No. 47 ¶ 82.

Based upon these allegations, it cannot be reasonably inferred that Patton agreed with one or more of the other individual defendants to enter into the other individual defendants' conspiracy to violate Weimer's civil rights. The Connellsville Defendants' Motion to Dismiss the civil rights conspiracy claim against Patton must be granted and the claim dismissed. Said dismissal, however, is without prejudice to Weimer to file a second amended complaint that alleges additional specific facts to support a plausible § 1983 civil rights conspiracy claim against Patton since "[d]ismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility" and in this case, there is no suggestion of bad faith, undue delay, prejudice, or futility. Alston v. Parker, 363 F.3d 229, 236 (3d Cir. 2004) (citation omitted).

### 2. Haggerty

Upon review of the factual allegations contained in Weimer's Amended Complaint, the Court finds that Weimer has sufficiently alleged that beginning with the first 20 months of the Haith investigation, when Cesario was the lead investigator of the investigation of the Haith murder, Cesario and Haggerty reached an agreement to deprive Weimer of her constitutional rights and engaged in concert action to achieve said agreement, and that Haggerty then continued to engage in numerous actions in furtherance of that agreement thereafter. See ECF No. 47

¶¶ 16-17, 27-34, 50, 59, 80, 81, 83, 114, 116-117. The Connellsville Defendants' Motion to Dismiss Weimer's § 1983 conspiracy claim against Haggerty is denied.[5]

### D. Plaintiff's § 1983 Failure to Intervene Claim against Patton and Haggerty - Count IV

In Count IV of the Amended Complaint, Weimer alleges a failure to intervene claim against the individual defendants, including Patton and Haggerty. Id. ¶¶ 121-125. The Connellsville Defendants move to dismiss the claim as against both Patton and Haggerty. With respect to both defendants, they raise the issue that it is unsettled whether the United States Court of Appeals for the Third Circuit recognizes a failure-to-intervene claim outside of excessive force claims. ECF No. 57 at 11. They also contend that Weimer has failed to plead a failure to intervene claim against either Patton or Haggerty. Id. at 12, 21.

Initially, the Court opines that if the Third Circuit was presented with a non-excessive force case where a law enforcement official had a realistic and reasonable opportunity to intervene in the face of a constitutional violation by a fellow law enforcement official investigating a homicide and he simply refused to intervene, the appellate court would find that a viable § 1983 failure to intervene claim had been stated. See Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994) (concluding that "[a]n officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene

---

[5] In anticipation of Plaintiff filing a second Amended Complaint with respect to Patton participating in a conspiracy to violate her constitutional rights in violation of § 1983, the parties are directed to the recent decision of the United States Court of Appeals for the Third Circuit in Jutrowski v. Tp. of Riverdale, __ F.3d __, 2018 WL 4344677, at *8-9 (3d Cir. Sept. 12, 2018), wherein the appellate court extensively addressed the requisite elements of a conspiracy claim brought pursuant to § 1983.

to prevent the harm from occurring."); <u>Woody v. City of Granite City, Ill.</u>, Civ. No. 17-534, 2018 WL 587517, at *2 (S.D. Ill. Jan. 29, 2018) (plaintiff who alleged that police defendants knew of the building and zoning defendants' actions (which included harassment, assault, invasion of property, and issuance of baseless citations), had the power to present the actions, and did nothing, had stated a § 1983 failure to intervene claim); <u>Herrera v. City of New Brunswick</u>, Civ. No. 04-3002, 2008 WL 305275, at *10 (D.N.J. Feb. 1, 2008) (same) (citing <u>Anderson v. Branen</u>, 17 F.3d 552, 557 (2d Cir. 1994) (explaining "[i]t is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.") (citing cases).

### 1. Patton

The Connellsville Defendants move to dismiss this claim as to Patton on the basis that the Amended Complaint does not allege any facts that show Patton had any opportunities to intervene on Weimer's behalf to prevent her being subjected to false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law given that his only identified involvement occurred in December 2015 after Weimer's conviction had been overturned. ECF No. 57 at 11.

Weimer responds that she has sufficiently pled that Patton participated in and was aware of an ongoing conspiracy to wrongfully arrest and maliciously prosecute Weimer. ECF No. 65 at 18. Patton acted as the lead investigator in 2015, knew of the ongoing conspiracy to deprive Weimer of her rights, and had the ability to stop the ongoing conspiracy. <u>Id.</u> Patton directly obtained evidence from Stenger that his testimony was false and coerced, but in furtherance of the conspiracy, attempted to misrepresent the veracity of Stenger.

Upon review of the Amended Complaint, Weimer has not sufficiently alleged that Patton was aware the existence of the conspiracy to deprive Weimer of her constitutional rights, had the ability to stop the ongoing conspiracy, but did not do so. The Amended Complaint only alleges that in 2015 Patton was the lead investigator of the on-going investigation of Haith's murder in an effort to re-prosecute Weimer for Haith's murder. The Connellsville Defendants' Motion to Dismiss Weimer's § 1983 failure to intervene claim against Patton shall be granted and Weimer's § 1983 failure to intervene claim against Patton dismissed. Said dismissal is without prejudice to Weimer to file a second amended complaint that alleges a plausible § 1983 failure to intervene claims against Patton since "[d]ismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility" and in this case, there is no suggestion of bad faith, undue delay, prejudice, the Court cannot state that allowing such an amendment would be futile. Alston, 363 F.3d at 236.

