# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CRYSTAL DAWN WEIMER,

        Plaintiff,

    v.

COUNTY OF FAYETTE, PENNSYLVANIA, and OFFICE OF THE FAYETTE COUNTY DISTRICT ATTORNEY[1], and CITY OF CONNELLSVILLE, and NANCY VERNON, in her official and individual capacities, and RONALD HAGGERTY, JR., and THOMAS CESARIO, and THOMAS PATTON, and BEVERLY ASHTON, in their individual capacities,

        Defendants.

Case Number:  2:17-cv-01265-MPK

**SECOND AMENDED COMPLAINT & JURY DEMAND**

Plaintiff Crystal Dawn Weimer ("Ms. Weimer"), by and through her undersigned counsel, Blank Rome LLP, hereby files her Second Amended Complaint[2] and alleges as follows:

## INTRODUCTION

1.      Due to the Defendants' deliberate, unlawful and unconstitutional conduct, Ms. Weimer was wrongfully imprisoned for more than 11 years for the 2001 murder of Curtis Haith ("Mr. Haith").  Throughout her ordeal, Ms. Weimer consistently and steadfastly maintained her innocence.  On October 1, 2015, Ms. Weimer's wrongful convictions were vacated and she was granted a new trial.  On June 27, 2016, in recognition of the fact that there was absolutely no

---

[1] By Order dated September 14, 2018, this Court previously dismissed Ms. Weimer's claim against Defendant Office of the Fayette County District Attorney with prejudice. (ECF No. 71 at p. 34).  This Second Amended Complaint does not plead any causes of action against Defendant Office of the Fayette County District Attorney. That Defendant is named herein, however, to preserve Plaintiff's appellate rights relating to the Court's September 14, 2018 dismissal orders.

[2] By Court Orders dated September 14, 2018, this Court previously granted Ms Weimer leave to file a Second Amended Complaint. (ECF Nos. 69-72).  This Second Amended Complaint is filed pursuant to those Orders.

credible evidence tying Ms. Weimer to this murder, all charges against her were dismissed with prejudice.  Finally, Ms. Weimer was fully exonerated.

2.      On April 7, 2006, Ms. Weimer was wrongfully convicted of third-degree murder and conspiracy to commit third-degree murder.  She was sentenced to 15 to 30 years in prison for crimes that she did not commit.

3.      This miscarriage of justice was the direct result of the Defendants' egregious misconduct. Despite the lack of any credible evidence tying Ms. Weimer to Mr. Haith's murder, the Defendants acted with tunnel vision, focusing their investigation almost solely on Ms. Weimer, to the exclusion of other potential suspects.  Their investigation ignored exculpatory DNA evidence, which corroborated Ms. Weimer's statements and directly contradicted Defendants' alleged version of events.  Lacking any DNA evidence, Defendants coerced multiple false witness statements to implicate Ms. Weimer in the murder.  Even though their investigation revealed evidence that directly contradicted their coerced false witness statements, Defendants willfully ignored contradictory evidence and presented knowingly false statements as evidence at pre-trial hearings and during trial.  And at trial, the prosecution blatantly lied to the jury on issues that directly impacted the jury's ability to evaluate the credibility of certain key witnesses.

4.      Moreover, Defendants intentionally concealed their misconduct throughout Ms. Weimer's wrongful incarceration, and after Ms. Weimer's wrongful convictions were vacated.  Defendants deliberately and knowingly withheld exculpatory portions of their investigative file, only producing certain exculpatory information for the first time in 2014 and 2015, in conjunction with Ms. Weimer's state and federal post-conviction proceedings, and subsequent 2016 pre-trial proceedings.  Indeed, after Ms. Weimer's wrongful convictions were vacated, Defendants engaged in an after the fact conspiracy to cover up and suppress the facts

999998.91782/106574616v.1

that led to Ms. Weimer's wrongful convictions, in an effort to maintain their ability to re-prosecute the wrongful criminal charges.

5.      Indeed, as set forth in detail below, Ms. Weimer's wrongful convictions were the direct result of the unconstitutional and otherwise improper policies, practices and customs of Fayette County, Pennsylvania, and the City of Connellsville, whose policies, practices and customs evidence deliberate indifference and abuse of authority.

6.      Sadly, Ms. Weimer's mistreatment is not an isolated incident.  In 1986, David Munchinski was wrongfully convicted of two counts of first-degree murder and sentenced to two consecutive life sentences without the possibility of parole.  Mr. Munchinski was wrongfully imprisoned for 27 years, until he was fully exonerated by DNA evidence.  By way of further example, the convictions of Mark Breakiron were overturned based in part upon the failure to turn over exculpatory evidence.  This unconstitutional conduct demonstrates a long-standing pattern and practice of improper behavior that is considered acceptable by the Defendant entities and their employees.

## JURISDICTION AND VENUE

7.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.  This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

8.      This Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367(a).

9.      Venue is proper in the Western District of Pennsylvania under 28 U.S.C. § 1391(b) in that this is the District in which the claims arose.

**JURY DEMAND**

10.     Plaintiff demands a trial by jury on all issues and claims set forth in this Amended

Complaint, pursuant to the Seventh Amendment of the U.S. Constitution and Federal Rule of

Civil Procedure 38(b).

**PARTIES**

11.     Plaintiff **CRYSTAL DAWN WEIMER**, at all times relevant to this Amended

Complaint, was and is a resident of the Commonwealth of Pennsylvania.  On April 7, 2006, Ms.

Weimer was wrongfully convicted of third-degree murder and conspiracy to commit third-degree

murder in connection with the murder of Mr. Haith and, as a result, was incarcerated for more

than 11 years before she was fully exonerated of all charges.

12.     Defendant **COUNTY OF FAYETTE, PENNSYLVANIA**, at all times relevant to this

Amended Complaint, is a county located in the Commonwealth of Pennsylvania.  The County of

Fayette, Pennsylvania, at all times relevant to this Amended Complaint, was officially

responsible for the policies, practices and customs of the Fayette County District Attorney's

Office and the Connellsville Police Department.

13.     Defendant **OFFICE OF THE FAYETTE COUNTY DISTRICT ATTORNEY**, at all

times relevant to this Amended Complaint, is an office located in the Commonwealth of

Pennsylvania.  During certain times relevant to this Amended Complaint, the Office of the

Fayette County District Attorney was held by Defendant Nancy Vernon.

14.     Defendant **CITY OF CONNELLSVILLE**, formerly captioned as CONNELLSVILLE

TOWNSHIP, at all times relevant to this Amended Complaint, is a city located within Fayette

County, Pennsylvania.  Upon information and belief, the City of Connellsville was officially

responsible for the policies, practices and customs of the Connellsville Police Department, and

was the employer of Defendants Thomas Cesario and Ronald Haggerty, Jr. and Thomas Patton.

4

15.     Defendant **NANCY VERNON**, at times relevant to this Amended Complaint, was the District Attorney for Fayette County, Pennsylvania, acting under color of law and within the scope of her employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the Fayette County District Attorney's Office.  She is sued in her official and individual capacities.  Defendant Vernon participated in investigating Mr. Haith's murder, and was also the lead prosecuting attorney in Ms. Weimer's criminal trial and subsequent wrongful conviction.

