IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CRYSTAL DAWN WEIMER,                )
                                    )
            Plaintiff,              )        Civil Action No. 17-1265
                                    )        Magistrate Judge Maureen P. Kelly
            v.                      )
                                    )
COUNTY OF FAYETTE, PENNSYLVANIA,    )
OFFICE OF THE FAYETTE COUNTY        )        Re: ECF No. 86
DISTRICT ATTORNEY, CONNELLSVILLE    )
TOWNSHIP, NANCY VERNON *in her*     )
*official and individual capacities*, RONALD )
HAGGERTY, JR., THOMAS CESARIO,      )
THOMAS PATTON, BEVERLY ASHTON *in*  )
*their individual capacities,* CITY OF )
CONNELLSVILLE,                      )
                                    )
            Defendants.             )

## OPINION

On April 7, 2006, Plaintiff Crystal Dawn Weimer ("Weimer") was wrongfully convicted

of third-degree murder and conspiracy to commit third-degree murder in connection with the

murder of Curtis Haith ("Haith").  ECF No. 74 ¶¶ 1-2. As a result of this wrongful conviction,

Weimer was incarcerated for more than eleven years before she was fully exonerated of all charges.

Id. ¶ 1.  Defendant Nancy Vernon ("Vernon") was the District Attorney for Fayette County,

Pennsylvania and was the lead prosecutor in Weiner's criminal trial.  Id. ¶ 15.  Pending before the

Court is a Motion to Dismiss Weimer's Second Amended Complaint Pursuant to Rule 12(b)(6)

and 12(f) filed by Defendants Fayette County, Pennsylvania and Vernon, seeking the dismissal of

three civil rights claims (Counts II, III and IV) brought against Vernon in the Second Amended

Complaint.  ECF No. 86.

## I.       PROCEDURAL BACKGROUND

Weimer filed her original Complaint against County of Fayette, Pennsylvania, Office of

the Fayette County District Attorney, Connellsville Township, Vernon, the District Attorney for Fayette County, in her official and individual capacities, and Ronald Haggerty, Jr., a Sergeant in the Connellsville Police Department, Thomas Cesario, a Detective Lieutenant in the Connellsville Police Department, Thomas Patton, a Corporal in the Connellsville Police Department and Beverly Ashton, a Corporal in the Pennsylvania State Police Department, in their individual capacities, on September 28, 2017. ECF No. 1. The defendants filed motions to dismiss the original Complaint, ECF Nos. 23, 29, 32, and 35, which were denied as moot after Weimer filed an Amended Complaint. ECF No. 48. In the Amended Complaint, Weimer named as defendants County of Fayette, Pennsylvania, Office of the Fayette County District Attorney, City of Connellsville, Vernon, in her official and individual capacities, and Ronald Haggerty, Jr., Thomas Cesario, Thomas Patton and Beverly Ashton, in their individual capacities. ECF No. 47. Connellsville Township was terminated as a defendant the same date.

Defendants County of Fayette, Pennsylvania, the Office of the Fayette County District Attorney, and Vernon, (collectively, the "Fayette County Defendants") filed a Motion to Dismiss the Amended Complaint. ECF No. 54. On September 14, 2018, this Court filed an Opinion and Order granting in part and denying in part the Motion to Dismiss. ECF No. 71. As to Vernon, this Court, *inter alia*, denied the Motion to Dismiss as to a claim of § 1983 malicious prosecution concerning Vernon's involvement in investigating bite mark evidence and granted the Motion to Dismiss without prejudice as to claims of: (1) § 1983 civil rights conspiracy concerning Vernon's involvement in the police investigation; (2) § 1983 failure to intervene; and (3) § 1983 supervisory liability.[1] Id. Weimer was granted leave to file a second amended complaint and allege facts

---

[1] The Court also granted with prejudice the Motion to Dismiss as to claims against Vernon for § 1983 malicious prosecution (on all bases other than bite mark investigation), § 1983 14th Amendment due process violations, § 1983 civil rights conspiracy (on all bases other than involvement in police investigation) and state law malicious prosecution. Id.

sufficient to support the claims dismissed without prejudice. Id. Further, in connection with her § 1983 malicious prosecution claim against Vernon, Weimer was granted leave to identify specific wrongful investigatory acts by Vernon and to add certain facts from the Connellsville Police Report. Id.

On October 15, 2018, Weimer filed the Second Amended Complaint. ECF No. 74. Therein, she raises the following claims against Vernon: (1) Count I - § 1983 malicious prosecution; (2) Count II - § 1983 civil rights conspiracy; (3) Count III - § 1983 failure to intervene; and (4) Count IV - § 1983 supervisory liability.[2] Id. On November 16, 2018, the Fayette County Defendants, through Fayette County and Vernon,[3] filed the instant Motion to Dismiss and brief in support, seeking dismissal of Counts II, III and IV against Vernon and to strike certain allegation in the Complaint. ECF Nos. 86-87. On December 20, 2018, Weimer filed a brief in opposition. ECF No. 97. The Fayette County Defendants filed a Reply Brief on January 3, 2019. ECF No. 99. The Motion to Dismiss is now ripe for consideration.

