**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CRYSTAL DAWN WEIMER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 17-1265 |
| | ) | Magistrate Judge Maureen P. Kelly |
| v. | ) | |
| | ) | Re: ECF Nos. 183, 186, 188, 193, 209, |
| COUNTY OF FAYETTE, PENNSYLVANIA, | ) | and 223 |
| NANCY VERNON *in her official and* | ) | |
| *individual capacities*, RONALD | ) | |
| HAGGERTY, JR., THOMAS CESARIO, | ) | |
| THOMAS PATTON, BEVERLY ASHTON *in* | ) | |
| *their individual capacities,* CITY OF | ) | |
| CONNELLSVILLE, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION**

**KELLY, Magistrate Judge**

Plaintiff Crystal Dawn Weimer ("Weimer") initiated this civil rights action pursuant to 42 U.S.C. § 1983 against the County of Fayette, Pennsylvania; its former District Attorney, Nancy Vernon; the City of Connellsville; and members of the city and state police departments (collectively, "Defendants"). Weimer claims that Defendants violated her rights under the United States Constitution and Pennsylvania law by wrongfully prosecuting her for third-degree murder. Defendants' alleged misconduct resulted in her imprisonment for over eleven years, and ended only after her convictions were vacated and all charges against her were dismissed with prejudice.

Presently before the Court are Motions for Summary Judgment filed on behalf of each Defendant. ECF Nos. 183, 186, 188, and 193. Also pending are two motions by Defendants to have facts deemed admitted for purposes of resolving the motions for summary judgment, and a motion to strike Weimer's statement of additional facts. ECF Nos. 209, 223. For the reasons that

1

follow, the Motion for Summary Judgment filed on behalf of Thomas Cesario ("Cesario"), ECF No. 183, is granted as to Weimer's claims for failure to intervene, but denied as to her claims for malicious prosecution, conspiracy, and supervisory liability; the Motion for Summary Judgment filed on behalf of City of Connellsville ("Connellsville"), Ronald Haggerty, Jr., ("Haggerty"), and Thomas Patton ("Patton"), ECF No. 186, is granted as to Connellsville and Patton, and as to Weimer's claims against Haggerty for failure to intervene and supervisory liability, but denied as to her claims against Haggerty for malicious prosecution and conspiracy; the Motion for Summary Judgment filed on behalf of Fayette County and Nancy Vernon ("Vernon"), ECF No. 188, is granted; and the Motion for Summary Judgment filed on behalf of Beverly Ashton ("Ashton"), ECF No. 193, is granted as to Weimer's claims for failure to intervene and supervisory liability, but denied as to her claims for malicious prosecution and conspiracy. Defendants' joint motions to have facts deemed admitted and to strike, ECF Nos. 209 and 223, are denied.[1]

## I.    FACTUAL BACKGROUND

The parties have submitted a brief Joint Statement of Facts, supplemented by Defendants' Joint Statement of Facts and exhibits thereto.[2] ECF Nos. 180, 181, 182. In accordance with Local Civil Rule 56(C)(1), Weimer filed a response to Defendants' Joint Statement of Facts that sets forth her agreement, disagreement, or objections to Defendants' factual statements, as well as supporting exhibits. ECF No. 203. Dissatisfied with Weimer's response, Defendants moved to have certain facts deemed admitted, ECF No. 209, and Weimer followed with a response to the motion setting forth additional facts and supplementing her objections. ECF No. 222. Defendants

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case. ECF Nos. 21, 22, 27, 28, and 38.

[2] In contrast to the Joint Statement of Facts with 56 numbered factual statements, ECF No. 180, Defendants' Joint Statement of Facts contains 545 numbered paragraphs and is 78 pages long. ECF No. 181.

followed with a Joint Response to Plaintiff's Statement of Additional Facts. ECF No. 225. The Court construes disputed facts in the light most favorable to Weimer as the nonmoving party, and summarizes the record as follows. In setting forth the facts, the Court incorporates the allegations of the Second Amended Complaint as summarized by the United States Court of Appeals for the Third Circuit in Weimer v. Cnty. of Fayette, Pennsylvania, 972 F.3d 177 (3d Cir. 2020), and as developed in the summary judgment record.

### A. The Initial Investigation into Curtis Haith's Murder

Curtis Haith was murdered in the early morning hours of January 27, 2001. ECF No. 222 ¶ 396. Police from the Connellsville Police Department arrived and found Haith dead on the sidewalk outside his apartment, brutally beaten and with a gunshot wound to the face. Id.

Detective Lieutenant Cesario was assigned as lead investigator of Haith's murder. Cesario responded to the report of a homicide, spoke with Haith's neighbors, and recovered evidence from the crime scene and Haith's apartment. ECF No. 180 ¶¶ 3, 5-7; ECF No. 222 ¶ 397. The evidence included blood and hair samples from Haith, blood from the rear porch and the sidewalk, and a blue handkerchief and sweatshirt. ECF No. 180 at 5, 7; ECF No. 222 ¶ 397. Police searched Haith's apartment and collected marijuana, drug paraphernalia, a gun, pager, and a notebook that contained "possible owe sheets." ECF No. 222 ¶ 398; ECF No. 182-2 at 6. According to Cesario, "owe sheets" comprise a "ledger that's sometimes kept by people that are involved in drug sales to people that they have sold drugs to and – kind of like on credit." ECF No. 182-1 at 14.

Cesario asked Haggerty, a Connellsville police officer, to assist with witness interviews. ECF No. 222 ¶ 28. Over the next hours and days, police interviewed Haith's neighbors and friends and learned that Haith had attended parties and had hosted a dozen or more people in his apartment

the prior evening. ECF No. 222 ¶ 399; ECF No. 182-2 at 5. Police interviewed individuals identified as being with Haith at those gatherings, including Weimer. ECF No. 222 ¶¶ 400-01.

Haggerty spoke with Weimer at her sister's residence the day of the murder. Weimer was sleeping when police officers arrived, and she was dressed in the same clothes that she had on the night before. ECF No. 74 ¶ 28. "The officers observed what appeared to be mud and blood on Ms. Weimer's clothes, as well as some injuries to her face and foot…. Ms. Weimer voluntarily accompanied the officers to the police station and […] provided her clothing for forensic testing." Id.; see also ECF No. 222 ¶¶ 42-44 (Weimer's responses). Weimer told the officers that Haith had attended a party at her sister's house for about an hour, and that she and another partygoer drove Haith to Connellsville and dropped him off in front of the Arch Café. ECF No. 222 ¶ 406.

Weimer explained that her injuries resulted from "fooling around" with her boyfriend, Michael Gibson, and another man, Jason Mills, who fell on her. ECF No. 182-2 at 19-20; ECF No. 222 ¶¶ 42 – 43, 49 (Weimer's responses). Defendants contend that Weimer's explanations as to the cause of her injuries varied, and included being beaten in a "house fight." Weimer vehemently denies providing an inconsistent statement, and maintains that she repeatedly explained that she was injured in a physical interaction with her boyfriend. ECF No. 222 ¶¶ 49-51. Based on the presence of blood and mud on her clothing, Haggerty collected mud samples from the crime scene. Id. ¶ 45. Gibson and Mills later confirmed Weimer's version of her injuries as the result of a fight with him, despite initial discrepancies. ECF No. 182-2 at 28.

During the first months of the investigation, witnesses shared with Cesario and Haggerty rumors of a fight between Haith and Shawn Breakiron months before Haith's murder. ECF No. 182-1 at 29, 31; ECF No. 182-2 at 15. The incident ended with Haith shooting a gun into the air. Id. Three witnesses separately reported a rumor of Breakiron's involvement in the murder to

Cesario. ECF No. 182-2 at 18, 27, 29. One of the witnesses shared that he heard that Breakiron and his brother beat Haith with a tire iron and then shot him to prevent Haith from identifying his assailants. Id. at 27. The witness reported that Breakiron drives a white car. Id.

Haith's neighbor related that on night of the murder, she heard popping noises and saw a white older-model car drive up and down the street. Id. Another neighbor reported seeing a male wearing a blue sweatshirt urinate on the road in front of her house and enter Haith's apartment at 3:45 a.m. Id. at 22. She believed Haith was involved in drug trafficking. Id.

Cesario interviewed Breakiron about two months after Haith's murder. Id. at 31. Breakiron confirmed that he had a physical altercation with Haith six months earlier, and that Haith may have been the person who fired three or four gunshots. Breakiron stated he did not have any further dealings with Haith since their altercation, and that he was with his girlfriend on the night of the murder. Breakiron reported a rumor that Haith had been involved in a $2500 "drug rip-off" the day before the murder. Id.

In late March 2001, Cesario learned that early non-specific blood sample testing of the blood taken from Weimer's coat was consistent with Haith. Id. On March 26, 2001, Cesario obtained a search warrant to obtain samples of Weimer's blood. Id. When he served the search warrant, Weimer denied any involvement in Haith's murder and repeated her earlier statement that she was not present at Haith's apartment that evening. Id. at 32. She stated that the blood on her coat came from Gibson, whom she had bitten in an altercation. Id. DNA testing later confirmed that the blood on Weimer's clothes belonged to Gibson, and none of the DNA samples collected from the crime scene matched Weimer. ECF No. 222 ¶ 94; ECF No. 225 ¶ 556; ECF No. 182-2 at 37-38. Cesario did not seek a blood sample from Breakiron, or any other potential suspect, despite rumors connecting them to the murder, and nondescript alibis. ECF No. 182-1 at 30-36.

5

Other witness interviews occurred over the next six months, and police continued to receive information that men not previously identified were involved in Haith's murder. Weimer was not named as a participant in any of these interviews. ECF No. 182-2 at 32-34.

Cesario retired from the Connellsville Police Department effective September 15, 2002. ECF No. 222 ¶ 391. As of the date of his retirement, "Cesario didn't feel they 'were even close to having enough' probable cause to charge anyone for the Haith homicide." Id. ¶ 416. By the date of his retirement, Cesario knew the blood on Weimer's coat belonged to Gibson, and that there was no fiber, hair, blood, or gunshot residue evidence connecting Weimer to the murder scene. ECF No. 182-1 at 21. That said, Cesario provided Vernon with continual updates of the evidence gathered as to Weimer, but he did not share information related to Haith's drug activity, and there is no evidence that he shared with Vernon the persistent rumors that Breakiron or other named individuals, but not Weimer, killed Haith. Id. at 23, 25, 45.

### B.  Weimer is Implicated

Upon Cesario's retirement, Haggerty became the lead investigator. ECF No. 222 ¶ 424. In October 2002 – over twenty months after the murder – Thomas Beal, whom Weimer had dated before Gibson, told police that Weimer and Gibson killed Haith. ECF No. 182-2 at 34; ECF No. 222 ¶ 59. According to Beal, Weimer told him that Haith had raped her, and she and Gibson killed him for revenge. Haith fought back, and during the struggle Gibson bled on Weimer's clothes. ECF No. 182-2 at 34; ECF No. 222 ¶¶ 60-62. Beal further reported that Weimer admitted both that she shot Haith and that Gibson shot Haith. ECF No. 182-2 at 34; ECF No. 222 ¶ 63.

The next month, Haggerty requested assistance from the Pennsylvania State Police ("PSP") cold case squad at the Uniontown Barracks. ECF No. 222 ¶ 65. He first met with Defendant Corporal Ashton, Trooper Venick, and Corporal Tobin. Id. ¶ 66.  Ashton was assigned to work on

the Haith murder investigation with Haggerty. While reviewing autopsy photographs, Ashton noticed an apparent bite mark on Haith's hand. Id. ¶ 68. ECF No. 182-2 at 34.  Haggerty and Ashton met with a local dentist to confirm Ashton's speculation. ECF No. 222 ¶ 70. The dentist examined the photos and stated that with teeth molds, she could determine whether the mark was possibly from a suspect. ECF No. 182-2 at 35.