## 2. Haggerty

The Connellsville Defendants move to dismiss the failure to intervene claim as to Haggerty on the basis that because Weimer has alleged that Haggerty was directly liable for conduct, "it would be nonsensical to apply a failure to intervene where an officer is already directly liable for conduct." ECF No. 57 at 21.

At the motion to dismiss stage a plaintiff "may plead alternative and inconsistent legal causes of action arising out of the same facts." Nieves v. Lyft, Inc., Civ. No. 17-6146, 2018 WL 2441769, at *19 (D.N.J. May 31, 2018) (citing Fed.R.Civ.P. 8(d)(2) - (3)); see also ClinMicro Immunology Ctr., LLC v. PrimeMed, P.C., Civ. No. 11-2213, 2012 WL 3011698, at *9 (M.D. Pa. July 23, 2012) (denying motion to dismiss claim because a plaintiff may plead alternative

theories at the motion to dismiss stage). The Connellsville Defendants' Motion to Dismiss Haggerty's motion to intervene claim is denied.

### E. Plaintiff's § 1983 Supervisory Liability Claim against All of the Connellsville Defendants – Count V

In Count V of her Amended Complaint, Weimer alleges a § 1983 supervisory liability claim against all the of Connellsville Defendants - Patton, Haggerty, and Connellsville.

It is well established that "'[t]here are two theories of supervisory liability,' one under which supervisors can be liable if they 'established and maintained a policy, practice or custom which directly caused [the] constitutional harm,' and another under which they can be liable if they 'participated in violating plaintiff's rights, directed others to violate them, or, as the person[s] in charge, had knowledge of and acquiesced in [their] subordinates' violations'." Santiago v. Warminster Twp., 629 F.3d 121, 129 n. 5 (3d Cir. 2010) (quoting A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004)).

#### 1. Patton and Haggerty

The Connellsville Defendants' move to dismiss Weimer's § 1983 supervisory liability claim against Patton and Haggerty because Weimer has not alleged that either Patton or Haggerty supervised any of the other defendants nor are there any allegations in the amended complaint that Patton or Haggerty had actual knowledge of or acquiesced to any subordinate's violations of Weimer's constitutional rights. ECF No. 57 at 12-13, 22.

Weimer responds that she adequately alleged that Patton and Haggerty were Connellsville's lead investigating officers of the Haith murder and as such, directly and actively supervised those Connellsville officers involved in the Haith investigation. ECF No. 65 at 19.

Upon review of the Amended Complaint, the Court finds that Weimer sufficiently alleges that as the lead investigators of the Haith murder for the Connellsville Police Department, Patton

and Haggerty were the supervisors of other Connellsville police officers and directed the wrongful investigation at issue. The Amended Complaint includes allegations as to their conduct sufficient to survive at this early stage. However, during discovery facts will need to be further developed as to the supervisory roles of Patton and Haggerty including details of whether they participated in their subordinates' violations of Weimer's rights, directed others to violate them, or as the person in charge, had knowledge of and acquiesced in their subordinates' violations of Weimer's constitutional rights. Therefore, the Connellsville Defendants' Motion to Dismiss Weimer's § 1983 supervisory liability claims against Patton and Haggerty is denied.

   **2.   Connellsville**

It is well settled that a municipality may not be held liable under Section 1983 based on a theory of respondeat superior or merely because its employees may have acted unconstitutionally. Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). Rather, a municipality may only be found liable for their own illegal acts or where the plaintiff is able to identify a municipal "policy" or "custom" that caused the constitutional violation. Bd. of Cty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 403 (1997).

"A government policy or custom can be established in two ways. Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict. A course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well settled' as to virtually constitute law." Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting Monell, 436 U.S. at 691), *abrogated in part on other grounds by* Jensen v. Potter, 435 F.3d 444, 499 n.3 (3d Cir. 2006), *overruled in part on other grounds by* Burlington N. & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006) (citations omitted); see also

McTernan v. City of York, 564 F.3d 636, 657-58 (3d Cir. 2009). Under either scenario, it is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom. Andrews, 895 F.2d at 1480. See Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 583–84 (3d Cir. 2003).

Weimer has alleged that a pattern and practice of specific and repeated abuses with respect to the Haith murder investigation, including the fabrication of false witness testimony, witness intimidation and coercion, and deliberately ignoring and failing to disclose exculpatory evidence, carried out by Connellsville police officers, Cesario, Haggerty, and Patton over a period of years, that caused Weimer's constitutional injuries. Weimer also has alleged that the misconduct engaged in by Cesario, Haggerty, and Patton was committed with the knowledge of Defendants' supervisors or was allowed to occur because of their deliberate indifference to this misconduct. Finally, Weimer has alleged that Connellsville policymakers were aware of the individual defendants' unconstitutional practices, as well as alternatives to such practices, including training and discipline to prevent fabrication of evidence; the withholding of exculpatory evidence; ignoring exculpatory evidence; the procurement of false witness statements; failing to pursue leads; and arrest and prosecution without probable cause. Based upon these allegations, the Court finds that while the record will need to be more fully developed, in particular as it relates to the specifics of the policymakers, for purposes of this motion to dismiss, Weimer has sufficiently alleged a Monell supervisory liability claim against the City. The Connellsville Defendants' Motion to Dismiss Weimer's § 1983 supervisory liability claim against Connellsville is denied.