16.     Defendant **THOMAS CESARIO**, at times relevant to this Amended Complaint, was a Detective Lieutenant in the Connellsville Police Department acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the Connellsville Police Department.  He is sued in his individual capacity. Defendant Cesario was the police officer originally assigned to lead and oversee the investigation of Mr. Haith's murder.

17.     Defendant **RONALD HAGGERTY, JR.**, at times relevant to this Amended Complaint, was a Sergeant in the Connellsville Police Department acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the Connellsville Police Department.  He is sued in his individual capacity.  Defendant Haggerty was the police officer assigned to lead and oversee the investigation of Mr. Haith's murder following Defendant Cesario's retirement.  Upon information and belief, during the relevant time period, Defendant Haggerty was also a member of the Fayette County Drug Task Force.

18.     Defendant **THOMAS PATTON**, at times relevant to this Amended Complaint, was a Corporal in the Connellsville Police Department acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage

999998.91782/106574616v.1

of the Connellsville Police Department.  He is sued in his individual capacity.  Upon information and belief, Defendant Patton was assigned to lead the ongoing investigation of Mr. Haith's murder after Ms. Weimer's wrongful convictions were vacated.

19.     Defendant **BEVERLY ASHTON**, at times relevant to this Amended Complaint, was a Corporal in the Pennsylvania State Police Department, assigned to the Cold Case Unit, acting under color of law and pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the Pennsylvania State Police Department.  She is sued in her individual capacity. Upon information and belief, Defendant Ashton was the lead officer for the Pennsylvania State Police Department's investigation of Mr. Haith's murder.

20.     At all times relevant to this Amended Complaint, the Defendants named above acted in concert and in conspiracy with one another in order to deprive Ms. Weimer of her constitutionally protected rights, during the time period prior to Ms. Weimer's wrongful convictions, during her wrongful incarceration, and after the wrongful convictions were vacated, until the charges were finally dismissed with prejudice.

## FACTUAL ALLEGATIONS

**Mr. Haith Is Brutally Murdered.**

21.     Curtis Haith was murdered in the early morning hours of January 27, 2001.  At approximately 4:50 am, police arrived at the crime scene and found Mr. Haith dead on the sidewalk outside his apartment, brutally beaten and with a gunshot wound to the face.

22.     At approximately 5:17 am, Defendant Cesario arrived at the crime scene.  Among other things, Defendant Cesario spoke with Mr. Haith's upstairs neighbor, who stated that a dozen or more people were in Mr. Haith's apartment earlier that night before the upstairs neighbor went to sleep.

999998.91782/106574616v.1

23.     At approximately 7:19 am, Defendant Vernon was requested to come to the crime scene and, upon information and belief, Defendant Vernon arrived at the crime scene shortly thereafter. Thus, Defendant Vernon became involved in Mr. Haith's murder investigation less than three (3) hours after the investigation began.  Upon information and belief, Defendant Cesario requested Defendant Vernon to the crime scene so that she could be involved in and help to direct the murder investigation from the onset of the investigation.

24.     Upon information and belief, Defendant Vernon was directly involved in and participated in Mr. Haith's murder investigation, from the early morning hours on the day that the body was initially discovered until Ms. Weimer's wrongful arrests approximately three (3) years later.

25.     Police analyzed the crime scene and collected evidence.  A sweatshirt and bandana were found near the body and taken into evidence.  Police were also able to recover approximately two dozen hair samples, which were able to be DNA tested.  The police also gathered blood samples from Mr. Haith and the crime scene, which were able to be DNA tested. Soil samples were also collected from the area surrounding the house.

26.     Police also searched Mr. Haith's apartment.  Inside the apartment, they located a large amount of apparent drug-related evidence, including drug paraphernalia, I.O.U. slips, guns and a pager.  These items were also taken into evidence.

27.     Police also began interviewing Mr. Haith's neighbors and friends, and soon learned that Mr. Haith had attended parties on the evening of January 26th and the early morning hours of January 27th – just prior to his death.  Police began interviewing people that attended those parties, including but not limited to Ms. Weimer.

**Ms. Weimer Is Interviewed and DNA Testing Fully Corroborates Ms. Weimer's Alibi.**

28.     The police, including Defendants Haggerty and Cesario, went to Ms. Weimer's house to interview her on the same day that Mr. Haith was murdered.  Ms. Weimer was sleeping when the police officers arrived, and was dressed in the same clothes that she had on the night before.  The officers observed what appeared to be mud and blood on Ms. Weimer's clothes, as well as some injuries to her face and foot.  In the interest of cooperation, Ms. Weimer voluntarily accompanied the officers to the police station and readily provided her clothing for forensic testing.

29.     Ms. Weimer told the officers that she was at a party with Mr. Haith and others the prior night in Uniontown, PA, and that Mr. Haith stayed at the party for about an hour.  When he was ready to leave, Ms. Weimer, her cousin Doug Giles and her oldest daughter Rose, drove Mr. Haith to Connellsville, PA, and dropped him off at the Arch Café, which turned out to be the location of Mr. Haith's second party.  After dropping Mr. Haith off, the group returned to Uniontown, where Ms. Weimer remained until the police arrived the following morning.

30.     Ms. Weimer's whereabouts were confirmed by multiple persons.  Indeed, Giles, Ms. Weimer's then-boyfriend Michael Gibson, and Ms. Weimer's sisters, Cynthia and Carla, all accounted for Ms. Weimer's whereabouts during the time of Mr. Haith's murder.  Ms. Weimer spent the majority of that evening at a birthday party at her sister Cynthia's house and, after dropping off Mr. Haith in Connellsville hours prior to his murder, spent the rest of that night at the housing community where her mother and her sisters all lived.

31.     When questioned about her apparent injuries, Ms. Weimer and Mr. Gibson both explained that she hurt her toe a few days earlier while "horseplaying" with each other.  She also explained that she hurt her eye on the night of Mr. Haith's murder during a fight with

Mr. Gibson.  During that fight, Ms. Weimer bit Mr. Gibson's thumb, which caused his thumb to bleed on Ms. Weimer's clothing.  Reacting to the bite, Mr. Gibson hit Ms. Weimer in the eye.

32.     Very significantly, all DNA testing performed at the crime scene and on Ms. Weimer's clothing fully corroborated Ms. Weimer's statements.  More specifically, DNA testing confirmed that Mr. Gibson's blood was the only blood on Ms. Weimer's clothing, corroborating their statements.  DNA testing also determined that: (a) Mr. Haith's blood was not on Ms. Weimer's clothing; and (b) the hair and blood samples found at Mr. Haith's crime scene did not match Ms. Weimer.  Indeed, to the contrary, an unidentified male DNA profile was discovered through DNA testing of the hair and blood samples from the crime scene.

33.     All DNA testing performed on Ms. Weimer and relating to Mr. Haith's crime scene fully supported that Ms. Weimer was not present at the crime scene, and corroborated Ms. Weimer's statements to the police.  The DNA evidence also fully supported the accounts of the various individuals that gave statements as to Ms. Weimer's whereabouts on the night of Mr. Haith's murder.

**Despite Exculpatory DNA Evidence, Police Continue to Focus on Ms. Weimer, Forgoing Other Leads and Suspects.**

34.     Notwithstanding DNA evidence that: (a) fully corroborated Ms. Weimer's account of the night of Mr. Haith's death; and (b) tied an unidentified male person's DNA to the crime scene, investigators continued to focus their investigation with tunnel vision on Ms. Weimer, to the exclusion of other leads.