## II.     STANDARDS OF REVIEW

### A.     Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) must be viewed in the light most favorable to the plaintiff and all the well-pleaded allegations of the complaint must be accepted as true. Erickson v. Pardus, 551 U.S. 89, 93-94 (2007). A complaint must be dismissed pursuant to Rule 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)

---

[2] Count V of the Second Amended Complaint - state law malicious prosecution - appears to have been brought against Vernon, because Plaintiff states that the claim is "Against Individual Defendants," ECF No. 74; however, this claim against Vernon was previously dismissed with prejudice. ECF No. 71 at 34. Accordingly, it cannot be brought against Vernon.

[3] Defendant Office of the Fayette County District Attorney was not a named movant on the Motion to Dismiss; however, further filings indicate that all of the Fayette County Defendants are the movants. The Court will refer to the Fayette County Defendants as movants.

(rejecting the traditional 12(b)(6) standard set forth in <u>Conley v. Gibson</u>, 355 U.S. 41 (1957)). <u>See also</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009) (specifically applying <u>Twombly</u> analysis beyond the context of the Sherman Act).

A court need not accept inferences drawn by a plaintiff if they are unsupported by the facts as set forth in the complaint. <u>See</u> <u>California Pub. Employees' Ret. Sys. v. Chubb Corp.</u>, 394 F.3d 126, 143 (3d Cir. 2004) (citing <u>Morse v. Lower Merion Sch. Dist.</u>, 132 F.3d 902, 906 (3d Cir. 1997)). Nor must the Court accept legal conclusions set forth as factual allegations. <u>Twombly</u>, 550 U.S. at 555 (citing <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986)). <u>See also</u> <u>McTernan v. City of York, Penn.</u>, 577 F.3d 521, 531 (3d Cir. 2009) ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). A plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level." <u>Twombly</u>, 550 U.S. at 556 (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004)). Although the United States Supreme Court does "not require heightened fact pleading of specifics, [the Court does require] enough facts to state a claim to relief that is plausible on its face." <u>Id.</u> at 570.

In other words, at the motion to dismiss stage, a plaintiff is "required to make a 'showing' rather than a blanket assertion of an entitlement to relief." <u>Smith v. Sullivan</u>, Civ. No. 07-528, 2008 WL 482469, at *1 (D. Del. Feb. 19, 2008) (quoting <u>Phillips v. Cty. of Allegheny</u>, 515 F.3d 224, 231 (3d Cir. 2008)). "This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." <u>Phillips</u>, 515 F.3d at 234 (quoting <u>Twombly</u>, 550 U.S. at 556 n. 3).

The United States Court of Appeals for the Third Circuit expounded on the Twombly/Iqbal line of cases:

> To determine the sufficiency of a complaint under Twombly and Iqbal, we must take the following three steps:
>
> First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.'

Burtch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) (quoting Santiago v. Warminster Tp., 629 F.3d 121, 130 (3d Cir. 2010)).

"The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case." Tracinda Corp. v. DaimlerChrysler AG, 197 F. Supp. 2d 42, 53 (D. Del. 2002) (citing Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993)). Indeed, the United States Supreme Court has held that a complaint is properly dismissed under Rule 12(b) where it does not allege "enough facts to state a claim to relief that is plausible on its face," Twombly, 550 U.S. at 570, or where the factual content does not allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. The question is not whether the plaintiff will prevail in the end but, rather, whether the plaintiff is entitled to offer evidence in support of his or her claims. Swope v. City of Pittsburgh, 90 F. Supp. 3d 400, 405 (W.D. Pa. 2015) (citing Oatway v. American Intern. Group, Inc., 325 F.3d 184, 187 (3d Cir. 2003)).

**B.     Federal Rule of Civil Procedure 12(f)**

Under Fed. R. Civ. P. 12(f), the Court may, on its own or on a timely motion made by either party, "strike from a pleading an … any redundant, immaterial, impertinent, or scandalous

matter." "The purpose of a motion to strike is to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters." <u>Simmons v. Nationwide Mutual Fire Ins. Co.</u>, 788 F. Supp. 2d 404, 407 (W.D. Pa. 2011) (citing <u>McInerney v. Moyer Lumber & Hardware, Inc.</u>, 244 F. Supp. 2d 393, 402 (E.D. Pa. 2002)).

While "a court possesses considerable discretion in disposing of a motion to strike under Rule 12(f)," a motion to strike is "not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case." <u>Thornton v. UL Enterprises, LLC, et al.</u>, Civ. A. No. 09-287E, 2010 U.S. Dist. LEXIS 24207, at *1 (W.D. Pa. Mar. 16, 2010) (citations omitted). "Striking some or all of a pleading is [] considered a drastic remedy to be resorted to only when required for the purposes of justice." <u>Tennis v. Ford Motor Co.</u>, 730 F. Supp. 2d 437, 443 (W.D. Pa. 2010) (citation and quotation marks omitted).

## III. FACTUAL ALLEGATIONS

In her Second Amended Complaint, Weimer alleges the following facts. Curtis Haith was murdered in the early morning hours on January 27, 2001, outside of his apartment. ECF No. 74 ¶ 21. He was beaten and shot in the face. <u>Id.</u> Connellsville police learned that a dozen or more people were in Haith's apartment that night. <u>Id.</u> ¶ 22. Defendant Thomas Cesario ("Cesario"), a Detective Lieutenant in the Connellsville Police Department, requested that Vernon come to the crime scene and participate in the investigation. <u>Id.</u> ¶¶ 16, 23. Vernon was present at the crime scene the morning of January 27, 2001. <u>Id.</u> DNA evidence was taken from the scene. <u>Id.</u> ¶ 25. A search of Haith's apartment revealed a large amount of drug-related evidence. <u>Id.</u> ¶ 26.