Ashton and Haggerty followed up with Beal to review his prior statement to police. At the time of the interview, Beal was incarcerated at the Washington County Jail. He repeated much of his story, but now added a third participant in the murder named "Lonnie." ECF No. 222 ¶¶ 71-72. Investigation of this version identified Lonnie, and it was determined that Lonnie was incarcerated at the time of the murder and for several months following Haith's death. ECF No. 182-2 at 35. Despite critical inconsistencies in Beal's statement, Ashton and Haggerty continued to investigate Weimer and Gibson.

Haggerty obtained search warrants for dental impressions, hair samples, and blood from Gibson, and dental impressions and hair samples from Weimer. ECF No. 222 ¶¶ 75, 80. The local dentist compared the  molds and first determined that the bite mark was consistent with Gibson. After receiving Weimer's mold, the dentist stated she could not rule out either Gibson or Weimer as a match to the bite mark on Haith's arm. ECF No. 182-2 at 36. At that point, Haggerty and Ashton contacted a forensic odontologist to assist in the investigation. ECF No. 222 ¶ 88; ECF No. 182-2 at 37.

Haggerty and Ashton interviewed Jason Mills nearly two years after the murder. ECF No. 222 ¶ 89. Mills stated that on the night of the murder, he was at a party at Carla Weimer's apartment with Doug Giles and Crystal Weimer. Crystal Weimer and Giles drove Haith to Connellsville at 11:30 p.m., and when they returned, Weimer had an eye injury and was crying. Mills denied any

physical altercation occurred between Weimer and Gibson, and said that Weimer left with Giles and Bill Martin shortly after returning to the party. ECF No. 182-2 at 37.

In May 2003, the forensic odontologist reported that he believed Weimer's dental mold matched the bite mark. ECF No. 222 ¶ 90. The following month, Haggerty interviewed Joseph Davanzo, who was incarcerated at the Fayette County jail. Davanzo was an ex-boyfriend of Weimer, and related that Weimer told him she was involved with Haith's murder. ECF 182-2 at 37. Haggerty also received the results of DNA testing from the crime scene and learned that the blood on Weimer's clothes matched Gibson's profile, and that none of the blood extracted from items at the crime scene matched Weimer. ECF No. 222 ¶ 94; ECF No. 182-2 at 37-38.

In late August 2003, Conrad Blair contacted PSP Trooper Venick and stated that he had information about Haith's murder. ECF No. 182-2 at 38.  Haggerty, Trooper Venick, and District Attorney Vernon met with Blair at the District Attorney's office. Blair advised that he was in prison with Joseph Stenger, and that Stenger confessed that he, Beal, and Weimer were involved in Haith's murder. According to Blair, Stenger admitted that he and Beal beat Haith, and then Beal shot him. The murder weapon was disposed of in a nearby pond, and clothing left in weeds nearby. Blair stated that Stenger wanted to cooperate with police in "hopes of getting a deal to help him with his charges." ECF No. 182-2 at 39; ECF No. 222 ¶¶ 95-96. Blair provided Haggerty a written statement he asked Stenger to draft. Id.

Haggerty arranged for a search of the identified pond and surrounding area, but no evidence was located. ECF No. 182-2 at 39. Haggerty, Ashton, and Vernon also met with Stenger's attorney to discuss Stenger's involvement with the murder. Id. Stenger's attorney advised that Stenger denied writing the statement Blair provided to police. Id.  Haggerty obtained and executed a warrant to search Stenger's jail cell for writing samples and for a sample of Stenger's blood. ECF

No. 222 ¶¶ 98-100. During the search, Stenger admitted he was at the scene of Haith's murder, but he did not pull the trigger. He also expressed his hope for a deal for his cooperation. Id. ¶¶ 101-02. A warrant was executed to obtain a sample of Beal's blood. Id. ¶ 103. The crime lab later reported that neither Beal nor Stenger's blood matched any evidence at the scene. ECF No. 182-2 at 40.

Haggerty contacted Giles to review the statement he had given two-and-a-half years earlier. Giles confirmed that he and Weimer drove Haith to the Arch Café and returned to the party without incident. Giles attributed any discrepancy with his earlier statement connecting Weimer to the murder to police error, and he confirmed his later version with a lie detector test. Id. Haggerty also contacted Weimer to request her consent to a lie detector test; Weimer declined. ECF No. 222 ¶¶ 104, 105. Weimer states she declined because despite her cooperation to date and the lack of any evidence connecting her to Haith's murder, Haggerty was trying to "set [her] up." Id. ¶ 105 (Weimer's Response).

### C. Proceedings Against Weimer and Continuing Investigation

In late December 2003, despite witness statements attributing the murder to third parties or a drug deal gone bad, and conflicting and contradictory statements from Beal, Blair, Giles, and Stenger, officers prepared a criminal complaint charging Weimer with Haith's murder. Vernon approved the criminal complaint in January 2004, and Weimer was arrested. Id. ¶¶ 106-07; ECF No. 182-2 at 41-42.

On January 22, 2004, two months before Weimer's preliminary hearing, Haggerty was contacted by Stenger's mother, who reported that her son saw Weimer shoot Haith. ECF No. 222 ¶ 108. The following day, Stenger's mother reported to Haggerty that Stenger told her "to keep her 'mouth shut,'" and that he made up the story about the murder. Id. ¶¶ 109, 110. Haggerty

prepared and filed a criminal complaint against Stenger for criminal homicide, conspiracy, and aggravated assault. Id. ¶ 111.

On February 4, 2004, Stenger met with Haggerty and Ashton and implicated Weimer in the murder. ECF No. 203-4 (videotaped statement). Haggerty and Ashton interviewed Stenger for around three hours and then recorded his statement. Before recording the statement, Stenger was asked about the discrepancies in his earlier interviews. Stenger conceded that he and Blair fabricated the earlier version because "Blair intended on getting out for helping and Stenger wanted to try to get a bond reduction and then run to avoid jail. They made the details up to make the story believable. Stenger [stated] that he implicated Tom Beal because he thought that Beal gave [information about] him. Stenger denied that Beal had any involvement." ECF No. 182-2 at 42-43.

Weimer asserts that the three-hour delay before recording the interaction provided Haggerty and Ashton time to coach Stenger on the contents of his statement, and that this coaching continued during the taping. See, e.g., ECF No. 205 at 8-10. At one point, with Haggerty off camera, Stenger appears confused and looks in Haggerty's direction and mouths words, waits, nods, and then resumes his statement. ECF No. 203-4. In his latest version, Stenger implicates two black males and Weimer. ECF No. 182-2 at 42-43.

On March 23, 2004, Weimer appeared for a preliminary hearing relative to the criminal complaint filed against her. ECF No. 222 ¶ 114. The hearing was conducted before District Justice Robert W. Breakiron in Connellsville. ECF No. 182-4 at 2. During the hearing, Beal refused to testify and asserted his Fifth Amendment rights. Haggerty, Ashton, Cesario, and Trooper Hunter testified. Id. at 4. At the end of the hearing, District Justice Breakiron determined that the

Commonwealth established a prima facie case against Weimer and held her for trial on the criminal charges. ECF No. 222 ¶¶ 115-119.

District Justice Breakiron's decision was reversed a month later, after Weimer filed a motion for habeas corpus relief with the Court of Common Pleas of Fayette County. During the habeas corpus hearing before Judge Ralph C. Warman, Beal admitted that he incriminated Weimer because he "was trying to get back at Crystal, and the officer there, Mr. Haggerty, kind of coaxed me along on how to do it." ECF No. 182-10 at 6. Beal testified that Weimer had pursued a protection from abuse order against him, and he was jailed as a result. Id. at 7. According to Beal, at the time of his initial statement, Haggerty provided a copy of the police report detailing evidence collected thus far, including a statement that there was blood on Weimer's clothes, and he "wrote what Mr. Haggerty wanted me to write." Id. at 8. The trial court discounted an attempt to match the mud on Weimer's clothing with mud at the crime scene because police based a connection between the two solely on the color of the mud. The trial court also determined that a statement related to the bite mark on Haith was not supported by evidence of timing to connect it to Haith's murder. Id. at 9-10. The trial court thus concluded that the evidence against Weimer was insufficient and dismissed the charges. Id. at 10-11; ECF No. 222 ¶ 121.

After the hearing, Haggerty and Ashton continued to investigate based on statements Stenger made that implicated Weimer in the murder. ECF No. 222 ¶¶ 122, 123.

On July 14, 2004, Haggerty and Ashton met with Stenger and his attorney. ECF No. 182-2 at 44. Stenger conveyed he wished that to cooperate in exchange for "a deal." Id.  During this meeting, Stenger provided yet another version of the events of the evening of Haith's murder. This version changed the timing and location of where they disposed of the gun and clothing and added that Weimer drove a light-colored Chevy. Id.

11

Ashton and Trooper Hunter located a car that was once registered to Weimer, and they recovered two samples of a dark stain from the back seat and an XXL blue flannel shirt. Id. The crime lab tested the samples and determined they contained no blood. Id.

Stenger followed through with his agreement to participate in a lie detector test, and he admitted that he had lied in each of his prior statements. Id. Accompanied by counsel, Stenger then met with Haggerty and Ashton two days later and revised his earlier statements. This time, he stated that Weimer and two men beat Haith, and then Stenger shot him once in the face. They left the scene. Stenger stated that the following day, he and Weimer disposed of the clothing and the gun in the "Yough River near Turtle Rock." Id.

A search of the river and surrounding area was conducted a few days later, and yielded a bag with clothing, but no weapon. The PSP DNA Crime Lab advised that the clothing would not yield any DNA evidence, given its exposure to dirt and water for three years. Id. at 45.

On September 24, 2004, as part of an agreement with Vernon and police, Stenger pleaded guilty to criminal conspiracy to commit criminal homicide. ECF No. 222 ¶ 132.

Haggerty prepared a second criminal complaint against Weimer. On September 27, 2004, she was charged with criminal homicide, aggravated assault, and criminal conspiracy. Id. ¶¶ 145, 146. A preliminary hearing was conducted on October 19, 2004, again before District Justice Breakiron. The evidence presented at this hearing differed only with respect to adding Stenger's testimony. District Justice Breakiron again found sufficient evidence to hold Weimer for trial on the charges. Id. ¶ 151.

In the intervening months, Haggerty received information from jailed individuals seeking to trade information about Weimer's alleged self-incriminating statements for leniency in resolving pending charges. ECF No. 182-2 at 45 – 47; ECF No. 182-22; ECF No. 182-23.

The criminal charges against Weimer proceeded to trial in the Court of Common Pleas of Fayette County on April 3 through April 7, 2006, and testimony was offered by participating investigators, dental/bite mark experts, and Stenger. ECF No. 222 ¶¶ 163, 165, 167, 177. The prosecution also called the jailhouse informants who had offered to testify against Weimer, but their letters offering testimony in exchange for leniency were not provided by the District Attorney's office to defense counsel. ECF No. 182-30 ¶¶ 7-8. Thus, Weimer's counsel lacked critical evidence on which to challenge the credibility of the testimony connecting Weimer to the murder. Over Weimer's objection, the prosecution also presented the expert testimony of Dr. Constantine Karazulas as to bite mark evidence implicating Weimer. ECF No. 222 ¶¶ 509 – 510. At the trial's conclusion, a jury found Weimer guilty of third-degree criminal conspiracy and third-degree criminal homicide. Id. ¶ 198. She was sentenced to fifteen to thirty years in prison. Commonwealth v. Weimer, 977 A.2d 1103, 1104 (Pa. 2009).