**F. Plaintiff's State Law Malicious Prosecution Claim Against Patton– Count VI[6]**

In Count VI of her Amended Complaint, Weimer alleges a Pennsylvania state law malicious prosecution claim against Patton. The Connellsville Defendants move to dismiss this claim against Patton, arguing Patton did not initiate or have any involvement in the criminal proceeding against Weimer. ECF No. 57 at 13.

Weimer responds that Patton can be held liable for malicious prosecution because of his improper and wrongful investigation tactics with respect to Stenger played a crucial role in Weimer's ongoing malicious prosecution. ECF No. 65 at 21. In particular, Weimer asserts that Patton's actions contributed to the prosecutor's decision to continue to pursue Weimer's re-prosecution. Id.

"The elements of a claim for malicious prosecution under Pennsylvania law are: "(1) institution of proceedings against the plaintiff without probable cause and with malice, and (2) the proceedings were terminated in favor of the plaintiff." Bell v. Bor. of West Mifflin, Civ. No. 16-690, 2017 WL 1832494, at *8 n. 4 (May 8, 2017) (quoting Manley v. Fitzgerald, 997 A.2d 1235, 1241 (Pa. Commw. 2010) (citation omitted)).

As previously held, contrary to Weimer's contention, the Amended Complaint does not allege that Patton engaged in any activity in that could have influenced the prosecutor's decision to re-prosecute Weimer. Accordingly, there are not any allegations in the Amended Complaint that Patton influenced or participated in the decision to institute the criminal proceedings against Weimer as Weimer contends. The Connellsville Defendants' Motion to Dismiss Weimer's state law malicious prosecution claim against Patton must be granted and the claim dismissed. Said dismissal, however, is without prejudice to Weimer to file a second amended complaint that

---

[6] The Connellsville Defendants do not move to dismiss Count VI as to Defendant Haggerty. ECF No. 57 at 18, n. 4.

states a plausible state law malicious prosecution claim against Patton since "[d]ismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility" and in this case, there is no suggestion of bad faith, undue delay, prejudice, or futility. Alston, 363 F.3d at 236.

## IV.  CONCLUSION

For the reasons set forth above, the Connellsville Defendants' Motion to Dismiss is granted in part and denied in part. An appropriate Order follows.

## ORDER

AND NOW this 14th day of September, 2018, it is hereby ORDERED, ADJUDGED, AND DECREED that the Motion to Dismiss filed by the defendants City of Connellsville, Ronald Haggerty, Jr., and Thomas Patton, ECF No. 56, is granted in part and denied in part as follows:

(1)  As to Count I, the motion is granted with prejudice as to Plaintiff's § 1983 Fourteenth Amendment malicious prosecution claim against Patton;

(2)  As to Count I, the motion is granted without prejudice as to Plaintiff's § 1983 Fourth Amendment malicious prosecution claim against Patton;

(3)  As to Count II, the motion is granted with prejudice as to Plaintiff's § 1983 Fourteenth Amendment due process claims against Patton and Haggerty contained in Count II of Weimer's amended complaint;

(4)  As to Count II, the motion is denied as to Plaintiff's §1983 Fourteenth Amendment fabrication of evidence claims against Haggerty;

(5)  As to Count III, the motion is granted without prejudice as to Plaintiff's § 1983 civil conspiracy claim against Patton;

(6) As to Count III, the motion is denied as to Plaintiff's § 1983 civil conspiracy claim against Haggerty;

(7) As to Count IV, the motion is granted without prejudice as to Plaintiff's § 1983 failure to intervene claim against Patton;

(8) As to Count IV, the motion is denied as to Plaintiff's § 1983 failure to intervene claim against Haggerty;

(9) As to Count V, the motion is denied as to Plaintiff's § 1983 supervisory liability claims against Patton, Haggerty, and the City of Connellsville; and,

(10) As to Count VI, the motion is denied without prejudice as to Plaintiff's state law malicious prosecution claim against Patton.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff is granted leave to file a second Amended Complaint, no later than October 15, 2018:

(1) As to Count I, that alleges facts sufficient to state a plausible Fourth Amendment malicious prosecution claim against Patton, solely as to the re-prosecution;

(2) As to Count III, that states a plausible § 1983 civil conspiracy claim against Patton;

(3) As to Count IV, that states a plausible § 1983 failure to intervene claim against Patton; and

(4) As to Count VI, that states a plausible state law malicious prosecution claim against Patton.

/s/ Maureen P. Kelly
MAUREEN P. KELLY
CHIEF UNITED STATES MAGISTRATE JUDGE