35.     For example, a number of witnesses told police that Mr. Haith had been involved with drugs, which was certainly backed up by the significant amounts of drug-related evidence found at his apartment.  Despite the presence of drug-related evidence, no illegal drugs were found at Mr. Haith's apartment, which could indicate that he may have been killed in connection with a

drug robbery.  Defendant Haggerty, a member of the Fayette County Drug Task Force, was
uniquely qualified to analyze and investigate potential drug-related evidence and leads, but there
is no indication in the investigative file that the police investigated whether Mr. Haith's potential
involvement with drugs might have provided somebody with a motive to kill him.

36.     There is also no indication in the investigative file that the police investigated Mr. Haith's
upstairs neighbor's claim, which he told to Defendant Cesario, that he heard approximately a
dozen persons in Mr. Haith's apartment before he went to bed that evening, shortly before
Mr. Haith's murder.

37.     In addition, while the murder was being investigated, no less than eight (8) persons came
forward to the police and provided evidence as to the actual perpetrator(s).  From those
statements, no less than ten (10) different people were implicated in Mr. Haith's death, all of
which were males.  The police were told that Mr. Haith recently kicked one of the potential
perpetrators out of his home, where he had been staying.  The police were also told that Mr.
Haith had prior altercations with another of the potential perpetrators, which included a gun
being fired into the air.  Despite this plethora of potential suspects and motives, the investigation
file reveals that little to no follow up was conducted by investigators on these leads.

38.     Instead, police focused their investigatory efforts against Ms. Weimer, stubbornly
convinced that they would be able to concoct and create some version of events that could tie
Ms. Weimer to the crime.

**Defendants Coerce Their First False Story To Implicate Ms. Weimer.**

39.     Nearly two years after Mr. Haith's murder, Thomas Beal emerged as the first "witness"
that the Defendants would attempt to use against Ms. Weimer.  In October 2002, Mr. Beal told
police that Ms. Weimer (his former girlfriend) and Mr. Gibson (her boyfriend at the time of the
murder) were the persons that killed Mr. Haith.  Mr. Beal said that Ms. Weimer told him that she

and Mr. Gibson beat Mr. Haith and then shot him.  Mr. Beal also said that Ms. Weimer told him

that Mr. Haith's blood was on her clothing.  Of course, the police already definitively knew –

through DNA testing – that Mr. Haith's blood was not on Ms. Weimer's clothing and that

Ms. Weimer's blood was not at the crime scene.  Knowingly and willfully ignoring those facts,

Defendants deliberately elected to rely upon Mr. Beal's uncorroborated statement.

40.     In November 2002, nearly two years after the murder, the Pennsylvania State Police Cold

Case Squad was engaged to assist with the investigation.  Despite the assistance of additional

outside resources, the Defendants' overall investigation maintained a tunnel-vision focus on

Ms. Weimer.

41.     Upon reviewing autopsy photographs, Defendant Ashton, a Pennsylvania State Police

Corporal, noticed an injury on Mr. Haith's hand that appeared to her to be a bite mark.

Defendant Ashton purported to identify the bite mark only through photographs.  Upon

information and belief, Defendant Ashton had no specialized training or knowledge regarding

bite marks or bite injuries.  The injury had not been identified as a bite mark by the medical

personnel that performed Mr. Haith's autopsy.  Nevertheless, lacking any credible leads relating

to Ms. Weimer, Defendants conspired to manufacture evidence of Ms. Weimer's alleged

involvement in Mr. Haith's murder.

42.     Dr. Kimberly Zeremba-Rabatin, a Fayette County dentist, was initially asked to analyze

the purported bite mark injury.  Dr. Zeremba-Rabatin initially concluded that the purported bite

mark was consistent with Mr. Gibson, Ms. Weimer's boyfriend at the time of Mr. Haith's

murder.  After being provided teeth impressions for Ms. Weimer, she concluded that she could

not make any positive identification as to which teeth caused the purported bite mark.

999998.91782/106574616v.1

43.     Unsatisfied with Dr. Zeremba-Rabatin's conclusions, Defendants continued to pursue the purported bite mark, shopping for an alleged expert witness that would be willing to link the purported bite mark to Ms. Weimer.  Ultimately, Defendants were able to locate such a person – Dr. Gus Karazulas, the Chief Forensic Odontologist for the Connecticut State Police. Dr. Karazulas reviewed Mr. Beal's false and contradicted statement that Ms. Weimer and Mr. Gibson committed the murder, photographs of the purported bite mark, and Mr. Gibson's and Ms. Weimer's teeth impressions.  Based solely upon that information, Dr. Karazulas opined that the alleged bite mark matched Ms. Weimer.

44.     Later in the investigation, the timing of the purported bite mark was called into question, as the purported bite mark could have occurred hours or even days before Mr. Haith's murder, rendering their alleged evidence ineffectual and likely inadmissible.

45.     Not to be deterred, upon information and belief, Defendant Vernon directed that the purported bite mark evidence be further investigated.  Defendants' hand-picked expert, Dr. Karazulas, was asked to update his opinions to address and eliminate any timing concerns. Thereafter, Dr. Karazulas opined that the purported bite mark occurred within 7-10 minutes before Mr. Haith's death.  Upon information and belief, Dr. Karazulas did not review any additional evidence or materials before rendering this additional opinion.  Upon information and belief, Defendants were aware that Dr. Karazulas was not provided any additional evidence or materials upon which to base his additional opinions, but nevertheless maintained their agreement and understanding to rely upon the manufactured evidence.

46.     In post-conviction proceedings, however, Dr. Karazulas completely disavowed his trial testimony about the alleged bite mark.  He testified that bite mark evidence was "junk science"

and further testified that he could not and would not even conduct a bite mark analysis in Ms. Weimer's case today.

47.     With their alleged bite mark evidence secured, Defendants again spoke to Mr. Beal, only to learn that his fabricated story had substantially changed.  Now, Mr. Beal told police that a black man named Lonnie was also involved in the murder and that Ms. Weimer suffered her toe injury while kicking Mr. Haith.

48.     Defendants were forced to further investigate and incorporate Mr. Beal's newly fabricated version of events into their narrative.  Upon further investigation, conducted at the direction and understanding of the individual defendants, including Defendant Vernon, Defendants discovered that the man that Mr. Beal identified as Lonnie was in jail at the time of Mr. Haith's murder.  Despite this discovery, Defendants nevertheless continued to utilize Mr. Beal as a key part of their investigation into Mr. Haith's murder.

49.     In late August 2003, Conrad Clinton Blair contacted police and told them that Joseph Stenger, a fellow inmate, confessed his involvement in Mr. Haith's murder.  To further investigate Mr. Blair's claims, Defendants Vernon and Haggerty interviewed Mr. Blair at Defendant Vernon's District Attorney's office.  At that interview in the Defendant Vernon's office, Mr. Blair told Defendants Vernon and Haggerty that Mr. Stenger supposedly participated in the murder with Mr. Beal and Ms. Weimer.

50.     Mr. Blair also provided Defendants Vernon and Haggerty with a statement purportedly written by Mr. Stenger, which recounted a substantially different version of events from the one that Mr. Blair previously told to the Defendants.  In the written statement, Mr. Stenger did not state that he was involved in the murder, but instead stated that he only heard of Mr. Haith's

death after it occurred and that he assisted in disposing of the weapon and other evidence in a pond.