Police learned that Haith had been at two parties the evening of January 26, 2001, and morning of January 27, 2001. Id. ¶ 27. They began interviewing people who had attended those parties, including Weimer. Id.

When police arrived at Weimer's house, she had been sleeping and was dressed in the same clothes she had worn the night before. Id. ¶ 28. They observed what appeared to be mud and blood on Weimer's clothes. Id. Weimer also had injuries to her face and foot. Id. Weimer voluntarily accompanied the officers to the police station and readily provided her clothing for forensic testing. Id.

Weimer told the police she had been at a party the night before with Haith and others in Uniontown, that she, her cousin, Doug Giles, and her daughter, Rose, had driven Haith from Uniontown to the Arch Cafe, a bar in Connellsville, left him there, and then returned to Uniontown where she spent the rest of the night at the housing community where her mother and sisters resided. Id. ¶¶ 29-30. Weimer's presence in Uniontown for the rest of the evening was corroborated by multiple witnesses. Id. ¶ 30.

In response to questioning about her injuries, Weimer explained to the police that her foot injury had been caused by horseplay with her then-boyfriend Michael Gibson ("Gibson") a few days before, and that the blood on her clothes and injury to her eye had been caused by a fight with Gibson the prior evening (i.e., on January 26, 2001), during which she had bit his thumb, causing Gibson to bleed on her clothing and strike her in the eye. Id. ¶¶ 30-31.

DNA testing of items collected from the crime scene as well as from Weimer's clothing subsequently showed that the blood on Weimer's clothing was Gibson's blood, Haith's blood was not on Weimer's clothing, and the hair and blood samples found at the scene of Haith's murder did not belong to Weimer, but rather, to an unidentified male. Id. ¶ 32. Thus, all DNA testing done

relative to Haith's murder supported the conclusion that Weimer was not present at the crime scene, corroborated her statements to the police, and supported the accounts of the other individuals who stated to the Connellsville police that Weimer had been in Uniontown, and not in Connellsville, the night of the murder. <u>Id.</u> ¶ 33.

Even though the DNA evidence fully corroborated Weimer's account of the night of Haith's death and tied an unidentified male's DNA to the crime scene, investigators continued to focus their investigation with tunnel vision on Weimer, to the exclusion of other leads. <u>Id.</u> ¶ 34. By way of example, witnesses told the Connellsville police that Haith had been involved with drugs, there was drug-related evidence found in Haith's residence upon his death, but no drugs, and yet, there was no indication in the Connellsville police investigative file that the police investigated whether Haith's death was drug-related. <u>Id.</u> ¶ 35. Similarly, at least eight people came to the police and provided evidence as to who killed Haith. <u>Id.</u> ¶ 37. From this evidence ten males were implicated in Haith's death, including a male Haith had recently kicked out of his apartment and another male whom Haith had had an altercation with where a gun had been fired into the air. <u>Id.</u> Yet, the Connellsville police investigative file indicates little to no follow-up was conducted by the police with respect to these leads. <u>Id.</u> The focus of the Connellsville police investigation remained on Weimer, the police stubbornly convinced that they would be able to concoct and create some version of events that could tie Weimer to Haith's murder. <u>Id.</u> ¶ 38.

In October 2002, Thomas Beal ("Beal") told the Connellsville police that Weimer, who was Beal's former girlfriend, and Gibson, killed Haith, and that Haith's blood was on Weimer's clothing. <u>Id.</u> ¶ 39. The police already definitively knew, through DNA testing, that Haith's blood was not on Weimer's clothing and that Weimer's blood was not at the crime scene. <u>Id.</u> Knowingly

and willfully ignoring those facts, the defendants[4] deliberately elected to rely upon Beal's uncorroborated statement. Id.

In November 2002, nearly two years after the murder, the Pennsylvania State Police ("PSP") Cold Case Squad was engaged to assist with the investigation. Id. ¶ 40. Defendant Beverly Ashton ("Ashton") became the lead officer for the PSP's investigation of Haith's murder. Id. Upon reviewing autopsy photos, noticed an injury on Haith's hand that appeared to be a bite mark. Id. ¶ 41. A Fayette County dentist, Dr. Kimberly Zeremba-Rabatin, analyzed the injury but could not make a positive identification as to the teeth that caused the mark. Id. ¶ 42. Unsatisfied, defendants continued to attempt to link the bite mark to Weimer. Id. ¶ 43. Dr. Gue Karazulas, the Chief Forensic Odonotologist for the Connecticut State Police, reviewed Beal's statement incriminating Weimer and Gibson, the purported bite mark and Gibson's and Weimer's teeth impressions and opined that the bite mark matched Weimer. Id. Later in the investigation, the timing of the bite mark was called into question. Id. ¶ 44.