After exhausting all available state court remedies, Weimer filed a *pro se* Petition for Writ of Habeas Corpus with this Court on December 19, 2013. Weimer v. Wilkes, No. 13-cv-1808 (W.D. Pa. Dec. 19, 2013), at ECF No. 2. Weimer claimed, *inter alia*, that her conviction was based on (i) Stenger's perjured testimony, and (ii) scientifically flawed evidence relative to the "bite mark" testimony. Id. On July 8, 2014, this Court determined that the interests of justice required the appointment of counsel and appointed the Federal Public Defender to represent Weimer. Id. at ECF No. 17.

On February 13, 2015, Weimer filed a Petition for Post-Conviction Relief (the "PCRA Petition") in the Court of Common Pleas of Fayette County. ECF No. 222 ¶ 202; ECF No. 182-6. As part of preparation of the PCRA Petition, an investigator with the Federal Public Defender's office interviewed Stenger. ECF No. 203-3 at 2. During the interview, and in subsequent telephone

calls, Stenger informed the investigator that he lied when he implicated Weimer in Haith's murder. He conceded that he gave police several conflicting stories, and he stated that police officers "walked him through his story, suggesting how things happened, where they happened, etc." Id. at 3. At one point, police drove him to the crime scene and provided him with directional cues. Stenger admitted that he made up his statement that "two black guys" were involved, and he stated that police gave him a copy of a search warrant, where he gleaned the details related to evidence found at the scene of the murder.  Id.

A hearing on the PCRA Petition was held on October 1, 2015, before Judge John F. Wagner, Sr., and the Petition was granted that same day. ECF No. 222 ¶¶ 203, 204. Judge Wagner cited the recanted testimony of the dental expert as to the timing of the bite and as to whether Weimer's dental mold matched the bite on Haith's arm. ECF No. 182-28. The dental expert explained that based on current scientific standards, his original opinion was based on "garbage" or "junk science." Id. at 15, 19. In addition, the trial court noted that Stenger's counsel reported that, if called as a witness, Stenger would say he testified falsely at Weimer's trial.  Id. at 7-8. Judge Wagner vacated Weimer's conviction, and her criminal charges were listed as pending for purposes of a new trial. ECF No. 222 ¶ 205.

In November 2015, Detective Patton was assigned to lead the ongoing investigation into Haith's murder. Id. ¶ 207. He interviewed Stenger and questioned him about rumors identifying other individuals as involved in the murder, including Curtis Barnes. Id. ¶ 210. Stenger reaffirmed that he had lied in his prior statements implicating Weimer. ECF No. 203-6 at 3.  According to Stenger, he was coerced by Haggerty into confessing and implicating Weimer. He thought he would be given a break by prosecutors on other charges if he cooperated. Stenger told Patton he learned of facts related to the murder by word of mouth, newspapers, and court documents that

had been provided to him. Id. Patton told Stenger he did not believe him based on certain consistencies in his prior versions of events on the night of the murder. Id. Patton also interviewed other witnesses about the possible involvement of yet another suspect in the murder. Id. at 4-6; ECF No. 222 ¶¶ 212-215.

On June 27, 2016, Judge Daniel Howsare conducted a hearing on the effect of Stenger's admission that he testified falsely at the initial trial and would assert his rights under the Fifth Amendment in any future proceedings. ECF No. 182-25. Upon learning that Stenger would not testify, the Fayette County District Attorney informed the trial court that the available evidence was insufficient to overcome a writ of habeas corpus. Id. at 34. Without objection, the trial court dismissed all charges against Weimer with prejudice. ECF No. 182-25; ECF No. 222 ¶ 217.

## II.   RELEVANT PROCEDURAL HISTORY

Weimer commenced this counseled federal civil rights action on September 28, 2017. ECF No. 1. After preliminary motions to dismiss, the filing of an Amended Complaint, and additional motions to dismiss, Weimer filed the operative Second Amended Complaint on October 15, 2018. ECF No. 74.

In her Second Amended Complaint, Weimer alleges that despite exculpatory DNA evidence, her consistent statements denying involvement and explaining her injuries, and other evidence reflecting that she was not involved in Haith's murder, police investigators and Vernon focused on Weimer as the prime suspect in Haith's murder, to the exclusion of all other suspects. Id. 74 ¶ 3.  In pursuit of their "tunnel vision," Defendants "coerced false witness statements," "willfully ignored contradictory evidence and presented knowingly false statements as evidence at pre-trial hearings and during trial." Id. Defendants also failed to reveal facts that "directly impacted the jury's ability to evaluate the credibility of certain key witnesses." Id. As a result,

Weimer was wrongfully convicted and remained incarcerated for over 11 years. Id. ¶ 2. Weimer alleges that Defendants' misconduct continued after Weimer's conviction was vacated through attempts to "cover up and suppress the facts that led to Ms. Weimer's wrongful convictions, in an effort to maintain their ability to re-prosecute the wrongful criminal charges." Id. ¶ 4.  Thus, she asserts the following claims: (1) Count I - § 1983 malicious prosecution (against all individual Defendants); (2) Count II - § 1983 civil rights conspiracy (against all individual Defendants); (3) Count III - § 1983 failure to intervene (against all individual Defendants); (4) Count IV - § 1983 Supervisory Liability Claims (against all Defendants, except the Office of the Fayette County District Attorney); and, (5) Count V- Malicious Prosecution under Pennsylvania state law (against all individual Defendants). Id. ¶¶ 106-148.

Defendants Ashton, Cesario, Haggerty, and Connellsville filed Answers to the Second Amended Complaint, ECF Nos. 76, 82, and 90, and Defendants Patton, Fayette County, Fayette County District Attorney, and Nancy Vernon filed Motions to Dismiss.  ECF Nos. 86, 91. The Court granted Patton's Motion to Dismiss as to Counts I, II, III, and V, and Patton filed his Answer on the sole remaining claim against him for supervisory liability (Count IV). ECF Nos. 101, 105.

This Court also granted in part Vernon's Motion to Dismiss as to all claims arising out of Vernon's prosecution of the case against Weimer, for which Vernon enjoys absolute immunity. ECF No. 102. Vernon's motion was denied as to Weimer's claims arising out Vernon's alleged involvement in the investigation of Haith's murder, because investigative conduct is not within the scope of prosecutorial functions for which immunity applies. Thus, as to allegations that Vernon directed or participated in the investigation, this Court held that Weimer stated claims that were

not precluded by absolute or qualified immunity, given Vernon's alleged awareness of conflicting evidence throughout the investigation.[3] Id. 102.

Vernon and the Fayette County Defendants appealed to the United States Court of Appeals for the Third Circuit, and they filed a motion in this Court to stay this action pending the disposition of the appeal.  ECF Nos. 103, 106. A stay was granted as to Vernon and Fayette County only, and the Court permitted the remaining parties to conduct written discovery. ECF No. 116.

The Third Circuit affirmed in part and reversed in part the order denying Vernon and Fayette County's Motion to Dismiss. Weimer v. Cnty. of Fayette, 972 F.3d 177 (3d Cir. 2020). The Third Circuit affirmed this Court's holding that absolute immunity applied to Vernon's actions that were prosecutorial in nature, but not to claims against her that arose from her alleged involvement in the investigation of the crime scene on the morning of Haith's murder, nor for any alleged investigation into statements by Beal, Blair, and Stenger. The Third Circuit also held that at the time of Vernon's alleged misconduct, Weimer did not have a clearly established right to have Vernon protect her from an allegedly unconstitutional police investigation. Thus, Vernon was entitled to qualified immunity as to Weimer's failure to intervene claim. Finally, the Third Circuit determined that the unreliability of bite-mark evidence was not widely recognized at the relevant time period – from late 2002 to early 2006. Thus, Vernon was not on notice that her alleged misconduct in directing further investigation into the bite-mark evidence would violate Weimer's rights. Absent such notice, Vernon is entitled to qualified immunity as to Weimer's malicious

---

[3] This Court granted Vernon's Motion to Dismiss with prejudice Weimer's claims in the Amended Complaint for § 1983 malicious prosecution (on all bases other than bite mark investigation), § 1983 civil rights conspiracy (on all bases other than involvement in the police investigation), and state law malicious prosecution. ECF No. 71. Apart from Weimer's repleaded § 1983 malicious prosecution claim for conduct arising out Vernon's alleged investigatory conduct, the previously dismissed claims are not at issue.

prosecution claim challenging Vernon's participation in investigating the timing of the bite mark. Id. at 192.

Vernon and Fayette County filed their Answer to the Second Amended Complaint, ECF No. 158. Thereafter, the parties completed fact discovery. ECF No. 173.

The parties have filed the pending Motions for Summary Judgment, Statements of Facts, and briefs in support and in opposition to the pending motions. Defendants have documented their dissatisfaction with Weimer's responses to Defendants' Joint Statement of Facts with motions to have certain facts deemed admitted and a motion to strike. ECF Nos. 209, 223. Weimer opposes both motions. ECF Nos. 222, 225. All pending motions are now ripe for consideration.

## III.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof"). Thus, summary judgment is warranted where, "after adequate time for discovery and upon motion . . . a party . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

The moving party bears the initial burden of demonstrating to the court that there is an absence of evidence to support the non-moving party's case. Celotex, 477 U.S. at 322; Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004). "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. Matreale v. New Jersey Dep't of Mil. & Veterans Affs., 487 F.3d 150, 152 (3d Cir. 2007); Woodside v. Sch. Dist. of Philadelphia Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001).

## IV.    DISCUSSION

### A.    Defendants' Motions to Have Facts Deemed Admitted and Motion to Strike

Defendants have filed two joint motions to have statements in the Defendants' Joint Statement of Facts deemed admitted, and a Motion to Strike Plaintiff's Statement of Additional Facts. ECF Nos. 209, 223. Defendants contend that, in large part, Weimer's responses to Defendants Joint Statement of Facts violate Local Civil Rule 56. Thus, in resolving the pending summary judgment motions, Defendants urge the Court to deem dozens of "material" facts admitted. Defendants also move to strike Weimer's Statement of Additional Facts because it too violates the Local Civil Rules of this Court. Defendants support the renewed motion with a brief in support, ECF No. 224, and Weimer has filed her brief in opposition, ECF No. 227.

In accordance with Local Civil Rule 56, a party moving for summary judgment must file:

> A separately filed concise statement setting forth the facts essential for the Court to decide the motion for summary judgment, which the moving party contends are **undisputed and material**, including any facts which for purposes of the summary judgment motion only are assumed to be true. The facts set forth in any party's Concise Statement shall be stated in separately numbered paragraphs. A party must cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record supporting the party's statement, acceptance, or denial of the material fact.

LCvR 56(B)(1) (emphasis in original). The Local Civil Rules also require a party opposing a motion for summary judgment to file a responsive concise statement of material facts which responds to each numbered paragraph in the movant's concise statement by: (1) admitting or denying the facts asserted in the movant's concise statement; (2) setting forth the basis for any denial, to the extent a fact is not admitted entirely, with appropriate citation to the record; and (3) setting forth, in separately numbered paragraphs, any other material facts at issue. See LCvR 56(C)(1).

"The purpose of Local Rule 56.1 is to aid the court in deciding a motion for summary judgment by identifying material facts and supporting documentation to determine whether or not the fact is disputed." Bouriez v. Carnegie Mellon Univ., No. 02–2104, 2005 WL 2106582, at *3 (W.D. Pa. Aug. 26, 2005) (citing W.D. PA. R. 56.1)(2005); see also Markham v. White, 172 F.3d 486, 490 (7th Cir. 1999) (the local summary judgment rules "assist the court by organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side proposed to prove a disputed fact with admissible evidence"). Thus, a concise statement of material facts and responsive concise statement under Local Civil Rule 56 provide a mechanism by which the court can expeditiously determine what, if any, material facts are in dispute. Porter v. Hogue, No. 12-101, 2013 WL 1673135, at *2 (W.D. Pa. Apr. 17, 2013).