51.     On September 4, 2003, in order to further investigate the claims in Mr. Blair's interview and Mr. Stenger's alleged statement, upon information and belief, Defendants Vernon and Haggerty assembled a dive team to search the pond for the alleged murder weapon and other evidence.

52.     Later on the morning of September 4, 2003, to further investigate Mr. Stenger's alleged statement, Defendants Vernon, Haggerty and Ashton met with Mr. Stenger's legal counsel.  At this meeting, Mr. Stenger's counsel denied that her client wrote the written statement provided by Mr. Blair.  Despite this investigatory meeting with Mr. Stenger's counsel, upon information and belief, Defendants decided to continue the murder investigation, relying in part upon Mr. Stenger's alleged written statement.

53.     At this point, nearly three years after Mr. Haith's murder, the Defendants' investigation uncovered statements made by three different persons – Beal, Blair and Stenger – that were patently inconsistent, and moreover, were contradicted by known DNA evidence.

54.     In late December 2003, despite these wildly inaccurate and uncorroborated stories, Defendants Vernon, Haggerty and Ashton reviewed the investigative efforts to date, and based upon the investigation to date, agreed to proceed with filing criminal charges against Ms. Weimer.  Defendant Haggerty prepared a criminal complaint, which was approved by Defendant Vernon.

55.     In January 2004, Ms. Weimer was arrested for Mr. Haith's murder.

56.     At Ms. Weimer's March 2004 preliminary hearing, the Commonwealth called Mr. Beal as its only fact witness against Ms. Weimer, even though Defendants knew that Mr. Beal's

14

statements were contradicted by known evidence, other statements, and even by Mr. Beal himself.  On the stand, Mr. Beal invoked his Fifth Amendment rights and refused to testify, yet Ms. Weimer was still held over for trial.

57.     At Ms. Weimer's subsequent April 2004 hearing, Defendants again called Mr. Beal to testify, presumably in support of their prosecution.  On the stand, Mr. Beal fully recanted the statement he previously made to police in which he had implicated Ms. Weimer in Mr. Haith's death.  Among other things, Beal testified that "the officer there, [Defendant] Haggerty, kind of like coaxed me along on how to do it."  Thereafter, the judge dismissed the charges against Ms. Weimer and released her from prison.

58.     Mr. Beal was the first person to admit – under oath – that the Defendants directly conspired to fabricate false and misleading evidence to implicate Ms. Weimer in Mr. Haith's murder.  Defendants did not merely rely upon inconsistent and uncorroborated statements throughout their investigation, but they also knowingly conspired to fabricate false statements to bolster their investigation.

**Defendants Coerce Their Second False Story, Again Ignoring Evidence To The Contrary.**

59.     Shockingly, even after Mr. Beal revealed that the Defendants coerced and fabricated false testimony in their zeal to prosecute Ms. Weimer, the Defendants still refused to drop their vendetta against Ms. Weimer.  Instead, they re-focused their efforts, and worked to concoct and fabricate new evidence against Ms. Weimer.  This time, Defendants fabricated false statements from Mr. Stenger, who made several inconsistent statements throughout the course of Defendants' investigation.

60.     In July 2004, Mr. Stenger told law enforcement officials that he would be willing to implicate Ms. Weimer in Mr. Haith's murder in exchange for leniency on his sentencing for unrelated robbery convictions.

61.     Defendants intentionally elected to ignore that Mr. Stenger's new version of events was already contradicted by his own prior written statement, by DNA evidence and by other known facts.  Instead, using Mr. Stenger's statement, Ms. Weimer was again arrested and charged with Mr. Haith's murder.

62.     At Ms. Weimer's October 2004 preliminary hearing, Defendants elicited testimony from Mr. Stenger that was profoundly different from his prior statements to Defendants.  By the time Mr. Stenger testified at Ms. Weimer's preliminary hearing, he claimed to have been present during Mr. Haith's murder, and claimed that Mr. Haith was beaten by two unidentified black men while Ms. Weimer was "screamin'and yelling."  Defendants elicited this testimony despite the fact that Mr. Stenger's first written statement claimed only that he learned about Mr. Haith's murder after the fact, and that his written statement implicated Beal.

63.     Indeed, during the course of Defendants' ongoing investigation and Ms. Weimer's ordeal, Mr. Stenger made 15 statements, either directly or through others.  He also testified 3 times (at his plea hearing, Ms. Weimer's second preliminary hearing, and Ms. Weimer's trial), receiving a favorable plea deal in exchange for his cooperation.  Mr. Stenger's story changed each time that he provided a statement until, during Ms. Weimer's post-conviction proceedings, he finally fully recanted and disavowed all of his prior stories and unequivocally stated that he has no knowledge of the circumstances surrounding Mr. Haith's death.

64.     Leading up to Ms. Weimer's trial, Anthony Williams also came forward, providing evidence that further undermined Mr. Stenger's false testimony.  Mr. Williams alerted Ms. Weimer's criminal trial counsel that Mr. Stenger admitted that he was going to provide false trial testimony implicating Ms. Weimer in Mr. Haith's murder.

999998.91782/106574616v.1

65.     Learning that Mr. Williams was going to be called as a defense witness at trial, in March 2006, Defendant Vernon directed Defendants Haggerty and Ashton to further investigate Mr. Williams' exculpatory evidence.

66.     Upon that request, Defendants Haggerty and Ashton visited Mr. Williams in prison and used their positions of authority to threaten Mr. Williams, and to attempt to force him to provide false testimony that would place Ms. Weimer at the crime scene.  Mr. Williams refused to provide any false testimony.

**Defendants Cultivate False Jailhouse Informant Testimony Induced By Potential Leniency, And Fail To Disclose The Requests for Leniency To Ms. Weimer's Defense Counsel.**

67.     Leading up to Ms. Weimer's trial, and in their further efforts to investigate the alleged facts and circumstances of Mr. Haith's murder, Defendants used their positions of authority to encourage witnesses to provide false jailhouse confessions.

68.     In late 2004 into 2005, at least two (2) jailhouse informants—Robert Mackey and Linda Reynolds—directly contacted Defendant Vernon with information that Ms. Weimer allegedly "confessed" some involvement in Mr. Haith's death to them.  Both Mr. Mackey and Ms. Reynolds sought consideration in exchange for their testimony.

69.     In his written statement, dated April 15, 2005, Mr. Mackey directly conditions his testimony against Ms. Weimer on the willingness of the Defendants to make a deal.  Specifically, Mackey writes "If your willing to make a deal … I would like to see about getting out on early parole.  Also I would like someone to talk to Tropper Curry on my wife, Joyce Mackey, whos case is comeing up May 26th at Kulas.  If I was able to get out early it would also benefit Trooper Gar[] who I made a deal with to help him on some stuff."

70.     By his own admission, Mr. Mackey's testimony is being offered in exchange for a deal to help himself and his wife with pending charges and the length of potential jail sentences.

Mr. Mackey's true motives clearly detract from his credibility and trustworthiness, and seriously undermine the eventual testimony that he provided against Ms. Weimer.