Vernon directed that the purported bite mark evidence be further investigated. Id. ¶ 45. Dr. Karazulas was asked to update his opinions and eliminate any timing concerns. Id. Without any additional evidence, Dr. Karazulas updated his opinion to find that the bite mark happened 7-10 minutes before Haith's death. Id. ¶ 45. In post-conviction proceedings, however, Dr. Karazulas completely disavowed his bite-mark analysis, calling it "junk science." Id. ¶ 46.

At some point in the investigation, the defendants again spoke to Beal, only to learn that his "story" had substantially changed. Id. ¶ 47. Beal's new version of Haith's murder was that a

---

[4] Plaintiff makes multiple references in the Second Amended Complaint to "the defendants," where it does not appear logical that she could intend to refer to all of the defendants in this case. Nonetheless, the Court will merely echo Plaintiff's terminology in this context.

black man named Lonnie was also involved in the murder, and Weimer suffered her toe injury while kicking Haith. Id.

The defendants were forced to further investigate and incorporate Beal's new version of events into their narrative. Id. ¶ 48. Upon further investigation, conducted at the direction and understanding of the individual defendants, including Vernon, the defendants discovered that the man that Beal identified as Lonnie was in jail at the time of Haith's murder. Id. Despite this discovery, the defendants nevertheless continued to utilize Beal as a key part of their investigation into Haith's murder. Id.

In late August 2003, Conrad Clinton Blair ("Blair") contacted police and told them that Joseph Stenger ("Stenger"), a fellow inmate, confessed his involvement in Haith's murder. Id. ¶ 49. Vernon and Ronald Haggerty, Jr. ("Haggerty"), a Sergeant in the Connellsville Police Department, interviewed Blair at Vernon's office. Id. ¶¶ 17, 49. Blair told them that Stenger supposedly participated in the murder with Beal and Weimer. Id. ¶ 49. Blair also provided Vernon and Haggerty with a statement purportedly written by Stenger. Id. ¶ 50. In the written statement, Stenger did not state that he was involved in the murder, but instead said that he only heard of Haith's death after it occurred, and had assisted in disposing of the weapon and other evidence in a pond. Id.

On September 4, 2003, Vernon and Haggerty assembled a dive team to search the pond for the alleged murder weapon and other evidence. Id. ¶ 51. Later that morning, Vernon, Haggerty and Ashton met with Stenger's counsel. Id. ¶ 52. At that meeting, Stenger's counsel denied that Stenger wrote the written statement provided by Blair. Id. Despite this meeting, defendants decided to continue the murder investigation, relying in part upon Stenger's statement. Id.

Even though the Beal, Blair and Stenger statements were inaccurate, uncorroborated and contradicted by DNA evidence known to the defendants, as well as inconsistent with each other, in late December 2003, Vernon, Haggerty and Ashton reviewed the investigative efforts to date and agreed to proceed with filing charges against Weimer. Id. ¶¶ 53-54. In January, 2004, Weimer was arrested for Haith's murder. Id. ¶ 55.

At Weimer's March 2004 preliminary hearing, the Commonwealth called Beal as its only fact witness against Weimer, even though the defendants knew that Beal's statements were contradicted by known evidence, other statements, and even by Beal himself. Id. ¶ 56. On the stand, Beal invoked his Fifth Amendment rights and refused to testify. Id. Weimer was still held over for trial. Id.

At Weimer's subsequent April 2004 hearing, the Commonwealth again called Beal to testify. Id. ¶ 57. On the stand, Beal fully recanted the statement he previously made to police in which he had implicated Weimer in Haith's death. Id. Beal testified that "the officer there, [Defendant] Haggerty, kind of like coaxed me along on how to do it." Id. Thereafter, the judge dismissed the charges against Weimer and released her from prison. Id.

Even after Beal revealed to the Court that the defendants had coerced and fabricated false testimony in their zeal to prosecute Weimer, the defendants still refused to drop their vendetta against Weimer. Id. ¶ 59. Instead, they re-focused their efforts, and worked to concoct and fabricate new evidence against Weimer. Id. This time, the defendants fabricated false statements from Stenger, who made many inconsistent statements throughout the course of the defendants' investigation. Id. Specifically, in July 2004, Stenger told law enforcement officials that he would be willing to implicate Weimer in Haith's murder in exchange for leniency on his sentencing for unrelated robbery convictions. Id. ¶ 60. The defendants intentionally elected to ignore that

Stenger's new version of events was already contradicted by his own prior written statement, by DNA evidence, and by other known facts. Id. ¶ 61. Instead, using Stenger's statement, Weimer was again arrested and charged with Haith's murder. Id.

At Weimer's October 2004 preliminary hearing, the Commonwealth elicited testimony from Stenger that was profoundly different from his prior statements. Id. ¶ 62. By the time Stenger testified at Weimer's preliminary hearing, he claimed to have been present during Haith's murder, and claimed that Haith was beaten by two unidentified black men while Weimer was "screamin' and yelling." Id. The defendants elicited this testimony despite the fact that Stenger's first written statement claimed only that he learned about Haith's murder after the fact and implicated Beal in the murder. Id.