In this case, Defendants' Joint Statement of Facts does not comply with Local Civil Rule 56 because it is not concise and does not solely set forth "undisputed and material" facts. Defendants' document is 78 pages long and contains 545 statements, many of which are immaterial. The Court's review finds that the Defendants have produced a disordered compilation that places an undue burden on Weimer's counsel. Despite the breadth of Defendants' Joint Statement of Facts, Weimer countered with 194 pages in response to Defendants' individual statements, most with citations to evidentiary support. In her response, many statements are admitted; many are contested with appropriate record citations, and many are correctly identified as immaterial. Baumiller v. Sessions, 371 F. Supp. 3d 224, 228 (W.D. Pa. 2019) (citing Sovereign Bank v. BJ's Wholesale Club, Inc., 533 F.3d 162, 172 (3d Cir. 2008)) ("[a] fact is material if, under substantive law of the case, it is outcome determinative.").

Reflecting the lack of materiality of much of Defendants' Joint Statement of Facts, Cesario's Brief in Support of his Motion for Summary Judgment refers generally to the document, ECF No. 184 at 2, and then fails to cite a single factual statement in support of any argument advanced. The Connellsville Defendants' brief cites no more than three dozen statements, almost all of which are either admitted, denied with citations to other evidence, or identified as immaterial. See, e.g., ECF No. 181 ¶¶ 96-134. The Fayette County Defendants appropriately cite Defendants' Joint Statement of Facts to support the contention that Vernon was not involved in the investigation of Haith's murder. ECF No. 189. In response to each cited statement, Weimer either admits the facts set forth, or denies them based on cited testimony she asserts is contradictory. See, e.g., ECF Id. ¶¶ 294 – 298. Other statements cited by the Fayette County Defendants are conclusory or require an assessment of her credibility. See, e.g., id. ¶ 300 ("Vernon did not participate in witness interviews in her capacity as a District Attorney, because of the possibility that she would become

21

a witness herself." (Ex. O, Vernon Depo. at 75-77)). Weimer's responses to these statements cite evidence that she contends gives rise to a contradictory inference. Id. Finally, Defendant Ashton appropriately cites approximately four dozen of the hundreds of statements in the Defendants' Joint Statement of Facts to support her contention that she is entitled to judgment in her favor as a matter of law. ECF No. 194. Many cited facts overlap with those cited by Haggerty and, by and large, are admitted by Weimer or denied by her with citations to conflicting evidence of record.

Given that the Defendants' Joint Statement of Facts fails to meet the standards required by Local Civil Rule 56, and Weimer has responded more than adequately under the circumstances presented, Defendants' Joint Motion to Have Deemed Admitted Statements of Facts, ECF No. 209, and the renewed motion, ECF No. 223, are denied. See Brugh v. Mount Aloysius Coll., No. 3:17-CV-71, 2019 WL 7505741, at *2 (W.D. Pa. Aug. 15, 2019) (granting a motion to strike a party's concise statement of facts containing 381 facts, where only 111 are cited in briefs); and citing Hartshron v. Throop Borough, No. 3:07-cv-01333, 2009 WL 761270, at *2 (M.D. Pa. Mar. 19, 2009) (finding that a 241-paragraph concise statement of material facts violated the Middle District of Pennsylvania's comparable local rule); see also Ace v. Armstrong Utilities, Inc., No. 14-526, 2015 WL 6066946, at *1 (W.D. Pa. Oct. 15, 2015) (dismissing without prejudice defendants' motion for summary judgment supported with a "statement [that] is 40 pages long and contains 282 separate paragraphs; by no definition of the word could this submission be called 'concise.' Nor are all of the facts material or even arguably undisputed."). The Motion to Strike Weimer's statement of additional facts, included in the renewed motion, ECF No. 223, is also denied.

Rather than dismiss the pending motions for summary judgment to be refiled with compliant statements of facts, consideration of the parties' statements of facts will be given when

adequately supported by evidence. When appropriate, the Court also may consider evidentiary materials in the record beyond the parties' statements of fact and responses. See Scalia v. WPN Corp., 417 F. Supp. 3d 658, 661 (W.D. Pa. 2019) ("rely[ing] on the record as a whole to determine the applicable material facts").

### B.    Motions for Summary Judgment

Section 1983 provides a civil remedy for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. To prevail in an action under § 1983, a plaintiff must establish: (1) a violation of a right secured by the Constitution or laws of the United States, and (2) that the alleged deprivation was committed by a person acting under color of state law. Hodges v. Mankey, No. 13-1600, 2015 WL 7289409, at *2 (W.D. Pa. Nov. 16, 2015), aff'd, 651 F. App'x 81 (3d Cir. 2016) (citing Groman v. Twp. of Manalapan, 47 F.3d 628, 638 (3d Cir. 1995); Shaw by Strain v. Strackhouse, 920 F.2d 1135, 1141-42 (3d Cir. 1990)). The imposition of liability requires that each named defendant have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior. Rode v. Dellarciprete, 845 F.2d 1195, 1207–08 (3d Cir. 1988). Personal involvement can be shown when a defendant personally directs the wrongs, or has actual knowledge of the wrongs and acquiesces in them. Id.; A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004) ("a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations").

In this case, Defendants do not dispute that they were acting under the color of state law when Weimer was investigated, charged, and ultimately convicted for Haith's murder. Rather,

Defendants contend that Weimer fails to establish that any of them violated her civil rights and, as to certain conduct, that qualified immunity bars her claims.

The Court will consider the motions for summary judgment by claim.

### 1.  Malicious Prosecution - § 1983 (Count I)

In Count I, Weimer alleges that the Defendants, "acting individually and in concert with malice and knowing that their investigation revealed that probable cause did not exist to prosecute Weimer, intentionally caused her to be arrested, charged, and prosecuted for those crimes."  ECF No. 74 ¶ 107.  She further alleges that each individual Defendant fabricated evidence and withheld or misrepresented exculpatory evidence, which resulted in her arrest and conviction without probable cause. Id. ¶ 108. Finally, she alleges that the Defendants influenced or participated in the decision to initiate or continue Weimer's prosecution, and that their wrongful conduct continued after her conviction was vacated in an effort to re-prosecute her on the same charges. Id. ¶ 109.

To prevail on a § 1983 Fourth Amendment malicious prosecution claim, a plaintiff must establish that:

> (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in [the] plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

Harvard v. Cesnalis, 973 F.3d 190, 203 (3d Cir. 2020) (quoting Est. of Smith v. Marasco, 318 F.3d 497, 521 (3d Cir. 2003)); see also Halsey v. Pfeiffer, 750 F.3d 273, 296-97 (3d Cir. 2014).

Defendants do not dispute that Weimer was charged and incarcerated for Haith's murder, or that the criminal proceedings ultimately ended in her favor. Rather, Cesario contends that he was not personally involved in any alleged misconduct that led to prosecuting Weimer because he had retired long before any of the actions identified in the Second Amended Complaint occurred.

ECF No. 184 at 2-3, 9. Vernon argues she was not personally involved in any alleged investigatory misconduct that led to charging and ultimately convicting Weimer. ECF No. 189 at 5-13. Defendants Haggerty and Ashton parse the conduct identified in the Second Amended Complaint and assert that liability for malicious prosecution cannot be imposed for each individual act. ECF Nos. 187, 194.

### a. Cesario

Turning first to Cesario, he was the lead investigator from the initiation of the Haith homicide investigation in late January 2001 until his retirement on September 15, 2002. He asserts that he cannot be liable to Weimer for malicious prosecution because he did not participate in initiating criminal proceedings against her in 2004, or in any alleged unconstitutional misconduct that led to her conviction. ECF No. 184 at 4-6. Direct and personal involvement in the alleged constitutional violation is a requirement for § 1983 liability. Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 289 (3d Cir. 2018). However, "[i]t is settled law that 'officers who conceal and misrepresent material facts to the district attorney are not insulated from a § 1983 claim for malicious prosecution simply because the prosecutor, grand jury, trial court, and appellate court all act independently to facilitate erroneous convictions.' If the officers influenced or participated in the decision to institute criminal proceedings, they can be liable for malicious prosecution." Halsey, 750 F.3d at 297 (citations and footnote omitted).

Thus, "[p]olice officers (as opposed to prosecutors) may be liable for malicious prosecution if they 'conceal or misrepresent material facts' to the prosecutor." Thomas v. City of Philadelphia, 290 F. Supp. 3d 371, 379 (E.D. Pa. 2018) (quoting Halsey, 750 F.3d at 297). "In particular, an officer is liable if he 'fails to disclose exculpatory evidence to prosecutors, makes false or misleading reports to the prosecutor, omits material information from the reports, or otherwise

interferes with the prosecutor's ability to exercise independent judgment in deciding whether to prosecute.'" Id.

In this case, Weimer raises sufficient material factual issues to survive summary judgment. The record reflects that before his retirement, Cesario informed Vernon of leads and sparse evidence related to Weimer, but he failed to provide information related to other suspects repeatedly identified by witnesses, or information related to Haith's drug activity, including evidence of a $2,500 drug dispute. ECF No. 182-1 at 23, 25, 45. Vernon testified that Cesario did not disclose that an informant provided a statement that Breakiron or his brother beat and shot Haith, or that the statement included facts related to the gunshot wound that were not publicly known. ECF No. 182-17 at 31-33. Under these circumstances, and construing the evidence in the light most favorable to Weimer, a reasonable jury could conclude that Cesario's failure to disclose exculpatory information and his repeated omission of evidence about other suspects both materially influenced Vernon's decision to prosecute Weimer and was malicious.[4] See Lippay v. Christos, 996 F.2d 1490, 1503 (3d Cir. 1993) ("Legal malice is not limited to motives of hatred or

---

[4] Cesario's reliance on Lonzano v. New Jersey, 9 F.4th 239 (3d Cir. 2021), Johnson v. Logan, 721 F. App'x 205 (3d Cir. 2018), and Ekwunife v. City of Philadelphia, 756 F. App'x 165,169 (3d Cir. 2018), does not suggest a different result. In Lonzano, the Third Circuit reversed an order denying summary judgment on qualified immunity grounds in favor of a police officer whose only connection to arresting and charging the plaintiff was the officer's presence when the plaintiff was detained and transporting the plaintiff to the police station. Lonzano, 9 F.4th at 246-47. In Johnson, a panel of the Third Circuit affirmed the grant of summary judgment because there was "no evidence that [the defendant police officers] provided false information to, or concealed information from, prosecutors. Rather [defendants] merely failed to discover information" that could have undermined an ultimately false eyewitness account. Johnson, 721 F. App'x at 207. In concluding that summary judgment was properly entered, the Third Circuit panel noted that "[o]ur holding does not foreclose the possibility that a plaintiff could satisfy the 'initiated criminal proceeding' element of a malicious prosecution claim by showing that an officer was willfully blind to exculpatory information that the officer clearly had reason to know existed," and the officer "influenced or participated in the decision to institute criminal proceedings." Id. at 207 n.5, 6 (citing Halsey, 750 F.3d at 297). Finally, in Ekwunife, the Third Circuit affirmed the grant of summary judgment for a police officer where the undisputed evidence established he neither knowingly nor maliciously provided any misinformation to the district attorney and did not conceal material information from prosecuting authorities. In contrast, Weimer presents evidence sufficient to permit a reasonable jury to conclude that Cesario concealed material information from Vernon and was otherwise willfully blind to exculpatory information that ultimately influenced Vernon's decision to charge Weimer.

ill will, but may consist of defendant's *reckless* and oppressive *disregard* of plaintiff's rights.") (emphasis in original, citation omitted).