71.     Ms. Reynolds also conditioned her testimony against Ms. Weimer on the willingness of the Defendants to make a deal.  Indeed, Reynolds wrote two letters directly to Defendant Vernon during the course of Defendants' investigation, seeking to help herself in exchange for testimony against Ms. Weimer.  Specifically, on November 29, 2004, Reynolds wrote:  "Nancy, Can you help me?  Are you able to talk to Judge Solomen and explain to him I'd been to see you.  I was there 5 months before the charges – surely you can see that I was trying to get the mess straightened up the right way and I wasn't trying to fraud anyone … I do have something that I can help you with, if you want.  I'm hoping you can use another witness on Crystal Weimer…"

72.     Further, in a second letter dated June 7, 2005, Ms. Reynolds again directly wrote to Defendant Vernon, offering testimony against Ms. Weimer for leniency.  Specifically, Reynolds wrote "My reason for writing is to ask if there is anyway your office can help me.  On April 18, 2005, 2 Fay. Co. SP Homicide Detectives interviewed me here.  They indicated my information involving Debra Payne and Crystal Weimer were very helpful to the cases.  I asked if they'd help me with House Arrest for the duration of my minimum sentence … I realize this may be viewed as an unusual request, but I also feel a homicide trial the magnitude of, especially, Crystal's should normally take a higher stand then theft by deception [Reynold's convicted crime] … I'm praying for the opportunity to prove myself <u>and</u> help the Commonwealth in these 2 cases.  I feel you'll help if you legally can."

73.     By her own admission, Ms. Reynolds' testimony is being offered in exchange for a deal regarding where she would serve the remainder of her jail sentence.  Ms. Reynolds' true motives

clearly detract from her credibility and trustworthiness, and seriously undermine the eventual testimony that she provided against Ms. Weimer.

74.     Defendant Vernon received and reviewed Mr. Mackey's and Ms. Reynolds' letters and, in furtherance of the Defendants' investigation, oversaw and directed additional investigatory acts, including interviews with these potential witnesses and others.

75.     Prior to Ms. Weimer's trial, the letters written by Mr. Mackey and Ms. Reynolds were not provided in discovery to Ms. Weimer's defense counsel.  Indeed, the November 29, 2004 letter was first produced by the Fayette County District Attorney's Office during post-conviction discovery in 2015.  The June 7, 2005 letter was provided directly by the Connellsville Police Department from their files, and it was mailed on June 22, 2016, mere days before Ms. Weimer's pre-trial hearing after being released from prison.

76.     Upon information and belief, the individual Defendants acted in concert and with the understanding of collecting evidence that could be used to prosecute Ms. Weimer, and to turn a blind eye toward contradictory evidence and other potential leads.  The individual Defendants also acted in concert in failing to disclose exculpatory evidence prior to trial.

**Defendant Vernon Suborns Perjury and Blatantly Lies to the Jury Regarding Jailhouse Informants' Testimony.**

77.     Not only did the Commonwealth fail to disclose the letters written by Mr. Mackey and Ms. Reynolds, offering their testimony in exchange for leniency, Defendant Vernon knowingly elicited perjury, and then failed to correct false testimony, by having Mackey and Reynolds testify that they sought nothing in exchange for their testimony.  Just as egregiously, Defendant Vernon then blatantly lied to the jury when she told them that the fact that Mr. Mackey and Ms. Reynolds asked for nothing in exchange for their testimony should underscore the credibility of their testimony.

999998.91782/106574616v.1

78.     Defendant Vernon deliberately elicited testimony intended to mislead the jury regarding Mr. Mackey's motivation for providing testimony.  Specifically, the following testimony was elicited:  "Q. Why is it that you contacted the police?  A. Because I didn't think it was right, what happened.  Q. Were you provided any deals by the Commonwealth, any promises, any plea bargains, any consideration whatsoever for your testimony?  A. Not for me, no."

79.     Mr. Mackey then went on to provide completely unsubstantiated evidence, including ridiculously false testimony that Ms. Weimer was allegedly dating Mr. Haith in 2003, which was of course impossible because Mr. Haith was murdered in 2001.

80.     Defendant Vernon also deliberately elicited testimony intended to mislead the jury regarding Ms. Reynolds' motivation for providing testimony.  Specifically, the following testimony was elicited: "Q. Did you contact the authorities to tell them about this conversation?  A. Yes.  Q. Why did you do that?  A. Because someone died and it wasn't – someone died.  Q. Were any promises, offers, leniency, deals, anything offered to you in exchange for your testimony?  A. No.  Q. You don't expect anything from your testimony; is that correct?  A. That's correct."

81.     In closing arguments, Defendant Vernon relied upon this deliberately misleading testimony and argued that the jurors should be more willing to believe Mackey and Reynolds than those witnesses called by the defense.  Specifically, Defendant Vernon told the jury that: "Then we come down to the testimony of Reynolds, Harris and Mackey … And, you know, there are some good people left in this world.  And there are some people that once somebody tells them something, particularly about somebody that died, that they can live with that for awhile, and then say, 'I need to tell someone.'  These aren't the Anthony Williams' that want to deal and that I'm going to be happy if I get them out of prison for something or try to get him time served

toward the sentence.  These are people that have asked nothing of the Commonwealth.  What possible motive would they have to come forward?"

82.     Defendant Vernon's statements that Mr. Mackey and Ms. Reynolds did not "want to deal" and that they "asked nothing of the Commonwealth" are deliberate and blatant lies to the jury.  Those statements are plainly contradicted by Mackey's and Reynolds' letters, some of which were addressed directly to Defendant Vernon.  These blatant falsehoods could not be rebutted or challenged because Defendant Vernon or the individual police defendants deliberately withheld the exculpatory letters from Ms. Weimer's criminal trial lawyers.

83.     Upon information and belief, Mr. Mackey and Ms. Reynolds may have received some leniency or deals in exchange for their false testimony.  At the time that Ms. Reynolds testified falsely against Ms. Weimer, Ms. Reynolds had already been moved out of prison to a halfway house to serve the remainder of her sentence.  Mr. Mackey asked for a deal on behalf of himself and his wife in exchange for his testimony, and his testimony suggests that his wife may have received some leniency or a deal.  At trial, Defendant Vernon asked Mr. Mackey whether he was "provided any deals by the Commonwealth, any promises, any plea bargains, any consideration whatsoever for your testimony", and Mr. Mackey testified "Not for me, no."

84.     Without this fabricated evidence and false testimony, there is a reasonable likelihood that Ms. Weimer would not have been convicted.

**After Ms. Weimer's Wrongful Conviction, Ms. Weimer's Appeal and Post-Conviction Hearings Reveal Additional Misconduct.**

85.     In late 2014 and early 2015, the Commonwealth's already weak case against Ms. Weimer crumbled.

86.     After Ms. Weimer's convictions were vacated, the individual Defendants continued to act in concert to cover up and suppress the wrongful actions that led to Ms. Weimer's wrongful

convictions.  Toward that end, the individual Defendants attempted to create additional evidence, and to continue to suppress the prior rec with the intent of re-prosecuting Ms. Weimer for Mr. Haith's murder.  The Defendants' ongoing investigation of Mr. Haith's murder and malicious pursuit of Ms. Weimer included interviews of Mr. Stenger, as well as the continued and deliberate withholding of exculpatory evidence, including the Mackey and Reynolds letters.