During the course of the defendants' ongoing investigation of Haith's murder and Weimer's prosecution, Stenger made 15 statements, either directly or through others. Id. ¶ 63. He also testified 3 times (at his plea hearing, Weimer's second preliminary hearing, and Weimer's trial), and received a favorable plea deal in exchange for his cooperation. Id. Stenger's story changed each time he provided a statement until, during Weimer's post-conviction proceedings in 2015, he finally fully recanted, disavowed all of his prior stories, and unequivocally stated that he has no knowledge of the circumstances surrounding Haith's death. Id.

Prior to Weimer's trial, Anthony Williams ("Williams") came forward, providing evidence that undermined Stenger's false testimony. Id. ¶ 64. Williams alerted Weimer's criminal trial counsel that Stenger admitted that he was going to provide false testimony at trial implicating Weimer in Haith's murder. Id.

Upon learning that Williams was going to be called as a defense witness at trial, in March 2006, Vernon directed Haggerty and Ashton to further investigate Williams' evidence. Id. ¶ 65.

Haggerty and Ashton visited Williams in prison and used their positions of authority to threaten Williams and attempt to force him to provide false testimony that would place Weimer at the crime scene. Id. ¶ 66. Williams refused to provide any false testimony. Id.

The defendants also used their positions of authority to encourage individuals to provide false jailhouse confessions by Weimer. Id. ¶ 67. In late 2004 into 2005, at least two jailhouse informants, Robert Mackey ("Mackey") and Linda Reynolds ("Reynolds"), directly contacted Vernon with information that Weimer allegedly "confessed" some involvement in Haith's death to them. Id. ¶ 68. Both Mackey and Reynolds sought consideration from Vernon, for themselves or a significant other, in exchange for their testimony. Id. ¶¶ 68-73.

Vernon received and reviewed Mackey's and Reynolds' letters and, in furtherance of the defendants' investigation, oversaw and directed additional investigatory acts, including interviews with these potential witnesses and others. Id. ¶ 74. The letters written by Mackey and Reynolds were not provided to Weimer's trial counsel prior to, or after, trial. Id. ¶ 75. Reynolds' November 29, 2004, letter was first produced by the Fayette County District Attorney's Office during post-conviction discovery in 2015. Id. Reynolds' June 7, 2005, letter was provided directly by the Connellsville Police Department from their files, and it was mailed on June 22, 2016, mere days before Weimer's pre-trial hearing after being released from prison. Id. The individual defendants acted together to collect evidence that could be used to prosecute Weimer, to turn a blind eye toward contradictory evidence and other potential leads, and to not disclose exculpatory evidence prior to trial. Id. ¶ 76. At Weimer's trial, Vernon knowingly elicited perjury from Mackey and Reynolds and then lied to the jurors when she told them that Mackey and Reynolds sought nothing in exchange for their testimony. Id. ¶ 77.

On October 1, 2015, after serving eleven years in prison, Weimer's convictions and sentence were vacated, and she was granted a new trial. Id. at 1. After Weimer's convictions were vacated, the individual defendants continued to act in concert to attempt to create additional evidence, with the intent of re-prosecuting Weimer for Haith's murder. Id. ¶ 86. The defendants' ongoing investigation of Haith's murder and malicious pursuit of Weimer included interviews of Stenger, as well as the continued and deliberate withholding of exculpatory evidence, including the Mackey and Reynolds letters. Id.

At this point, Stenger completely recanted his trial testimony. Id. ¶ 87.  In an interview with Weimer's federal habeas investigator, Stenger admitted that he never saw Weimer on the night of Haith's murder, and he had no knowledge that she was involved in the crime. Id.  Stenger further admitted that law enforcement, including Haggerty, walked him through his eventual "story," directly provided evidence and details as to how and where things happened to Stenger, to ensure that Stenger's details matched the actual crime scene. Id.

Thomas Patton ("Patton") had been assigned to lead the ongoing investigation of Haith's murder in an effort to re-prosecute Weimer for Haith's murder. Id. ¶ 89. Stenger reiterated his recantation to Patton on December 12, 2015, when Patton interviewed him without Stenger's legal counsel present. Id. Stenger told Patton "he was coerced by police into confessing and implicated Crystal Weimer." Id.

There is a videotaped "confession" showing Stenger receiving details about evidence from Haggerty and Ashton, who are in the room, but not visible on the video. Id. ¶ 90. In all, Stenger told 15 stories regarding Haith's murder, either directly to law enforcement or to others, from 2003 through 2014. Id. In each version Stenger's story shifted. Id. Despite the scores of inaccuracies in Stenger's statements, which were revealed during the defendants' investigation, they nevertheless

called Stenger at court hearings and elicited false testimony from him three different times, in their unfettered zeal to convict Weimer regardless of the actual evidence that showed she could not have committed the murder. Id. ¶ 91.

Additionally, Weimer's post-conviction counsel, after requesting the defendants' entire investigatory file, were able to discover, in Vernon's file, some of the letters by Mackey and Reynolds specifically asking for deals in exchange for their cooperation. Id. ¶ 92. A remaining letter from Reynolds was only discovered when, after multiple discovery requests and court conferences, documents were produced from the Connellsville Police Department's file during Weimer's 2016 pre-trial proceedings. Id.

As set forth above, Dr. Karazulas disavowed of his trial testimony regarding the bite mark. Id. ¶ 94. Further, Dr. Charles Wetli, a forensic pathologist who reviewed the photographs of Weimer's toe taken by police on January 27, 2001, concluded that her injury was consistent with the account of horseplay given by Weimer and Gibson. Id. ¶ 95.