Cesario also contends that he is entitled to qualified immunity because, under the circumstances alleged, he did not influence Weimer's prosecution or violate her right to be free from malicious prosecution. ECF No. 184 at 10.

The United States Court of Appeals for the Third Circuit has explained the factors to be considered in applying qualified immunity in a malicious prosecution context as follows:

> "'A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry. If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.'" Wright v. City of Philadelphia, 409 F.3d 595, 600 (3d Cir. 2005) (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).).

Andrews v. Scuilli, 853 F.3d 690, 697 n.8 (3d Cir. 2017). Here, a reasonable jury could conclude that Cesario was "willfully blind to exculpatory information" and relayed only contradicted or inadequately investigated inculpatory findings to Vernon, and thus also conclude that he violated Weimer's Fourth Amendment right to be free from malicious prosecution by materially influencing Vernon's decision to charge her. Johnson, 721 F. App'x at 207 n.5.

The Court next considers whether the right at issue was clearly established. The right to be free from prosecution on criminal charges that lack probable cause was known and clearly established when Cesario reported his findings to Vernon. See, e.g., Andrews, 853 F.3d at 705 (citing Donahue v. Gavin, 280 F.3d 371, 380 (3d Cir. 2002)). This right was "grounded in well-settled law and thus, on the record of this case, 'it would be clear to a reasonable officer that [Cesario's] conduct was unlawful in the situation he confronted.'" Id. (quoting Saucier, 533 U.S.

at 202). Accordingly, the entry of judgment in Cesario's favor on grounds of qualified immunity is not appropriate at this point.

### b. Vernon

The Third Circuit has held that absolute immunity bars Weimer's malicious prosecution claim against Vernon to the extent that Weimer's allegations of misconduct arise from Vernon's prosecutorial functions. However, Vernon's alleged involvement in directing the crime scene investigation and investigating contradictory witness statements from Beal, Blair, and Stenger before charges were filed are not activities within the scope of prosecutorial functions for which immunity applies. Weimer, 972 F.3d at 189-90. Nor does prosecutorial immunity apply to alleged wrongful conduct by Vernon, if any, after Weimer's conviction was vacated – a time when Vernon was a sitting Court of Common Pleas Judge in Fayette County.  Id. at 190 n.9.

Considering the limits of her potential liability, Vernon asserts that there is no evidence on which a reasonable jury could conclude that she directed the investigation of the crime scene on the morning Haith's body was discovered, or that she led or participated in an investigation of the Beal, Blair, or Stenger statements. ECF No. 189 at 6-13. Vernon therefore moves for the entry of summary judgment in her favor because her "actual involvement falls within the scope of immunity afforded to prosecutors." Id. at 6.

Weimer responds that the evidence gives rise to genuine disputes of material fact related to Vernon's involvement in the investigation. ECF No. 208 at 4-9. Specifically, Weimer points to Vernon's presence at the crime scene and at investigatory meetings. Id.

The Court has conducted a detailed review of the record and concludes that if construed in a light most favorable to Weimer, a reasonable jury could not find that Vernon participated in the

investigation of Haith's murder. As such, her conduct does not give rise to liability for malicious prosecution.

### i.   Vernon's presence at crime scene

Weimer points to evidence that Vernon was at the crime scene on the morning Haith's body was discovered and that, in the past, when she was at a crime scene, she would speak up if she "saw something blatantly bad that was going on." Id. at 5; ECF No. 222 ¶¶ 294 – 298. Vernon also concedes she had the authority to direct Fayette County's drug task force to be involved in any investigation. ECF No. 208 at 6. That said, Plaintiff fails to point to any evidence that Vernon "spoke up" or employed her authority to direct or forego the participation of the drug task force in the Haith investigation. Instead, the evidence, construed in the light most favorable to Weimer, establishes that Vernon walked around the crime scene for half an hour to an hour, but she did not give any guidance, collect any evidence, or interview any witnesses. ECF No. 222 ¶¶ 293, 294, 295, 313, 316, 317 – 320. Because merely being present at the scene is not enough to establish participation in the alleged violation of Weimer's rights, Lozano, 9 F.4th at 246, liability does not attach to Vernon's conduct on the morning after Haith's murder.

### ii.   Vernon's investigation of statements made by informants

Weimer also fails to present evidence that Vernon was present for Beal's interview or that she directed or participated in the investigation of the statements made by Beal, Blair, or Stenger. ECF No. 189 at 10, ECF No. 208 at 7-8. The fact that Vernon may have been present for potential plea discussions does not support a reasonable inference that she directed or participated in the investigation of statements made by these informants. To that end, there is no evidence that Vernon directed or participated in assembling a dive team to locate evidence, or that she ordered an investigation to determine the identity of any potential suspect. Weimer's claims of malicious

prosecution after her conviction was vacated in 2016 are equally unsupported by the record. Any alleged misconduct at that time occurred when Vernon was a sitting judge on the Court of Common Pleas of Fayette County, and no longer serving as the district attorney.

Without evidence that Vernon participated in the alleged violation of Weimer's rights during the investigation of Haith's murder, summary judgment is appropriately entered in Vernon's favor as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 250 (where, as here, "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'").

### c. Haggerty

The Connellsville Defendants misconstrue Weimer's claim for malicious prosecution against Haggerty. According to these Defendants, the Second Amended Complaint asserts three independent claims for the violation of Weimer's Fourteenth Amendment rights: (1) a substantive due process claim for failure to investigate; (2) a substantive due process claim for fabrication of evidence; and (3) a due process claim for withholding or destroying documents containing exculpatory evidence. ECF No. 187 at 14-23. These claims were set forth at Count II in Weimer's initial and first amended complaints, but they are not included in the operative Second Amended Complaint. See ECF No. 1 at 23; ECF No. 47 at 26. Instead, as Weimer points out in her brief in opposition to the pending Motion for Summary Judgment, her claim at Count I is for malicious prosecution and is measured by factors not briefed by Defendant Haggerty. ECF No. 206. Undeterred, Haggerty's reply brief reiterates his perception of Weimer's malicious prosecution claim as a Fourteenth Amendment due process claim and, to be safe, adds a boilerplate conclusory sentence denying the elements of a malicious prosecution claim. ECF No. 218 at 2-5. On this basis,

the Connellsville Defendants have not established entitlement to summary judgment as to "Count I: 42 U.S.C. § 1983 Malicious Prosecution," and the motion is properly denied.

In the interest of judicial economy, the Court notes that the record contains a plethora of evidence related to Haggerty's alleged misconduct during the Haith murder investigation that would otherwise preclude the entry of summary judgment. As explained, "an officer is liable [for malicious prosecution] if he 'fails to disclose exculpatory evidence to prosecutors, makes false or misleading reports to the prosecutor, omits material information from the reports, or otherwise interferes with the prosecutor's ability to exercise independent judgment in deciding whether to prosecute.'" Thomas, 290 F. Supp. 3d at 379. In this case, the evidence would permit a reasonable jury to conclude that Haggerty coached or aided the fabrication of false statements, failed to provide the prosecutor with material exculpatory evidence, and otherwise willfully and recklessly ignored both exculpatory evidence and the absence of inculpatory physical evidence connecting Weimer to Haith's murder. A sampling of this evidence follows.

(1) In Stenger's statement to the Federal Public Defender recanting his trial testimony, Stenger explained that Haggerty coached him in the details of his statements, provided him with a copy of the search warrant listing the evidence at the crime scene (including facts not otherwise publicly available), and drove him to the crime scene to guide the contents of his statement. Stenger also confessed to making up the existence and description two black accomplices. ECF No. 182-6 at 27-28, 55-57.

(2) Haggerty testified that Stenger told him Blair fabricated the story of Weimer's involvement to "get a deal." Haggerty also confirmed that he gave Stenger a copy of the search warrant and that he drove him to the murder scene. Thus, a jury may infer

that Haggerty provided Stenger with details of the evidence discovered near Haith's body to support his statement implicating Weimer. ECF No. 182-5 at 16-21.

(3) Upon review, a reasonable jury could conclude that during Stenger's video statement, Haggerty coached Stenger as to the content of his statement. ECF No. 203-4; ECF No. 182-5 at 25-28.

(4) Defendants have provided the Court with transcripts of state court proceedings vacating and ultimately dismissing Weimer's charges. These proceedings focus on Stenger's intention to assert his rights against self-incrimination under the Fifth Amendment because he "testified falsely at trial." ECF No. 182-5 at 4; ECF No. 182-28 at 7; ECF No. 182-25 at 6, 26-27.

(5) Beal testified that Haggerty coached and coaxed him to implicate Weimer, and that he "wrote what Mr. Haggerty wanted [him] to write." A reasonable jury could conclude that Vernon's initial decision to charge Weimer was influenced by Beal's fabricated statement and also conclude that Beal's testimony about Haggerty's conduct is consistent with Stenger's statements recanting his testimony. ECF No. 182-19 at 7-8.

(6) Vernon testified that Haggerty did not share with her the identity or statements of informants who separately named Breakiron or other alleged participants in Haith's murder. ECF No. 182-17 at 31-33.

(7) Haggerty testified that he failed to investigate (and did not report) Stenger's multiple inconsistent statements to police including: (i) Stenger's statement that Weimer screamed throughout the alleged murder despite evidence by multiple witnesses that only one scream for help was heard and the absence of evidence it was a woman's voice; (ii) Stenger's statement that he and Weimer discussed the murder the next day

in her sister's basement even though her sister's house did not have a basement; and (iii) Stenger's statement that Weimer and Stenger disposed of her clothing the day after the murder despite all evidence that when Weimer was awakened by police, she was wearing her clothes from the prior evening and those clothes were confiscated by police. ECF No. 182-5 at 16-45.

(8) Haggerty's testimony that there was no physical or DNA evidence connecting Weimer to Haith's murder. Id. at 45.

In sum, the record provides ample evidence on which a jury could find that Haggerty coaxed or participated in the fabrication of statements implicating Weimer, and that he knew of exculpatory and conflicting evidence reflecting that Weimer was not involved in Haith's murder, but willfully ignored it and failed to provide this information to Vernon. Thus, a reasonable jury may infer that through this conduct, Haggerty improperly and maliciously influenced Vernon's decision to institute criminal proceedings against Weimer and violated her Fourth Amendment right to be free from malicious prosecution. Accordingly, the motion for summary judgment on behalf of Haggerty is denied.[5] Hasley, 750 F.3d at 298 (error to grant summary judgment for police officer where prosecutor's reliance on fabricated confession and other evidence raised issues of fact).

---

[5] Haggerty argues that the record lacks evidence that he coerced testimony linking the bite mark to Weimer, or "participated in the development, let alone the falsification of bite mark evidence." ECF No. 218 at 2. As explained in this Court's discussion of Ashton's Motion for Summary Judgment, Haggerty's alleged misconduct in pursuing and investigating bite mark evidence is subject to qualified immunity. Thus, the Court does not consider this conduct in relation to Weimer's malicious prosecution claim. The Court notes, however, that Haggerty's awareness of inculpatory bite mark evidence does not resolve whether, at the time he pursued charges against Weimer, there was probable cause to charge her. See Harvard v. Cesnalis, 973 F.3d at 200 (based on the totality of the circumstances and viewing those circumstances in the light most favorable to plaintiff, summary judgment is not appropriate where a reasonable jury could conclude that the plainly exculpatory evidence available to the arresting officer "outweighs the probable cause otherwise established" through inculpatory evidence).