87.     Mr. Stenger completely recanted his trial testimony.  In an interview with Ms. Weimer's federal habeas investigator, Mr. Stenger admitted that he never saw Ms. Weimer on the night of Mr. Haith's murder and he has no knowledge that she was involved in the crime.  Mr. Stenger further admitted that law enforcement, including Defendant Haggerty, walked him through his eventual "story" – directly provided evidence and details as to how and where things happened – to ensure that Mr. Stenger's details matched the actual crime scene.

88.     At one point, Defendant Haggerty asked Mr. Stenger to take him to Mr. Haith's residence, but he could not do so because he did not know where Mr. Haith lived.  Consequently, Defendant Haggerty just drove Mr. Stenger to Mr. Haith's residence, prompting purported driving directions from Mr. Stenger as Defendant Haggerty himself was making the turns.

89.     Mr. Stenger reiterated his recantation to Defendant Patton, a Connellsville Police Officer, on December 12, 2015.  By 2015, Defendant Haggerty was no longer with the Connellsville Police Department.  Upon information and belief, Defendant Patton was assigned to lead the ongoing investigation of Mr. Haith's murder, in an effort to re-prosecute Ms. Weimer for Mr. Haith's murder.  Toward that end, Defendant Patton interviewed Mr. Stenger, without his legal counsel present, while Mr. Stenger was still incarcerated.  In that interview, Mr. Stenger again admitted that "he was coerced by police into confessing and implicated Crystal Weimer."

22

90.     In all, Stenger told 15 stories regarding Mr. Haith's murder, either directly to law enforcement or to others, from 2003 through 2014.  In each version his story shifted, starting from his claim to Mr. Blair that he gave Mr. Beal a gun and Mr. Beal and Ms. Weimer killed Mr. Haith, to his claim that he was at the scene but did not participate, to his claim that he shot Mr. Haith, to his now total recantation.  One such videotaped "confession" shows that Mr. Stenger is receiving details about the evidence from Defendants Haggerty and Ashton, who are in the room, but not visible on the video.

91.     Despite the scores of inaccuracies in his statements, which were revealed during the Defendants' investigation, the Defendants nevertheless called Mr. Stenger and elicited false testimony 3 different times, in their unfettered zeal to convict Ms. Weimer regardless of the actual evidence.

92.     Further, Ms. Weimer's Post-Conviction Relief legal counsel, after requesting the Defendants' entire investigatory file, were able to discover, in Defendant Vernon's file, some of the letters by Mackey and Reynolds specifically asking for deals in exchange for their cooperation.  A remaining letter from Reynolds was only discovered when, after multiple discovery requests and court conferences, Defendants produced documents from the Connellsville Police Department's file during Ms. Weimer's 2016 pre-trial proceedings.  These letters directly revealed the intentionally misleading testimony elicited at trial, as well as Defendant Vernon's blatant lie to the jury in her closing arguments.

93.

94.     The prosecution's hand-picked alleged bite mark evidence expert, Dr. Karazulas, completely disavowed his trial testimony about the purported bite mark.  Indeed, Dr. Karazulas testified that bite mark evidence is "junk science."

95.     Dr. Charles Wetli, a forensic pathologist who reviewed the autopsy report, autopsy

photographs, and photographs of the injuries to Ms. Weimer's toe taken by police on January 27,

2001, also concluded that Ms. Weimer's toe injury was consistent with Ms. Weimer's and

Mr. Gibson's account that Ms. Weimer's toe was injured when Gibson pulled it while they were

"horseplaying" a few days before Mr. Haith's death.

96.     The crumbling of the case against Ms. Weimer culminated on Monday, June 27, 2016.

By that date, Judge Daniel Howsare (Senior Judge, Bedford County) had been assigned to

Ms. Weimer's case because the Court of Common Pleas Judges from Fayette County were

conflicted out of the case as a result of the fact that Defendant Vernon was by then a sitting

Court of Common Pleas Judge in Fayette County.  On that date, after a non-Fayette County

Judge heard the facts and circumstances surrounding Ms. Weimer's wrongful conviction, the

charges against her were dropped with prejudice, and Ms. Weimer was fully exonerated.

**Ms. Weimer's Wrongful Conviction Is Not An Isolated Instance.**

97.     The Defendants' deliberate and willful actions taken against Ms. Weimer are not isolated

events, but rather demonstrate ongoing policies, practices or customs of unconstitutional

misconduct in homicide investigations, and in particular, using coercive techniques in interviews

and interrogations to induce false confessions; withholding exculpatory evidence; and fabricating

incriminating statements from witnesses, suspects, and arrestees by feeding details about the

crime that the police knew (or believed to be true) to those witnesses, suspects, and arrestees.

98.     Various cases demonstrate that this misconduct was pervasive within Fayette County law

enforcement agencies at the time of Ms. Weimer's investigation.   Upon information and belief,

the misconduct described herein was committed with the knowledge of Defendants' supervisors,

or was allowed to occur because of their deliberate indifference to this misconduct.

99.     These unconstitutional acts and practices were used time and again during the investigation of Mr. Haith's murder, which resulted in Ms. Weimer's wrongful conviction and imprisonment.

100.    The same acts and practices were also perpetrated by the same Fayette County District Attorney's Office against Mr. Munchinski, who was wrongfully convicted and served 27 years in prison before being fully exonerated. *See Munchinski v. Solomon, in his Official Capacity as District Attorney of Fayette County, Pennsylvania and in his Individual Capacity, et al.*, Civil Action No. 2:13-cv-1280 (DSC), W.D Pa.  The same acts and practices were also perpetrated by the same Fayette County District Attorney's Office against Mr. Breakiron, whose convictions were overturned because exculpatory evidence was withheld.  *See Breakiron v. Horn, et al.*, 642 F.3d 126 (3d Cir. 2011).    There are notable similarities between these cases.  *Munchinski*, like this case, involved witness coaching, the use of witnesses who were not credible, recanted testimony, and the withholding of exculpatory evidence relating to witness credibility. *Breakiron* also involved prosecutorial use of non-credible witnesses and failure to disclose that a material witness had sought a deal in exchange for their testimony.

## DAMAGES

101.    The unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions of the Defendants caused Ms. Weimer to be improperly arrested and imprisoned, unfairly tried, wrongfully convicted, and forced to serve over 11 years in prison for a murder that she did not commit.

102.    As a direct result of Defendants' conduct and omissions, Ms. Weimer sustained injuries and damages, including loss of her freedom for more than 11 years, pain and suffering, mental anguish, emotional distress, indignities, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet,

sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

103.    As a direct result of Defendants' conduct and omissions, Ms. Weimer was deprived of her familial relationships, including with her children, Rose, Miranda and Bridgett, who were only 10, 7 and 4 years old respectively, when Ms. Weimer was incarcerated, as well as her parents, four sisters, and two grandsons who were born while she was incarcerated.

104.    As a direct result of Defendants' conduct and omissions, Ms. Weimer sustained economic injuries and damages, including loss of income and loss of career opportunities.

105.    As a direct result of Defendants' conduct and omissions, Ms. Weimer sustained physical injuries and damages, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care.

### CAUSES OF ACTION[3]

### COUNT I:  42 U.S.C. § 1983 Malicious Prosecution
### (Against Individual Defendants)

106.    Plaintiff incorporates by reference all of the foregoing paragraphs.

107.    The individual Defendants, acting individually and in concert with malice and knowing that their investigation revealed that probable cause did not exist to prosecute Ms. Weimer, intentionally caused Ms. Weimer to be arrested, charged, and prosecuted for those crimes, thereby violating Ms. Weimer's clearly established right, under the U.S. Constitution, to be free of prosecution absent probable cause.