On June 27, 2016, Judge Daniel Howsare[5] dismissed all charges against Weimer with prejudice. Id. ¶ 96.

The defendants' deliberate and willful actions taken against Weimer are not isolated events, but rather demonstrate ongoing policies, practices or customs of unconstitutional misconduct in homicide investigations, and in particular, the use of coercive techniques in interviews and interrogations to induce false confessions; the withholding of exculpatory evidence; and the fabricating of incriminating statements from witnesses, suspects, and arrestees by feeding details about the crime that the police knew (or believed to be true) to those witnesses, suspects, and arrestees. Id. ¶ 97. Various cases demonstrate that this misconduct was pervasive within Fayette

---

[5] By that time, Vernon was a judge on the Court of Common Pleas of Fayette County and thus Judge Howsare of the Court of Common Pleas of Bedford County was assigned to the case. Id. ¶ 96.

County law enforcement agencies at the time of the Weimer investigation. Id. ¶ 98. The misconduct was committed with the knowledge of the defendants' supervisors, or was allowed to occur because of their deliberate indifference to this misconduct. Id. These unconstitutional acts and practices were used time and again during the investigation of Haith's murder, which resulted in Weimer's wrongful conviction and imprisonment. Id. ¶ 99.

## IV. DISCUSSION

### A. Motion to Dismiss

#### 1. Count II: § 1983 Civil Rights Conspiracy

In Count II of the Second Amended Complaint, Weimer alleges a § 1983 civil rights conspiracy claim against the individual defendants in this action, including Vernon. ECF No. 74 ¶¶ 112-120. This Court previously limited this claim to Vernon's involvement in the police investigation and permitted Weimer the opportunity to file a second amended complaint raising this claim on this theory. ECF No 71 at 25-26.

The Fayette County Defendants argue that this claim should be dismissed against Vernon because Weimer has failed to allege sufficient facts to support it. ECF No. 87 at 12-15. In response, Weimer asserts that her allegations are sufficient. ECF No. 97 at 9-10.

As the Court of Appeals for the Third Circuit recently held, "[t]o prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law 'reached an understanding' to deprive him of his constitutional rights." Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 293-94 (3d Cir. 2018). The Third Circuit further explained:

> [T]he plaintiff must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action. To show agreement, he must demonstrate that the state actors named as defendants in the complaint somehow reached an understanding to deny the plaintiff his rights, and in the absence of direct proof, that meeting of the minds or understanding or agreement to conspire can be inferred from circumstantial

evidence. Such circumstantial evidence may include that the alleged conspirators did or said something to create an understanding, the approximate time when the agreement was made, the specific parties to the agreement, the period of the conspiracy, or the object of the conspiracy. And in the context of an alleged conspiracy among police officers, it may manifest as conversations between officers about the incident, allegedly distorted stories that emerged, an awareness of conflicting stories and irregularities in the series of official investigations into the incident.

Id. at 295 (citations and quotation marks omitted).

The Fayette County Defendants argue that Weimer fails to allege any facts to support the existence of an agreement involving Vernon to carry out a conspiracy to violate Weimer's rights. ECF No. 87 at 14. The Court disagrees. Weimer makes multiple allegations of Vernon's involvement in the police investigation and her awareness of conflicting stories in that investigation. ECF No. 74 ¶¶ 23-24, 45-54, 65, 68 and 71-72. Further, Weimer alleges that the object of the conspiracy was to pursue charges against her, id. ¶ 115, and that Vernon's role therein was to act in concert with the police to obtain false witness statements, id. ¶ 118. At this early stage of the case, these allegations are sufficient to support a plausible claim of Vernon's involvement in a civil rights conspiracy. Accordingly, the Motion to Dismiss as to Count II against Vernon is denied.

### 2. Count III: § 1983 Failure to Intervene

In Count III of the Second Amended Complaint, Weimer alleges a § 1983 failure to intervene claim against the individual defendants, including Vernon. Id. ¶¶ 121-125. This Court previously dismissed this claim, finding that Weimer did not sufficiently allege in her Amended Complaint "that Vernon actively participated in the defendants' reckless and deliberately indifferent investigation and that her involvement in the investigation dates back to the initial states of the investigation such that Vernon had numerous reasonable and realistic opportunities to intervene to prevent unconstitutional investigatory activities prior to Weimer's arrest." ECF No.

71 at 27. However, this Court permitted Weimer to file a second amended complaint raising this claim. Id. The Fayette County Defendants now move to dismiss this claim against Vernon, arguing that the allegations in the Second Amended Complaint are insufficient and that Vernon is entitled to qualified immunity. ECF No. 87 at 15-17.

As to the sufficiency of the claim, at this early stage of the case, viewing the allegations of Vernon's involvement in the investigatory process of Haith's murder and the reasonable inferences therefrom in the light most favorable to Weimer, the Court finds that this claim should be permitted to be developed during discovery.

As to qualified immunity, the Fayette County Defendants assert that, even assuming *arguendo* that Weimer has stated a viable claim for failure to intervene, because there was no case law in the Third Circuit holding that a prosecutor has a duty to intervene in the actions of police officers, Vernon had no notice that she was violating Weimer's rights. ECF No. 87 at 17. In response, Weimer asserts that Vernon should have been able to identify the misconduct in the investigation and had a duty to intervene. ECF No. 97 at 11-12.