### d. Ashton

Turning to Corporal Ashton of the PSP cold case unit, she asserts that she is entitled to summary judgment in her favor as a matter of law for two reasons. First, qualified immunity shields her from liability for Weimer's malicious prosecution claim arising out of her pursuit of bite mark evidence. Second, the evidence fails to support Weimer's claims that Ashton engaged in misconduct while investigating bite mark evidence or when obtaining the statements from Stenger. ECF No. 194.

Qualified immunity shields a state officer "from a suit for monetary damages under § 1983 'unless the official violated a … constitutional right,' and 'the right was clearly established at the time of the challenged conduct.'" Weimer, 972 F.3d at 190 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)). "'[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that [s]he was violating it.'" Id. (quoting Plumhoff v. Richard, 572 U.S. 765, 778-79 (2014)).

The Third Circuit previously addressed the issue of qualified immunity from liability for Weimer's malicious prosecution claim relative to the bite mark evidence against Vernon. The Third Circuit held:

> During the relevant time period – from late 2002 to early 2006 – the unreliability of bite-mark evidence was not widely recognized such that "any reasonable official in [Vernon's] shoes would have understood that [s]he was violating" Weimer's rights by directing officers to investigate the timing of the bite mark on Haith's hand. See Plumhoff, 572 U.S. at 778-79, 134 S.Ct. 2012. Despite allegations that the bite-mark expert later referred to such evidence as "junk science" during Weimer's postconviction proceedings, see App. 102 ¶ 94, such evidence was widely used in criminal proceedings during and after Weimer's trial, see Erica Beecher-Monas, Reality Bites: The Illusion of Science in Bite-Mark Evidence, 30 Cardoza L. Rev. 1369, 1375-87, 1408 (2009) (outlining the scientific unreliability of bite-mark evidence and arguing that judges "circumvent[ ] their gate-keeping responsibilities" by "continu[ing] to admit bite-mark testimony into evidence"); see

also Brewer v. Hayne, 860 F.3d 819, 824-25 (5th Cir. 2017) (holding forensic odontologists were entitled to qualified immunity when the plaintiffs showed only that the evidence the experts presented at trial in the 1990s was no longer considered trustworthy by later standards and that the experts may have been negligent in their analysis). Thus, based on the law as it existed at the time, Vernon was not on notice that her alleged conduct of directing further investigation into the bite-mark evidence would violate Weimer's rights.

Id., 972 F.3d at 192.

Weimer contends that, despite the clarity of the Third Circuit's ruling, qualified immunity does not apply to Ashton because in developing the evidence connecting the bite mark to Haith's murder, Ashton ignored evidence that a link between the mark on Haith's arm and Weimer was speculative or exculpatory. ECF No. 205 at 4-8. Weimer points to the autopsy report that characterized the mark as the result of blunt force trauma, the contradictory opinion of the first dentist linking the bite to Gibson and then to either Gibson or Weimer, the failure to seek dental impressions from other possible suspects to broaden the pool of potential matches, and the pursuit of a second dental expert opinion to link the bite mark to either Gibson or Weimer despite the inconclusive and exculpatory opinion initially provided. Given contradictory evidence linking the bite mark to Haith's murder, Weimer contends that state of the law or science at the time is not the relevant inquiry. Instead, the Court must consider whether Ashton's pursuit of speculative bite mark evidence improperly influenced the prosecutor's decision to institute criminal proceedings against Weimer.

Weimer's assertions notwithstanding, the evidence cited underscores the reasons proffered by the dental expert for recanting his testimony and the Third Circuit's explanation for extending qualified immunity to Vernon. See ECF No. 182-28 at 9 – 16. At the time of the investigation, it was not widely recognized that bite mark evidence was untrustworthy and unreliable or that certain investigation techniques made it more so. Thus, failing to expand the pool of dental molds for

expert analysis or seeking a first or second opinion that linked the bite mark to the murder is not conduct a "reasonable official" in Ashton's shoes would have known violated Weimer's rights. Therefore, qualified immunity extends to Weimer's claim of malicious prosecution arising out of the police investigation of bite mark evidence.

Ashton also argues that she is entitled to summary judgment in her favor because there is no evidence that she coached Stenger in providing the statements used to prosecute Weimer, or that she was aware of any reason to doubt his statement implicating both himself and Weimer in Haith's murder. ECF No. 194 at 23. In her response in opposition, Weimer points to evidence that on February 4, 2004, Stenger was interviewed for about three hours by Haggerty and Ashton before providing his recorded statement implicating Weimer. During the video portion of Stenger's statement, Stenger appears to look to Haggerty for information related to the location and actions of the two men Stenger says beat Haith. Weimer argues that if this evidence is construed in the light most favorable to her, there are genuine issues of fact about whether Ashton participated in coaching Stenger to implicate Weimer. ECF No. 205 at 8-11.

For the reasons set forth as to Weimer's claim for malicious prosecution as to Haggerty, the Court agrees that the evidence raises issues of material fact related to Ashton's participation in obtaining Stenger's statements that are properly determined by a jury. These issues include whether Haggerty and Ashton willfully or recklessly misled the prosecutor as to the content and circumstances surrounding Stenger's statements that, if known, may have impacted Vernon's reliance on them.

In the alternative, Ashton asserts that summary judgment is properly entered in her favor based on "derivative prosecutorial immunity." ECF No. 194 at 23. Ashton contends she is entitled to absolute prosecutorial immunity for her conduct leading up to the filing of criminal charges

because the criminal charges against Weimer were initiated at Vernon's direction. Id. at 24-25 (citing Davis v. Grusmeyer, 996 F.2d 617, 631 (3d Cir. 1993) *overruled on other grounds by* Rolo v. City Investing Co. Liquidating Tr., 155 F.3d 644 (3d Cir. 1998)). In Davis, the defendant detective was granted absolute immunity for conduct that occurred after criminal charges were filed and, therefore, "during the prosecution," at the behest of the prosecutor. The scope of derivative immunity thus is narrow and applies to persons employed by a prosecutor to secure information relating to an ongoing prosecution of an accused. Id.

 In contrast, Weimer's claim for malicious prosecution against Ashton arises out of conduct that predates the prosecutorial phase of the action and was not undertaken at Vernon's behest. This conduct includes Ashton's alleged participation in the "coached" false statements of Stenger and Beal that Weimer contends impacted Vernon's ultimate decision to prosecute her.  In the absence of any evidence that this conduct was at Vernon's direction, the immunity from malicious prosecution enjoyed by a prosecutor does not apply.  See, e.g.,  Richter v. Pennsylvania State Police, No. 15-775, 2018 WL 2984966, at *5-6 (W.D. Pa. June 14, 2018) (absolute immunity applied to defendant State Trooper who drafted and filed a criminal complaint at the prosecutor's specific instruction).

In sum, other than Weimer's claims regarding bite-mark evidence for which Ashton is entitled to qualified immunity, the record presents several issues of fact related to Ashton's conduct during the investigation of Haith's murder and whether she willfully and improperly influenced Vernon's ultimate decision to prosecute Weimer. Halsey, 750 F.3d at 297.  Accordingly, Ashton's Motion for Summary Judgment as to Weimer's claim of malicious prosecution is denied.

### 2. Civil Rights Conspiracy (Count II)

Weimer also alleges a § 1983 claim for civil rights conspiracy against each of the individual Defendants. ECF No. 74 at 27. "'To prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law reached an understanding to deprive him of his constitutional rights.'" Harvard, 973 F.3d at 207 (quoting Jutrowski, 904 F.3d at 293-94). "This requires that the state actors took 'concerted action' based on an 'agreement' to deprive the plaintiff of his constitutional rights, and that there was an actual underlying constitutional violation of the plaintiff's rights." Id.

### a. Vernon

Turning first to Vernon, the Court has determined that she cannot be found liable for malicious prosecution. Absent any underlying constitutional violation, Vernon cannot be found to have engaged in a civil rights conspiracy to violate Weimer's rights. White v. Brown, 408 F. App'x 595, 599 (3d Cir. 2010) (citing Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 254 (3d Cir. 1999) (*superseded by statute on other grounds*) (summary judgment properly granted on conspiracy claims because plaintiff cannot establish an underlying violation of his constitutional rights)). Accordingly, summary judgment is properly granted in favor of Vernon as a matter of law.

### b. Cesario, Haggerty, and Ashton

As to Cesario, Haggerty, and Ashton, this Court has concluded that a jury question is presented as to the alleged violation of Weimer's Fourth Amendment rights. Thus, the sufficiency of evidence to support an "agreement" and "concerted action" at to each Defendant is separately examined.

To show agreement, [a plaintiff] must demonstrate that "the state actors named as defendants in the [] complaint somehow reached an understanding to deny [the

plaintiff] [her] rights," Kost v. Kozakiewicz, 1 F.3d 176, 185 (3d Cir. 1993), and in the absence of direct proof, that "meeting of the minds" or "understanding or agreement to conspire" can be "infer[red]" from circumstantial evidence, Startzell v. City of Philadelphia, 533 F.3d 183, 205 (3d Cir. 2008). Such circumstantial evidence may include that the alleged conspirators "did or said something … to create an understanding," "the approximate time when the agreement was made, the specific parties to the agreement[,] the period of the conspiracy, or the object of the conspiracy." Great W. Mining [& Min. Co. v. Fox Rothschild LLP, 615 F.3d 159, 178-79 (3d Cir. 2010)] (citations omitted). And in the context of an alleged conspiracy among police officers, it may manifest as "conversations" between officers about the incident, "allegedly distorted stories" and "irregularities in the series of official investigations into the incident." Hampton v. Hanrahan, 600 F.2d 600, 627–28 (7th Cir. 1979), rev'd in part on other grounds by Hanrahan v. Hampton, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980).

Because "inferring mental state from circumstantial evidence is among the chief tasks of factfinders, Kedra v. Schroeter, 876 F.3d 424, 444 (3d Cir. 2017) (citing United States v. Wright, 665 F.3d 560, 569 (3d. Cir. 2012)), an allegation of conspiracy can only be overcome at summary judgment when "the moving parties' submissions foreclose[ ] the possibility of the existence of certain facts from which 'it would be open to a jury ... to infer from the circumstances' that there had been a meeting of the minds," Anderson, 477 U.S. at 249, 106 S.Ct. 2505 (citing Adickes [v. S.H. Kress & Co.], 398 U.S. 144, 90 S.Ct. 1598 (1970)).

Jutrowski, 904 F.3d at 295.

Weimer points to evidence that during the early stages of the investigation, neither Cesario nor Haggerty investigated ample evidence connecting Haith's murder to drug activity or to other individuals who were identified as possible suspects, and that they otherwise ignored exculpatory and failed to report evidence that should have eliminated Weimer as a suspect. ECF No. 206 at 7-8; ECF No. 207 at 17-18. The record reflects that Cesario did not assign Haggerty to investigate a narcotics connection to the murder and that, despite their early awareness of drug-related evidence, neither officer sought to question or obtain blood or DNA samples from individuals listed in the "owe sheets" or identified by informants as participants in the murder. ECF No. 207 at 4-5, 7-8. Instead, Cesario and Haggerty jointly pursued Weimer's prosecution and failed to disclose these leads and other exculpatory evidence to Vernon. Under these circumstances, a reasonable jury

could conclude that Cesario and Haggerty agreed to focus their investigation and pursuit of charges against Weimer without probable cause and further interfered with Vernon's ability to weigh all available evidence.