---

[3] By Orders dated September 14, 2018, this Court previously dismissed certain of Ms. Weimer's claims against certain Defendants with prejudice. (ECF Nos. 69-72).  This Second Amended Complaint does not plead any of those previous causes of action that were dismissed with prejudice.  Ms. Weimer, however, reserves and preserves her appellate rights relating to the Court's September 14, 2018 dismissal orders and the counts dismissed with prejudice therein.  (ECF Nos. 69-72).

999998.91782/106574616v.1

108.    The individual Defendants, acting individually and in concert, fabricated evidence and intentionally withheld and misrepresented exculpatory evidence, all of which resulted in an arrest and conviction without probable cause.

109.    The individual Defendants, acting individually and in concert, influenced and/or participated in the decision to initiate the prosecution of Ms. Weimer and to continue to investigate and manufacture alleged evidence during the time period leading up to Ms. Weimer's wrongful convictions.  Further, after the wrongful convictions were vacated, the individual Defendants, acting individually and in concert, further investigated the criminal charges in an effort to re-prosecute Ms. Weimer on the same charges, which were ultimately dismissed with prejudice.

110.    The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Ms. Weimer's clearly established constitutional rights.

111.    The acts and omissions by the individual Defendants described in the preceding paragraphs were the direct and proximate cause of Ms. Weimer's injuries because these Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of Ms. Weimer.

### COUNT II:  42 U.S.C. § 1983 Civil Rights Conspiracy
### (Against Individual Defendants)

112.    Plaintiff incorporates by reference all of the foregoing paragraphs.

113.    The individual Defendants, acting within the scope of their employment and under color of state law, before and after Ms. Weimer's wrongful arrest and conviction, acted in concert in order to deprive Ms. Weimer of her clearly established rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of

liberty without due process of law, self-incrimination, and to a fair trial, and to deny her access to this Court to redress these wrongs.

114.    In furtherance of the conspiracy, the Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

    a.  Suggesting, coercing, and/or fabricating evidence in the form of false witness statements;

    b.  Intentionally or with deliberate indifference failing to comply with their duty to disclose *Brady* and impeachment material during the pendency of the case;

    c.  Wrongfully prosecuting Ms. Weimer while knowing that they lacked probable cause;

    d.  Committing and inducing perjury during hearings and trial; and

    e.  Implicitly or expressly engaging in an after the fact conspiracy to cover up and suppress the Defendants' prior wrongful actions, in an effort to potentially re-prosecute Ms. Weimer and to prevent her from accessing this Court to provide redress from the ongoing conspiracy.

115.    Defendants' concerted actions, from the initial investigation and continuing through their attempts to re-prosecute Ms. Weimer after the criminal convictions were vacated, and to cover up and suppress their prior wrongful actions, reflect a combination, agreement, or understanding between them that continued throughout the course of Ms. Weimer's ordeal.  All individual Defendants were involved in this ongoing conspiracy to prosecute and convict Ms. Weimer, and the after the fact conspiracy to cover up and suppress the wrongful prosecution and conviction.

116.    The object of the conspiracy was to pursue charges against Ms. Weimer for the murder of Mr. Haith, irrespective of the evidence.  After Ms. Weimer's convictions were vacated, the object of the after the fact conspiracy was to cover up and suppress the prior wrongful actions.

117.     This combination, agreement, or understanding began when Defendants, in an investigation led by Defendant Cesario, acted in concert to ignore robust and compelling evidence that Ms. Weimer had not committed the murder – that her DNA was not found at the scene of the murder; that Mr. Haith's DNA was not found on her; her statement that she was in Uniontown at the time of the murder in Connellsville; and several other witnesses confirming her whereabouts at the time of the murder.    Despite all of these facts, Defendants agreed and/or came to an understanding that they would continue to investigate Ms. Weimer as the sole suspect.  Defendants also acted together to ignore statements by other witnesses, implicating other suspects.

118.     Defendants continued to act in concert, based on their agreement and/or understanding, to pursue charges against Ms. Weimer.   For example, multiple Defendant police officers, acting together with and at the direction of Defendant Vernon, obtained false witness statements; and further acted in concert with Defendant Vernon to conceal exculpatory evidence and use false witness statements to prosecute and convict Ms. Weimer for a murder that she did not commit.

119.     Defendants also acted in concert, and by agreement or with common understanding, by withholding material exculpatory evidence in their possession during Ms. Weimer's post-conviction relief proceedings, in an ongoing after the fact conspiracy, in order to cover up and suppress the collective effort to wrongfully imprison Ms. Weimer.

120.     Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Ms. Weimer's injuries.  Defendants knew, or should have known, that their conduct would result in Ms. Weimer's wrongful arrest, prosecution, conviction, and incarceration.  Defendants' actions and omissions also served to attempt to cover up and

suppress their prior wrongful actions in an attempt to deprive Ms. Weimer's access to this Court to redress these prior wrongs.

### COUNT III:  42 U.S.C. § 1983 Failure to Intervene
### (Against Individual Defendants)

121.    Plaintiff incorporates by reference all of the foregoing paragraphs.

122.    By their conduct and under color of state law, the individual Defendants, acting within the scope of their employment, had opportunities to intervene on behalf of Ms. Weimer to prevent her false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law, as well as the after the fact cover up and suppression of the wrongful actions leading to Ms. Weimer's wrongful convictions, but with deliberate indifference, declined to do so.

123.    These Defendants had reasonable and realistic opportunities to intervene to prevent the violations of Ms. Weimer's constitutional rights.  For instance:

    a.    Any of the Defendants – including Defendants Vernon, Haggerty, Cesario and Ashton – who were involved in the early stages of the investigation could have intervened when it became clear that the Defendants implicitly or explicitly agreed that the investigation would unjustifiably target Ms. Weimer, despite exculpatory DNA evidence and multiple witness alibis; and they could have investigated other leads, which subsequently went cold.

    b.    Any of the Defendants who were involved when the Defendants began to obtain false witness statements against Ms. Weimer could have intervened to prevent the taking and use of false statements.

    c.    Any of the individual Defendants could have turned over the material exculpatory letters sent directly to Defendant Vernon, both prior to Ms. Weimer's wrongful

convictions, during her post-relief conviction proceedings, and during the ongoing

cover up and efforts to suppress the wrongful actions that led to Ms. Weimer's

wrongful convictions, both before and after the convictions were vacated, during the

ongoing effort to cover up and suppress the Defendant's prior wrongful actions, and

in an attempt to deny Ms. Weimer access to this Court to redress her wrongs.

124.    These Defendants' failures to intervene violated Ms. Weimer's clearly established

constitutional right to be free from unreasonable search and seizure and not to be deprived of

liberty without due process of law.  No reasonable law enforcement officer or prosecuting

attorney would have believed that failing to intervene to prevent these Defendants from coercing

and fabricating evidence, withholding material exculpatory and/or impeachment evidence,

deliberately failing to conduct a constitutionally adequate investigation, and causing Ms. Weimer

to be arrested and prosecuted without probable cause, were lawful.

125.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct

and proximate cause of Ms. Weimer's injuries.  Defendants knew, or should have known, that

their conduct would result in Ms. Weimer's wrongful arrest, prosecution, conviction, and

incarceration.  Defendants' actions and omissions also served to attempt to cover up and

suppress their prior wrongful actions in an attempt to deprive Ms. Weimer's access to this Court

to redress these prior wrongs.