As the Court of Appeals for the Third Circuit has recently explained:

> Government officials are entitled to qualified immunity for their actions if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).
>
> To determine whether qualified immunity shields a government official's action from § 1983 liability, courts apply a two-step test and inquire (1) whether the facts alleged by the plaintiff establish a violation of a constitutional right and (2) whether the constitutional right at issue was clearly established at the time of the alleged violation such that a reasonable official would understand that what he is doing violates that right. Pearson v. Callahan, 555 U.S. 223, 232, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).
>
> …
>
> "To be clearly established, the very action in question need not have

previously been held unlawful." <u>Dougherty v. Sch. Dist.</u>, 772 F.3d 979, 993 (3d Cir. 2014) (citing <u>Anderson v. Creighton</u>, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). Moreover, the Supreme Court has provided lower courts with the guiding premise that "a legal principle must have a sufficiently clear foundation in then-existing precedent." <u>D.C. v. Wesby</u>, 138 S. Ct. 577, 589, 199 L. Ed. 2d 453 (2018). The rule must be "settled law," which means it is dictated by "controlling authority" or "a robust consensus of cases of persuasive authority." <u>Id.</u> at 589-90 (internal quotation marks omitted). "It is not enough that the rule is suggested by then-existing precedent." <u>Id.</u> at 590. "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." <u>Id.</u> "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." <u>Kisela v. Hughes</u>, 138 S. Ct. 1148, 1151, 200 L. Ed. 2d 449 (2018) (per curiam) (quoting <u>White v. Pauly</u>, 137 S. Ct. 548, 551, 196 L. Ed. 2d 463 (2017)).

<u>Cole v. Encapera</u>, Nos. 17-2883, 17-2884, 17-2992, 2018 U.S. App. LEXIS 36667, at *5-6, 7-8 (3d Cir. 2018).

In our opinion on the County Defendant's Motion to Dismiss the Amended Complaint, this Court found that there no was case law in the Third Circuit holding a prosecutor liable for a failure to intervene in the conduct of police officers. ECF No. 71 at 27. A subsequent decision from this Court has extended liability for a failure to intervene claim to prosecutors who are engaging in investigative conduct. <u>Fogle v. Sokol</u>, Civ. A. 17-194, 2018 WL 6831137 (W.D. Pa. Dec. 28, 2018).[6] Therein, this Court explained:

> The garden-variety § 1983 claim for failure to intervene had its origins in claims against police officers. The typical claim was one for use of excessive force in violation of the Fourth Amendment. … [T]he law does not permit [an] officer to condone or cover up the constitutional violation and neither can [an officer] escape liability by turning either a blind eye or deaf ear to the illegal conduct of their colleagues.
>
> … What Defendant Prosecutors are being held to answer is predicated on their investigative activities which occurred before judicial proceedings had been initiated. Such conduct is not protected by absolute immunity, but instead is sufficiently shielded from mischief through qualified immunity. The United States Supreme Court and the United States Court of Appeals for

---

[6] Although <u>Fogle</u> was decided prior to the filing of the Fayette County Defendants' Reply Brief, <u>Fogle</u>'s applicability was not discussed in the Reply Brief. ECF No. 99.

the Third Circuit repeatedly have recognized this principle. In both Burns v. Reed, 500 U.S. 478 (1991) and Buckley v. Fitzsimmons, 509 U.S. 259 (1993), the Court made clear that investigative activities by prosecutors such as advising law enforcement officers about the use of hypnosis to obtain evidence of probable cause for an arrest warrant and fabricating evidence to obtain an indictment were purely investigatory activities. Burns, 500 U.S. at 482-83; Buckley, 509 U.S. at 275-76. Similarly, the Third Circuit has recognized that within the functional inquiry certain forms of conduct such as destroying exculpatory evidence and fabricating a false confession before initiating charges are the types of investigatory conduct that are beyond the reach of absolute immunity, whereas obtaining a false statement from a jailhouse informant after indictment is protected from suit. Odd [v. Malone], 538 F.3d [202] at 210-11 [3d Cir. 2008].

In undertaking the functional analysis that informs the scope of absolute immunity, what becomes evident from a review of these cases is that where a prosecutor is engaging in the types of investigatory activities that are beyond absolute immunity protections, he or she is acting in a law enforcement capacity and is to be treated with the protections afforded any other law enforcement officer. We fail to see sound reason for treating them differently with respect to the constitutional tort of failure to intervene. …

… Defendant Prosecutors enjoy prosecutorial immunity for all aspects of their conduct which were intimately associated with the judicial process. As a result, they are only being burdened with the need to justify and defend their course of conduct that can be narrowly defined and thereafter construed as investigative conduct. On this level Defendant Prosecutors are law enforcement officers who were sworn to uphold the law and were bound to use their authority to secure evidence capable of producing a lawful conviction.