The evidence relative to the later stages of the investigation involving Haggerty and Ashton compels a similar result. Beal testified at Weimer's first preliminary hearing that when he gave his statement incriminating Weimer, he "wrote what Mr. Haggerty wanted me to write." ECF No. 182-10 at 13. Ashton testified that she has no recollection of the interview, but concedes she was present with Haggerty when Beal gave his statement. ECF No. 182-11 at 22. After Beal recanted, Ashton and Haggerty obtained multiple statements from Stenger. Stenger's statements contained blatant contradictions and verifiably false information but, undeterred, Haggerty and Ashton presented each statement to Vernon to support charging and ultimately convicting Weimer for Haith's murder. The record reflects that Stenger eventually recanted his testimony, and he conceded that his testimony was false and "coached" by Haggerty to include incriminating details. A reasonable jury may construe the stumbles in Stenger's video statement as evidence that in Ashton's presence, Stenger was coached to incriminate Weimer. In total, this evidence may lead a reasonable jury to infer an agreement between Haggerty and Ashton to fabricate or misrepresent material facts in pursuit of Weimer's conviction and thus to violate her constitutional rights. Thus, the motions for summary judgment as to Weimer's claims for civil rights conspiracy on behalf of Cesario, Haggerty and Ashton are denied.

### 3.  Failure to Intervene (Count III)

Weimer alleges that Cesario, Haggerty, and Ashton are liable to her for failing to intervene to prevent the violation of her constitutional rights in her arrest, prosecution, and ultimate conviction for Haith's murder. ECF No. 74 at 30-31. Defendants Cesario and Ashton move for the

entry of summary judgment in their favor on the basis of qualified immunity. ECF No. 184 at 15; ECF No. 194 at 28-29. Defendant Haggerty contends that the evidence supports none of Weimer's constitutional claims, and thus there is no evidence that he knew of misconduct to have had a realistic opportunity to intervene. ECF No. 187 at 23-27.

In Vernon's appeal and again in <u>Lozano</u>, 9 F.4th at 247 n. 4, the Third Circuit acknowledged that a duty to intervene to prevent a constitutional violation has not been extended beyond situations involving excessive force. <u>Weimer</u>, 972 F.3d at 191-2. Because the law has not yet recognized such an obligation, there is no basis to find, in the context of this case, that any individual Defendant was on notice that failing to intervene on Weimer's behalf in the investigation was unlawful or violated a clearly established right. <u>Id.</u> Under these circumstances, the individual Defendants are entitled to qualified immunity on the failure to intervene claim. Therefore, summary judgment is properly entered in favor of Cesario, Haggerty, and Ashton as a matter of law.

### 4.  Supervisory Liability – Individual Defendants (Count IV)

Weimer brings a Section 1983 supervisory liability claim against Vernon, Patton, Cesario, Haggerty, and Ashton. ECF No. 74 at 31-35. She alleges that these Defendants failed to ensure that individuals they supervised conducted the Haith murder investigation in a manner that would not lead to the violation of her constitutional rights. <u>Id.</u> Defendants argue that they are entitled to summary judgment because the evidence fails to support Weimer's claims.

To establish a supervisory liability against any individual Defendant, Weimer must:

> (1) identify the specific supervisory practice or procedure that the supervisor failed to employ and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation

> resulted from the supervisor's failure to employ that supervisory practice or procedure.

Min v. Morris, 737 F. Supp. 2d 332, 339 (E.D. Pa. 2010) (quoting Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir. 2001)). Additionally, "'it is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did.' Rather, the plaintiff must identify specific acts or omissions of the supervisor that evidence deliberate indifference and persuade the court that there is a 'relationship between the 'identified deficiency' and the 'ultimate injury.'" Brown, 269 F.3d at 216 (quoting Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir.1989) (cleaned up)).

### a.  Cesario

Weimer alleges Cesario's "conduct in leading the investigation for its first two critical years" "materially influenced the prosecution of Ms. Weimer," and thus resulted in the violation of her rights. ECF No. 207 at 17-19, 24. Cesario argues that the evidence is insufficient to connect his supervisory activity to any wrongful conduct and, alternatively, that he is otherwise entitled to qualified immunity due to the lack of robust authority that an officer is liable "for failing to supervise under similar circumstance[s]." ECF No. 184 at 19.

Cesario's objections to the contrary, the evidence is sufficient to raise a jury question as to each factor identified in Brown, 269 F.3d at 216. It is not disputed that until his retirement, Cesario led the Haith investigation. In that capacity, Cesario failed to assign Haggerty the task of investigating identifiable and material drug-related tips, and further failed to ensure that Haggerty reported those tips and other exculpatory evidence to Vernon. A jury can infer that Cesario was aware of the risks of concealing or mispresenting material facts from District Attorney Vernon at any stage of the investigation, including the preliminary stages. The jury may also infer that Cesario's failure to direct Haggerty's investigation and reporting was material to Vernon's

conclusion that Weimer was properly charged in Haith's murder. In light of the many issues of fact related to Cesario's conduct in leading the investigation and in supervising Haggerty, Cesario's motion for summary judgment as to Weimer's failure to supervise claim is properly denied.

Cesario's claim of qualified immunity also fails. "As early as 1998, the Third Circuit Court of Appeals noted that 'a § 1983 malicious prosecution claim might be maintained against one who furnished false information to, or concealed material information from, prosecuting authorities.'" Thorpe v. City of Philadelphia, No. 19-5094, 2020 WL 5217396, at *12 (E.D. Pa. Aug. 31, 2020)(quoting Gallo v. City of Philadelphia, 161 F.3d 217, 220 n.2 (3d Cir. 1998)). And since at least 1994, the Third Circuit has recognized that "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr., 372 F.3d at 586 (citing Baker v. Monroe Twp., 50 F.3d 1186, 1190–91 (3d Cir. 1995)). Thus, it would have been clear to a reasonable officer in Cesario's shoes that failing to direct Haggerty to report his incomplete investigation of contradictory or exculpatory evidence to Vernon at each stage of the investigation would result in the violation of Weimer's constitutional rights. Accordingly, the motion for summary judgment based on qualified immunity is properly denied.

### b. Vernon, Haggerty, Ashton, and Patton

This Court addressed Defendants' motions to dismiss Weimer's supervisory liability claims as follows:

> [c]ontrary to Weimer's argument, to allege a § 1983 supervisory liability claim against [Defendants], it is not enough that Weimer allege facts that show that [Defendants] participated in the allegedly unconstitutional conduct. Weimer must allege facts that support that [Defendants] participated in their subordinates'

violation of Weimer's constitutional rights. Santiago [v. Warminster Twp., 629 F.3d 121, 129 n.5 (3d Cir. 2010)].

Weimer v. Cnty. of Fayette, Pennsylvania, 2018 WL 4385242, at *12 (W.D. Pa. Sept. 14, 2018); ECF No. 70. For a properly alleged supervisory liability claim, the Court observed that, "during discovery facts will need to be further developed as to the supervisory roles of [each Defendant] including details of whether they participated in their subordinates' violations of Weimer's rights, directed others to violate them, or as the person in charge, had knowledge of and acquiesced in their subordinates' violations of Weimer's constitutional rights." Weimer v. Cnty. of Fayette, Pennsylvania, 2018 WL 4404033, at *15 (W.D. Pa. Sept. 14, 2018); ECF No. 72. Defendants contend that Weimer has failed to adduce the evidence required to raise a triable issue of fact. The Court agrees.

As to each individual Defendant, Weimer fails to direct the Court to any evidence showing a specific supervisory practice that these Defendants failed to employ, the identity of an underling that violated Weimer's rights, or the precise violation that an underling may have committed. ECF No. 205 at 23-24; ECF No. 206 at 16-17; ECF No. 208 at 20. Because Weimer has failed to adduce evidence to support her supervisory liability claim as to Vernon, Haggerty, Ashton or Patton, summary judgment is properly entered in their favor.

### 5. Monell Claims – Fayette County and City of Connellsville (Count IV)

#### a. Fayette County

Weimer's Section 1983 municipal liability claims against Fayette County and Connellsville suffer from the same lack of evidence as her individual supervisory liability claims. For either Fayette County or Connellsville to be liable under Section 1983, Weimer must point to facts establishing that a policy or custom of the municipality caused, or was a moving force behind

the alleged violation of Weimer's rights. Bd. of Cnty. Comm'rs of Bryan Cnty v. Brown, Okl., 520 U.S. 397, 403 (1997).

"A government policy or custom can be established in two ways. Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect the action' issues an official proclamation, policy or edict. A course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well settled' as to virtually constitute law." Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990), *superseded by statute on other grounds*, 42 U.S.C. §§ 1981, 2000e et. seq. (1991) (quoting Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691 (1978)). Thus, a municipality may be held liable for constitutional violations that result from inadequate training of its employees if the failure to train constitutes a custom of the municipality. Connick v. Thompson, 563 U.S. 51, 61 (2011). The failure must reflect "deliberate indifference to the [constitutional] rights of persons with whom the police come in contact." Colburn v. Upper Darby Twp., 946 F.2d 1017, 1028 (3d Cir. 1991) (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)); see also Est. of Roman v. City of Newark, 914 F.3d 789, 798 (3d Cir. 2019).

> "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("Bryan Cnty."). Ordinarily, "[a] pattern of similar constitutional violations by untrained employees" is necessary "to demonstrate deliberate indifference for purposes of failure to train." Connick v. Thompson, [563 U.S. 51], 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Id. A pattern of violations puts municipal decisionmakers on notice that a new program is necessary, and "[t]heir continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." Bryan Cnty., 520 U.S. at 407, 117 S.Ct. 1382.

Thomas v. Cumberland Cnty., 749 F.3d 217, 223 (3d Cir. 2014).

Weimer clarifies that her municipal liability claim against Fayette County arises out of a violation of her rights under Brady v. Maryland, 373 U.S. 83 (1963), that occurred when the District Attorney's Office failed to turn over exculpatory evidence from witnesses Robert Mackey and Linda Reynolds offering to trade testimony for leniency. ECF No. 208 at 19-20. Weimer points to Vernon's concession that Fayette County does not train employees on discovery disclosure obligations under Brady, and she asserts that this failure to train caused the violation of her constitutional rights. Id. Weimer argues that she need not present evidence of repeated or similar incidents to establish the required deliberate indifference to support her claim. Rather, municipal liability for failure to train may be based on a single incident where "the violation of federal rights [is the] highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." Id. (quoting Bryan Cnty., at 409, and citing City of Canton, 489 U.S. at 388). Thus, the obviousness of the risk of failing to turn over exculpatory material and the resulting violation of a defendant's constitutional rights can substitute for a pattern of violations that is ordinarily necessary to establish municipal liability.

Fayette County responds that even if Weimer's municipal liability claim is broadly interpreted to include failure to train, turning over Brady material does not involve "a difficult choice" or the likelihood of employee mishandling to impose a defined training obligation. ECF No. 216 at 4 (citing Carter v. City of Philadelphia, 181 F.3d 339, 357 (3d Cir. 1999)).

In Connick, 563 U.S. at 64, the United States Supreme Court rejected the application of single-incident failure-to-train liability to a claim arising out of a district attorney's violation of Brady discovery disclosure obligations. The Supreme Court determined that the "obvious need for specific legal training" was lacking because the disclosure of discovery materials did not involve

split-second decision making with life-or-death consequences. In addition, prosecuting attorneys are officers of the court and subject to professional obligations and ongoing legal training. Id. at 64-66. Thus, the conditions would make a violation "highly predictable" are not present to establish deliberate indifference by reference to the "obviousness" of a need for other training.