**COUNT IV:  42 U.S.C. § 1983 Supervisory Liability Claim**
**(Against All Defendants, Except Defendant Office of the Fayette County District Attorney)**

126.    Plaintiff incorporates by reference all of the foregoing paragraphs.

127.    The individual Defendants acted with impunity in an environment in which they were not

adequately trained, supervised, or disciplined by Fayette County and the City of Connellsville,

both in this case and as a matter of practice and custom.

31

128.     Defendant Vernon acted recklessly and with deliberate indifference to Ms. Weimer's constitutional rights during her investigation and prosecution of Mr. Haith's murder, eliciting false witness testimony, failing to disclose critical evidence regarding witness credibility, and deliberately lying to the jury regarding the alleged motivation of certain witnesses, all of which deprived Ms. Weimer of her clearly established constitutional rights, including her rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, self-incrimination, and to a fair trial.

129.     Defendant Vernon was the Fayette County District Attorney and the lead prosecuting attorney in Ms. Weimer's trial, and directly supervised the investigative and prosecutorial acts taken by the Fayette County District Attorney's Office.

130.     Defendant Vernon also directly supervised certain investigative acts undertaken by the other Defendant law enforcement agents in violation of Ms. Weimer's constitutional rights.

131.     Defendant Vernon's acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Ms. Weimer's injuries.

132.     Defendant Haggerty acted recklessly and with deliberate indifference to Ms. Weimer's constitutional rights by coercing false witness testimony, and ignoring other contradictory evidence, to deprive Ms. Weimer of her clearly established constitutional rights, including her rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, self-incrimination, and to a fair trial.

133.     Defendant Haggerty was a lead investigator in Mr. Haith's murder, and directly supervised the investigative acts taken by the Connellsville Police Department.

999998.91782/106574616v.1

134.    Defendant Haggerty's acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Ms. Weimer's injuries.  Defendant Haggerty knew, or should have known, that his conduct would result in Ms. Weimer's wrongful arrest, prosecution, conviction, and incarceration.

135.    Defendant Cesario acted recklessly and with deliberate indifference to Ms. Weimer's constitutional rights by coercing false witness testimony, and ignoring other contradictory evidence, to deprive Ms. Weimer of her clearly established constitutional rights, including her rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, self-incrimination, and to a fair trial.

136.    Defendant Cesario was a lead investigator in Mr. Haith's murder, and directly supervised the investigative acts taken by the Connellsville Police Department.

137.    The actions undertaken by the Connellsville Police Department at the time that Defendant Cesario was in a supervisory role were critical in setting the course of Ms. Weimer's prosecution.  While Defendant Cesario was in a supervisory role, the Connellsville Police Department ignored exculpatory DNA evidence and testimony.    Notwithstanding the lack of any credible evidence against Ms. Weimer, the Connellsville Police Department focused almost exclusively on Ms. Weimer and ignored other leads and testimony implicating other suspects. These other leads went cold, leaving Ms. Weimer as the sole focus of the ongoing investigation, resulting in her eventual wrongful and malicious prosecution.

138.    Defendant Cesario's acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Ms. Weimer's injuries.  Defendant Cesario knew, or should

999998.91782/106574616v.1

have known, that his conduct would result in Ms. Weimer's wrongful arrest, prosecution, conviction, and incarceration.

139.    Defendant Patton acted recklessly and with deliberate indifference to Ms. Weimer's constitutional rights by coercing false witness testimony, and ignoring other contradictory evidence, to deprive Ms. Weimer of her clearly established constitutional rights, including her rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, self-incrimination, and to a fair trial.

140.    Defendant Patton's acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Ms. Weimer's injuries.  Defendant Patton knew, or should have known, that his conduct would result in Ms. Weimer's wrongful arrest, prosecution, conviction, and incarceration.

141.    Defendant Ashton acted recklessly and with deliberate indifference to Ms. Weimer's constitutional rights by coercing false witness testimony, and ignoring other contradictory evidence, to deprive Ms. Weimer of her clearly established constitutional rights, including her rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, self-incrimination, and to a fair trial.

142.    Defendant Ashton was the Pennsylvania State Police Cold Case Squad's liaison for the investigation of Mr. Haith's murder, leading the Pennsylvania State Police's involvement in the investigation.

143.    Defendant Ashton's acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Ms. Weimer's injuries.  Defendant Ashton knew, or should

999998.91782/106574616v.1

have known, that her conduct would result in Ms. Weimer's wrongful arrest, prosecution, conviction, and incarceration.

144.    The policymakers at Defendants City of Connellsville and Fayette County were aware or should have been aware of these practices, as well as alternatives to such practices, including training and discipline to prevent *inter alia* the fabrication of evidence; the withholding of exculpatory evidence; ignoring exculpatory evidence; the procurement of false witness statements; failing to pursue leads; and arrest and prosecution without probable cause.

145.    As reflected by the wrongful murder convictions against Ms. Weimer, as well as Mr. Breakiron, and Mr. Munchinski, the policymakers at Defendants City of Connellsville and Fayette County acquiesced in a longstanding policy or custom of inaction in regard to wrongful and malicious investigations and prosecutions.

146.    The policymakers at Defendants City of Connellsville and Fayette County were aware or should have been aware of these practices, as well as alternatives to such practices, and failed to discipline Defendants, either before or after the incidents in question, demonstrating deliberate indifference to the rights of persons with whom the police come into contact.

147.    In addition, the circumstances showed that the supervisors' inaction could have communicated a message of approval to the offending subordinates.

### COUNT V:  Malicious Prosecution under Pennsylvania state law
### (Against Individual Defendants)

148.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

149.    The Defendants investigated, initiated and participated in proceedings against Ms. Weimer, without probable cause, with malice or specific intent to injure, and the proceedings ultimately terminated in Ms. Weimer's favor, when she was fully exonerated.  The Defendants collectively participated in an ongoing conspiracy to maliciously prosecute Ms.

999998.91782/106574616v.1

Weimer, and after her convictions were vacated, Defendants – including but not limited to Defendant Patton – participated in an ongoing effort to cover up and suppress the prior wrongful actions, by ignoring and dismissed exculpatory evidence provided by Mr. Stenger, in a further effort to prevent Ms. Weimer's access to this Court to redress these prior wrongs.

150.    As a result of this malicious prosecution, Ms. Weimer sustained the injuries and damages set forth above.

**WHEREFORE**, Plaintiff Crystal Dawn Weimer prays as follows:

A.  That the Court award compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

B.  That the Court award punitive damages to Plaintiff, and against all individual Defendants in their individual capacity, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

C.  For a trial by jury;

D.  For pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E.  For any and all other relief to which Plaintiff may be entitled.

**JURY TRIAL DEMANDED.**


*/s/ Joseph E. Culleiton*
Joseph E. Culleiton
Pa. ID No. 82823
Blank Rome, LLP
501 Grant Street
Suite 850
Pittsburgh, PA  15219
Counsel for Plaintiff Crystal Dawn Weimer

999998.91782/106574616v.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served via ECF upon all counsel of record.

Dated:  October 15, 2018                          /s/Joseph E. Culleiton
                                                  Joseph E. Culleiton

999998.91782/106574616v.1