The nature of the averred conduct likewise supports the extension we choose to recognize today. Plaintiff has not predicated his lawsuit on an innocuous constitutional violation. The conduct here is the direct and purposeful undertaking to fabricate evidence through the use of informal hypnosis and coerced confessions to gain a basis for a probable cause determination where it was known to not exist. The approving silence emanating from a prosecutor who contributes to such efforts or otherwise stands by and watches as others unleash such corruptive tactics contributes to the actual fabrication of evidence, and it cannot be denied that the tacit support created by such silence lends encouragement and signals authorization to those who are actually engaging in the repugnant conduct. Such silence is an endorsement of the constitutional violation on an equal level.

And the invaded interest is one that is at the core of our constitution. Plaintiff's liberty interest in his freedom from unconstitutional constraint is a

central value within the concept of due process. In many ways the protections of the Fourth and Sixth Amendment are intended to augment the core values encompassed with the concept of ordered liberty. If a law enforcement officer's duty to intervene extends to an obvious use of excessive force in violation of the Fourth Amendment, it surely must follow a fortiori that it extends to the fabrication of evidence in violation of the Fourteenth Amendment's Due Process Clause. Just as the law prohibits efforts by a law enforcement officer to condone or cover-up such conduct, it does not, without more, permit that same officer to escape liability by turning either a blind eye or deaf ear to the illegal conduct of his or her colleagues.

Fogle, 2018 WL 683117 at *10-12 (citations and quotation marks omitted).

Given the recent developments in this area of the law and the early stage of this case, the Court will permit discovery on this issue and will revisit it at the summary judgment stage. Therefore, the Motion to Dismiss as to Count III against Vernon is denied.

### 3. Count IV: § 1983 Supervisory Liability

In Count IV of the Second Amended Complaint, Weimer alleges a § 1983 supervisory liability claim against all Defendants except Office of the Fayette County District Attorney. ECF No. 74 ¶¶ 126-147. This Court previously dismissed this claim against Vernon, finding that, although Weimer sought to hold Vernon liable for her subordinate's investigative acts, the Amended Complaint did not contain any allegation that Vernon supervised any subordinates in the District Attorney's office with respect to the investigation of the Haith murder. ECF No. 71 at 32. However, this Court permitted Weimer to file a second amended complaint raising this claim. Id.

In support of the Motion to Dismiss this claim, the Fayette County Defendants argue that Weimer's allegations remain unchanged with regard to her claim of supervisory liability against Vernon, and thus the claim should again be dismissed, this time with prejudice. ECF No. 87 at 18. In response, Weimer points to new allegations in the Second Amended Complaint concerning Vernon's active participation in the murder investigation from the start. ECF No. 97 at 12 (citing

ECF No. 74 ¶¶ 22-24). Weimer asserts that a reasonable inference flows from the allegations of Vernon's direct involvement in the investigation that District Attorney personnel would have been utilized during the investigation. Id.

This claim was previously dismissed because Weimer did not allege that Vernon supervised any subordinates with respect to the investigation. Upon review of the Second Amended Complaint, and construing the allegations therein and the reasonable inferences therefrom in the light most favorable to Weimer, the Court finds sufficient support for a claim based on Vernon's supervision of other individuals with respect to the investigation. At this early stage of the litigation, the Court will permit this claim to go forward. It will be revisited at the summary judgment stage. The Motion to Dismiss as to Count IV against Vernon is denied.

### B. Motion to Strike

The Fayette County Defendants move to strike the allegations in the Second Amended Complaint which are related to claims against Vernon that have been dismissed with prejudice. ECF No. 87 at 18-20. Specifically, the Fayette County Defendants seek to strike: (1) paragraphs 67 through 76, relating to Vernon's alleged failure to disclose the letters from Mackey and Reynolds; and (2) paragraphs 77 through 84, relating to Vernon's alleged suborning of perjury from Mackey and Reynolds and her alleged lies to the jury regarding the consideration that Mackey and Reynolds received for their testimony. Id. The Fayette County Defendants argue that these allegations are entirely immaterial and impertinent to any matter before the Court. Id. In response, Weimer argues that the subject allegations are related to the surviving conspiracy claims. ECF No. 97 at 13.

The Court agrees with Weimer that these allegations may be pertinent to the claims remaining in this case, particularly to the conspiracy claims. Further, while Vernon's conduct at

the trial may not be the subject of a viable claim, certainly the trial at which Weimer was convicted is not an immaterial part of the factual background of this case. At this stage in the litigation, the Court finds no justification for the drastic remedy of striking these allegations. Accordingly, the Motion to Strike is denied.

## V.    CONCLUSION

For the reasons set forth above, the Motion to Dismiss filed on behalf the Fayette County Defendants, ECF No. 86, is denied. The Motion to Strike filed on behalf of the Fayette County Defendants, id., is denied. An appropriate Order follows.

## ORDER

AND NOW this 5th day of April 2019, it is hereby ORDERED, ADJUDGED, AND DECREED that the Motion to Dismiss filed by Defendants County of Fayette, Pennsylvania, Office of the Fayette County District Attorney, and Nancy Vernon, in her official and individual capacities, is DENIED.

IT IS FURTHER HEREBY ORDERED, ADJUDGED, AND DECREED that the Motion to Strike filed by Defendants County of Fayette, Pennsylvania, Office of the Fayette County District Attorney, and Nancy Vernon, in her official and individual capacities, ECF No. 86, is DENIED.

BY THE COURT:

MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

23