Weimer seeks to avoid the holding in Connick by pointing to evidence that the District Attorney's "office staff" were directed by a prosecutor to physically turn over Brady material but not trained "to ensure that [they] knew and followed" "set … policies." ECF No. 208 at 19. Even so, performing the physical act of delivering file documents does not involve a "difficult choice," split-second decision-making, or a "likely" risk that office staff would intentionally withhold evidence. Absent such circumstances, the risk of a constitutional violation is not so obvious that a failure to train amounts to deliberate indifference. See Johnson v. City of Philadelphia, 975 F.3d 394, 403 (3d Cir. 2020) (citing Carter, 181 F.3d at 357). Thus, resort to single-incident liability is unavailable, and Weimer must present a pattern of similar violations by untrained or insufficiently trained employees to give rise to duty to train office staff on Brady obligations and procedures. Because she has not done so, summary judgment is properly entered in favor of Fayette County.

### b. City of Connellsville

Weimer's municipal liability claim against the City of Connellsville rests on its alleged failure to provide any formal training to police officers in the proper collection and identification of evidence. ECF No. 206 at 21-22. Weimer points to evidence that instead of formal police training, Connellsville pairs new officers with a "training sergeant" to teach what he or she knows "on how to do the job, you know, everything from how to talk to people on a call to doing traffic stops and criminal complaints and interviews." Id. Thus, according to Weimer, Connellsville fails to provide necessary training for "constitutionally sound practices of policing." Id.

Connellsville responds that Weimer fails to adduce evidence sufficient to permit liability based on a "single-incident, failure-to-train" theory. ECF No. 217 at 2. The Court is compelled to agree for two reasons. First, to establish deliberate indifference, the identified failure to train must present an obvious risk of malicious prosecution. Second, Weimer must establish a causal nexus between the training deficiency to the violation of her rights. In her brief in opposition, Weimer asserts that the lack of training relates to the collection and identification of evidence, the documentation of investigations, and probable cause determinations. ECF No. 205 at 22. She then broadly alleges that Connellsville's lack of "formal training" caused Haggerty and Patton to violate her rights. Critically absent, however, is testimony or evidence showing how "formal training" differs from the on-the-job training received, and how that training would have prevented the harms alleged. Without such evidence, she cannot establish that the existing training methods presented an "obvious" risk that her rights would be violated so as to render Connellsville's failure to incorporate formal training "deliberate indifference." See, e.g., Colburn, 946 F.2d at 1030 (emphasizing that plaintiff "must identify a failure to provide specific training that has a causal nexus with his or her injury and must demonstrate that the failure to provide that specific training can reasonably be said to reflect a deliberate indifference to whether constitutional deprivations of the kind alleged occur"); see also Noble v. City of Camden, 112 F. Supp. 3d 208, 224–25 (D.N.J. 2015) (granting summary judgment where plaintiff failed to identify the precise deficiency in training or how the deficiency contributed to a violation of plaintiff's constitutional rights). Thus, the Court or a jury is left to speculate as to the nature of different training and whether such training would have led to a different outcome. Because "the non-movant may not rest on speculation and conjecture in opposing a motion for summary judgment," Ramara, Inc. v. Westfield Ins. Co., 814

F.3d 660, 666 (3d Cir. 2016), Weimer's <u>Monell</u> claim against Connellsville fails and the motion for summary judgment will be granted.

### 6. Malicious Prosecution – State Law (Count V)

Weimer also brings a malicious prosecution claim under Pennsylvania law against all individual defendants. This claim was previously dismissed with prejudice as to Vernon and Patton, and thus remains only as to Cesario, Haggerty, and Ashton. See <u>Weimer</u>, No. 17-1265, 2018 WL 4404049, at *16 (W.D. Pa. Sept. 14, 2018), ECF No. 71 at 32-33; <u>Weimer</u>, 2019 WL 1505938, at *4 (W.D. Pa. Apr. 5, 2019), *aff'd in part and rev'd in part*, 972 F.3d 177 n. 2.

Cesario contends that he is entitled to immunity from Weimer's state law claim of malicious prosecution under the Pennsylvania Political Subdivision Tort Claims Act, 42 PA. CONS. STAT. § 8541 *et seq.* ("PSTCA" or the "Act"), and, alternatively, contends that there is insufficient evidence to support her claim. ECF No. 184 at 19-22. Haggerty asserts that summary judgment is properly entered in his favor because probable cause was determined by a state trial court after a preliminary hearing and "there is no admissible evidence of Stenger's recantation" or evidence establishing that he acted with malice. ECF No. 187 at 26-27. Ashton asserts that sovereign immunity bars this claim against her under 1 PA. CONS. STAT. § 2310, and contends that the evidence is insufficient to present a triable issue of fact. ECF No. 194 at 32-35. Weimer does not directly address arguments related to immunity but relies upon establishing the elements of a claim as sufficient to overcome any statutory bar. ECF No. 205 at 24; ECF No. 206 at 23-25; ECF No. 207 at 24.

The elements of a state law malicious prosecution claim mirror the first four elements of a Fourth Amendment claim; however, under Pennsylvania law, there is no requirement to prove a deprivation of liberty. <u>Merkle v. Upper Dublin Sch. Dist.</u>, 211 F.3d 782, 791 (3d Cir. 2000). As

noted, the record reflects genuine disputes of material fact as to whether Cesario, Haggerty, and Ashton violated Weimer's Fourth Amendment right against malicious prosecution by recklessly or willfully concealing material exculpatory information or providing false information to Vernon. As such, Haggerty's motion for summary judgment is denied. Summary judgment based on the evidence is also properly denied as to Cesario and Ashton, unless state law immunity applies.

The PSTCA grants immunity to employees of a municipality when acting within the scope of their official duties. Basile v. Twp. of Smith, 752 F. Supp. 2d 643, 668 (W.D. Pa. 2010) (citing Robbins v. Cumberland Cnty. Child. & Youth Servs., 802 A.2d 1239, 1252 (Pa. Commw. Ct. 2002), and citing 42 PA. CONS. STAT. § 8545)). "Immunity under the Act is abrogated, with respect to individuals only (including employees), for acts or conduct constituting a crime, actual fraud, actual malice, or willful misconduct.") Id. (citing 42 PA. CONS. STAT. § 8542(a)(2)). "Thus, when it is judicially determined that the act of the employee caused the injury and that such act constituted … actual malice or willful misconduct, PSTCA immunity does not apply to the individual employee." Id. (internal quotation marks omitted).

Willful misconduct has been equated with intentional torts; however, "this equation has no validity in the context of a lawsuit based upon police conduct…." Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994). Rather, for police, willful misconduct requires "not only that the police officer intended to commit the acts that he is accused of carrying out, but also that the officer understood that the actions he intended to take were illegal and chose to take the actions anyway." Brockington v. City of Philadelphia, 354 F. Supp. 2d 563, 571 (E.D. Pa. 2005) (quoting Maiale v. Youse, No. 03–5450, 2004 WL 1925004, at *11 (E.D. Pa. Aug. 27, 2004)). In the context of a malicious prosecution claim, willful misconduct has been found where an officer intentionally brought about a plaintiff's prosecution knowing there was no probable cause. Drawing all

reasonable inferences in favor of Weimer, a reasonable jury may infer that Cesario intentionally withheld material exculpatory evidence from Vernon to improperly influence her eventual decision to charge Weimer for a crime she did not commit. Thus, Cesario's motion for summary judgment is denied under the PSTCA.

Ashton's assertion of sovereign immunity fails for similar reasons. Under Article I, Section 11 of the Pennsylvania Constitution, "the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity." 1 Pa. C.S. § 2310. The General Assembly has waived sovereign immunity by statute in ten specific areas, none of which are at issue. 42 PA. CONS. STAT. § 8522(b) (listing the ten exceptions to sovereign immunity). Sovereign immunity also extends to intentional torts committed within the scope of an employee's duties. Minor v. Kraynak, 155 A.3d 114, 121-22 (Pa. Commw. Ct. 2017). Thus, Ashton is protected by sovereign immunity if, at the time of her alleged misconduct, she was acting within the scope of her employment.

> [T]he applicable criteria to resolve scope-of-employment issues are as follows:
>
>> Conduct of an employee is within the scope of employment if it is of a kind and nature that the employee is employed to perform; it occurs substantially within the authorized time and space limits; it is actuated at least in part, by a purpose to serve the employer; and if force is intentionally used by the employee against another, it is not unexpected by the employer. (citations omitted). These criteria mirror those contained in Section 228 of the Restatement (Second) of Agency...
>
> [Shell v. Guth, 88 A.3d 1053, 1067 (Pa. Commw. 2014)].
>
> Because sovereign immunity is an affirmative defense, the defendant bears the burden of proof on this issue. Id.; see also Justice [v. Lombardo, 208 A.3d 1057, 1068 (Pa. 2019)]. Where the facts and inferences to be drawn from the facts are not in dispute, the court may determine the scope as a matter of law. Justice, id. On the other hand, when more than one inference can be drawn, this issue must be resolved

by the factfinder. Id. (whether state trooper's conduct was for a purpose to serve the state police or "out of personal animus" was for the jury to decide.)

Mucy v. Nagy, No. 20-1950, 2021 WL 3370792, at *12 (W.D. Pa. Aug. 3, 2021).

Ashton contends that there is no evidence to suggest she acted outside the scope of her employment during her participation in the Haith investigation and therefore she is entitled to sovereign immunity under Pennsylvania law. However, for the reasons discussed as to Weimer's Fourth Amendment claim, there are genuine issues of material fact that preclude summary judgment. These disputed issues include whether Ashton facilitated false statements from Beal or Stenger or otherwise intentionally failed to disclose material exculpatory evidence, and thus, whether she knowingly interfered with Vernon's prosecutorial discretion in pursuit of Weimer's wrongful conviction. These issues of material fact extend to the issue of sovereign immunity. See, e.g., Lockhoff v. Slonaker, No. 16-2993, 2017 WL 2423790, at *16 (E.D. Pa. June 5, 2017) ("Because knowingly submitting false allegations to a prosecutor would not serve the interests of the Pennsylvania State Police or be otherwise justified by a legitimate penological purpose, such activity falls outside a Trooper's scope of employment, and so sovereign immunity is unavailable."). Thus, whether Ashton was acting within the scope of her employment is a question of fact issue that must be determined at trial. Mucy, 2021 WL 3370792, at *13. Ashton's motion for summary judgment is denied.

## VI.    CONCLUSION

For the foregoing reasons, the pending motions for summary judgment are resolved as follows:

1.   The Motion for Summary Judgment filed on behalf of Thomas Cesario, ECF No. 183, is granted as to Count III (Failure to Intervene), but denied as to Count I (§ 1983 Malicious

Prosecution), Count II (§ 1983 Conspiracy), Count IV (Supervisory Liability), and Count V (State Law Malicious Prosecution).

2. The Motion for Summary Judgment filed on behalf of the Connellsville Defendants, ECF No. 186, is granted as to Thomas Patton and the City of Connellsville, and as to Counts III (Failure to Intervene) and Count IV (Supervisory Liability) against Ronald Haggerty, Jr., but denied as to Count I (§ 1983 Malicious Prosecution), Count II (§ 1983 Conspiracy), and Count V (State Law Malicious Prosecution) as to Haggerty.

3. The Motion for Summary Judgment filed on behalf of the County of Fayette, Pennsylvania and Nancy Vernon, ECF No. 188, is granted.

4. The Motion for Summary Judgment filed on behalf of Beverly Ashton, ECF No. 193, is granted as to Counts III (Failure to Intervene) and Count IV (Supervisory Liability), but denied as to Count I (§ 1983 Malicious Prosecution), Count II (§ 1983 Conspiracy), and Count V (State Law Malicious Prosecution).

Further, for the reasons set forth herein, Defendants' Motions to Have Facts Deemed Admitted and Motion to Strike, ECF Nos. 209 and 223, are denied.

An appropriate Order follows.

MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

Dated: July 19, 2022

cc:    All counsel of record by Notice of Electronic Filing